## IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

Joseph Odish, an individual, EX. RELATOR,
ON BEHALF OF UNITED STATES GOVERNMENT,
THE RELEVANT STATES AND DISTRICT

Relator-Plaintiff                                          CASE NO:2-14-cv-10736

-vs-                                                                HON. JUDGE: MARK GOLDSMITH

Northrop Grumman Corporation, Inc.,
a Delaware Corporation, Nuance Communications, Inc.,
a Delaware Corporation, Cognitive Code Corporation, Inc.,
a Delaware Corporation, Leslie Spring, an individual,
John Chen, an individual, Mimi Chen,and individual, and
Sal DiFazio, an individual, Robert Rosen, an individual,
John Bourbeau, an individual, jointly and severally

Defendants.
_____/

## FIRST AMENDED COMPLAINT FOR MONETARY AND PERMANENT INJUCTIVE RELIEF

## FALSE CLAIMS ACT 31 U.S.C. § 3729 et seq. FILED IN CAMERA AND UNDER SEAL

NOW COMES Relator JOSEPH ODISH, (both individually and by his affiliate Cranbrook Capital Consulting Group, LLC, a Michigan limited liability company owned and controlled by Odish) and brings this qui tam action on behalf of the United States of America, the States of California, Connecticut, Delaware, Florida, Georgia, Hawaii, Illinois, Indiana, Louisiana, Massachusetts, Michigan, Montana, Nevada, New Hampshire, New Jersey, New Mexico, New York, North Carolina, Oklahoma, Rhode Island, Tennessee, Texas, Virginia, Wisconsin and the District of Columbia (collectively "the States and the District"), in the name of the United States Government and the States and District, complaining of the fraudulent and unlawful acts and misappropriation of Defendants (collectively "Defendants") and alleging and stating as follows:

## NECESSARY PRELIMINARY STATEMENT OF THE NATURE OF THIS ACTION.

A. Unless immediately enjoined, Corporate Defendants conspiratorial and unlawful behavior will effectuate a multi-billion dollar fraud upon United States government, a vast number of its agencies and programs related to defense, health (medicare/medicaid), information systems and countless others areas, both at the federal and state level.

 B. The fraud: Cognitive Code and Nuance Defendants conspiracy has resulted in an unlawful and illegal misappropriation of a "cross platforming" artificial intelligence technology and software (patent/ip) from cognitive code that northrop grumman deemed so valuable it decided to dedicate an entire business unit to the AI software in 2011.

C. that "cross platforming" capability and value to generate billions in multiple business sectors including department of defense, healthcare, mobile/cellular, computing (laptops, desktops), enterprise/server and cloud services, digital assistant, customer services, toys, gaming, many others.

D. Fraud that involves both defense sector and MEDICARE/MEDICAID by principal defendants, and generating revenues in multiple business sectors such as automotive telematics, mobile, toys.

E. Relator admits that the principal unlawful misconduct lies with Cognitive Code and Nuance Defendants, but as the facts state herein, Northrop Grumman upon strong information and belief does have liability under False Claims act. Northrop Grumman(or simply "NG") may not have engaged in the unlawful theft of the intellectual property, but under the facts and circumstances it is difficult to understand how this could have come about without some knowledge or reckless disregard of truth by NG in what was taking.

1.    This is an action to recover damages and civil penalties on behalf of the United States of America and the States [and District] relating to the fraudulent actions of Defendants, their agents, officers, employees and controlled entities in violation of the Federal Civil False Claims Act,  31 U.S.C. § 3729 et seq., as amended ("the FCA" or "the Act"), the Anti-Kickback Statute, Truth In Negotiations Act, Service Contract Act, and other violations of federal laws delineated below, as well as civil common law and equity claims.

a. On September 24, 2012, a simple but stern and prescient letter from United States Attorney General Eric Holder and Department of Health and Human Services Secretary Kathleen Sebelius specifically warned Healthcare providers that "healthcare fraud would not tolerated" and

those committing it would be prosecuted. **SEE EXHIBIT A-1. This action is being brought in reliance upon that letter as given the serious criminal misconduct, Relator has gone through the judicial process and been assaulted by it as he will document to the US Attorney General.** *This is essentially a significant insider trading case but far more complex and involving violations of numerous federal and state laws, and healthcare laws, securities laws, potential antitrust activities, etc.*

b. Nuance Defendants are exploiting the fruits of their unlawful conspiracy to effectuate a "niche fraudulent monopoly" in Healthcare through the use of this IP in e-health records, coding, data compliance and other components of President's Obama sweeping Affordable Care Act. But the fraud and conspiracy exploits the Cross Platform technological capabilities of the stolen IP to generate hundreds of millions in last two calendar years in Defense Sector, Mobile/Cellular, Enterprise, Computing, "app" creation, and a multiplicity of other uses - many of which have been fraudulently presented to government agencies for payment and/or approval as delineated below.

2.      A vast number of government agencies [and relevant programs promulgated by each] are unknowing victims ("customers") of the fraud and theft of this Platform IP known as SILVIA™, as Defendants in causing false claims, records and statements to be presented to Department of Defense, Department of Health and Human Services, Department of Justice, Federal Bureau of Investigation, SEC and numerous other governmental agencies, programs and interests delineated or implicated herein.

a. In early 2011, Relator became a shareholder and board member of a true tech startup: Cognitive Code Corporation that had no funding, had signed a number of horrific contracts with third parties but had just become an approved vendor of Northrop Grumman and signed a Confidentiality Agreement with Chrysler in December 2010. It had developed but not yet perfected [with a pending patent that had no assurance of ever being issued] "artificial intelligence" software, "digital assistant" and naturally conversational speech", etc. These are key terms that would recently emerge in last 60-90 days triggering the filing of this False Claims act complaint.

b. In the Summer of 2011 NG dedicates entire business unit to SILVIA IP - and then in early 2012 upon information and belief grants Cognitive Code Defendants a 50 million dollar licensing agreement. During summer of 2011, Defendant Spring turned over the entire development of the SILVIA technology to Northrop Grumman and its engineers. In November 2011, Relator is informed that Notice of Allowance on company's artificial intelligence patent has

been issued and that both HTC and COMCAST want to buy the company for "several hundred million dollars" [as Spring would state]. Realizing that the company was an acquisition target and knowing more about the IP than Spring himself, Northrop Grumman moved for exclusivity in defense sector [despite fact Lockheed Martin had contacted Spring] and having already decided to dedicate an entire business unit to the IP, granted and paid upon strong information and belief a FIFTY MILLION dollar licensing agreement in 2012 [part of the 200 mm dollar calculation]. During and from October 2011 into 2012, CCC Defendants asked their "advisor" friends Gary Morgenthaler of Morgenthaler Ventures to broker the sale of the company to HTC AND COMCAST.

     c. And then Cognitive Code defendants proceeded to upon strong and information, misappropriate, embezzle and send the Northrop Grumman monies unlawfully to an overseas bank account(s). As a licensed attorneyOnly a month ago Northrop Grumman executed a new licensing agreement on December 8, 2013. NG is using the IP in defense, medical and numerous commercial applications.

     d. CROSS PLATFORM IP (or Intellectual Property) vs a mere "app" or application. As a cross-platform IP, SILVIA™ can and presently is - as a result of the fraud and unlawful misappropriation by Nuance Defendants in conspiracy - generating hundreds of millions in profits for Defendants in healthcare, defense and other business sectors.

     e. Relator and his former partner, now defendant Bourbeau would hire attorney Robert Rosen out of Los Angeles, California and he would file a 175 million dollar action and complaint against Cognitive Code on October 22, 2012, and promised to name the morgenthalers (Gary Morgenthaler, Morgenthaler Ventures et al), but refused to do so for disturbing circumstances that Relator will place in the Documentary sworn certificate. As of the present date, Rosen and Bourbeau are conspiring to terminate Relator Odish's rights because in last few months he has learned the truth.

     f. Collectively, the "Morgenthalers" are not named in this action because there is one (and potentially two) pending actions that they are already named. It must be stated that prior to the filing of this action, Relator was Plaintiff in 3 pending and related cases (which remain pending, and one case in Alabama where he was a shareholder and Cognitive Code was the defendant). Relator will provide the Attorney General all relevant information related to those cases.

g. Upon learning the truth in October 2013 through next few months, Relator Odish sought confidential advice of government official in Office of Inspector General who advised Relator to file this action and then go to FBI, which Relator has - Relator Odish was always troubled because for the past several months since trying to fire his former attorney Rosen, Rosen has refused to return Odish's client files, which significantly compromised and delayed the bringing of this action.

3. Estimation of damages suffered by United States - from 200 million dollars if predicated solely on False Claims Act, but upwards past One Billion if the damages calculation is predicated upon the fair market value of the stolen IP, or intellectual property. Relator's conservative estimate of United States damages as a result of False Claims: at minimum at least 200 million dollars [before trebling] and if the damages are calculated in a manner consistent with the fair market valuation of the SILVIA™ artificial intelligence IP that has been illegally misappropriated, then in consideration of fact that United States Government paid for the perfection of this technology through payments to Northrop Grumman's engineers, the US Government's damages are in excess of One Billion Dollars - predicated upon the value of what has been stolen.

4. Relator's own civil damages, as shareholder and wrongfully discharged Board Member, are at least 100 million dollars predicated upon fair market value of his securities and rights and claims, before trebling.

5. **Relevant Government Agencies Defrauded.** Relator on behalf of the United States government seeks through this action to recover damages and civil penalties arising from the Defendant's submission of false claims for payment or approval. In this case, such claims were submitted to federally funded health care programs such as TRICARE, Medicare, United States Army, Department of Defense, Department of Justice, Federal Bureau of Investigation, Department of Veterans Affairs, Department of Human Health and Services, the Securities and Exchange Commission for payment and/or approval and a number of other government agencies.

6. **Compromised Nature of this Action - through no fault of Relator.** Through no fault of Relator Odish, Relator concedes that this action is slightly compromised by the wrongful refusal of Odish's former attorney to return his client files which constitute thousand and thousands of pages, emails and documents. And as stated below, at least 25% of the documents that should be sent to the US Attorney General pursuant to the federal statute. This constitutes thousands of documents

that Relator's former attorney Rosen fraudulently refuses to return to Relator despite repeated requests dating back several months. **SEE EXHIBIT A-2.**

7.      The False Claims Act is the federal government's "primary litigative tool for combating fraud."  See Senate Judiciary Committee, False Claims Amendments Act of 1986, S. REP. NO. 345 reprinted in 1986 U.S.C.C.A.N. 5266. Moreover, over the last decade, the scope of the False Claims Act ("FCA") has been broadened considerably by the adoption of the Fraud Enforcement and Recovery Act of 2009 ("FERA"), reflecting the clear intention of Congress to expand the reach of the FCA. Indeed, FERA made clear that "intent' to submit a false claim is irrelevant, and that liability attaches even if an innocent third party submitted the actual false claim. The False Claims Act provides that any person who knowingly submits or causes to be submitted to the United States for payment or approval a false or fraudulent claim is liable to the government for a civil penalty of not less than $ 5500 and not more than $11,000 for each such claim, 2 plus three (3) times the amount of damages sustained by the government because of the false claim. The Act allows any persons having knowledge of a false or fraudulent claim against the government to bring an action in Federal District Court for himself and for the United States government and to share in any recovery as authorized by  31 U.S.C. § 3730 as well as assert Relator civil damages in the action. Relator claims entitlement to a portion of any recovery obtained by the United States as qui tam Relator in this action, per the maximum allowable under the statute as well as entitlement to civil damages as allowed by the statute.

8.      Defendants have exploited the trust the Government has reposed in them to act with honesty and candor; to provide accurate, complete and current cost and/or pricing data; to act without conflicts of interest; and to serve as independent third party objective advisors. To varying degrees, in furtherance of this scheme, Defendants expressly or impliedly represented or certified to the Government that they complied with various Anti-Kickback statutes, FARs, Truth in Negotiations Act (TINA)(10 U.S.C. § 2036a and 41 U.S.C. § 254b), and organizational conflict of interest laws, when, in fact, they had not, and do not, comply with such laws and regulations. Again, this resulted in the making of false statements and false claims in violation of the False Claims Act to the Government in connection with Defendants' contracts and/or subcontracts.

      a.      The False Claims Act. The False Claims Act provides that:

          (i)      Any person who-

               1)   knowingly presents, or causes to be presented, to an officer or employee of the United States Government or a member of the Armed Forces of the United States a false or fraudulent claim for payment or approval;

2)  knowingly makes, uses, or [*13] causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government;

3)  conspires to defraud the Government by getting a false or fraudulent claim paid or approved by the Government; [or] is liable to the United States Government for a civil penalty of not less than [$ 5,500] and not more than [$ 11,000], plus 3 times the amount of damages which the Government sustains because of the act of that person

(ii)   Knowing and knowingly defined. For purposes of this section, the terms "knowing" and "knowingly" mean that a person, with respect to information -

1)  has actual knowledge of the information;

2)  acts in deliberate ignorance of the truth or falsity of the information; or

3)  acts in reckless disregard of the truth or falsity of the information, and no proof of specific intent to defraud is required.

b. The False Claims Act (FCA) provides that any person who causes a false claim to be submitted to the Government is liable for a civil penalty of between $ 5,500 and $ 11,000 per claim plus three times the amount of damages the Government sustained. 31 U.S.C. § 3729(a); 28 C.F.R. § 85.3. For purposes of the FCA, "the terms 'knowing' and 'knowingly' mean that a person, . . . (1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts with reckless disregard of the truth or falsity of the information." Id. at § (b). The FCA "require[s] no specific intent to defraud." Id. § 3729(b)(1)(B).

c. The False Claims Act provides that any person who knowingly submits or causes to be submitted to the United States for payment or approval a false or fraudulent claim is liable to the government for a civil penalty of not less than $ 5500 and not more than $ 11,000 for each such claim, 2 plus three (3) times the amount of damages sustained by the government because of the false claim. The Act allows any persons having knowledge of a false or fraudulent claim against the government to bring an action in Federal District Court for himself and for the United States government and to share in any recovery as authorized by 31 U.S.C. § 3730 as well as assert Relator civil damages in the action. Relator claims entitlement to a portion of any recovery obtained by the United States as qui tam Relator/Relator in this action, per the maximum allowable under the statute as well as entitlement to civil damages as allowed by the statute.

d. **The Anti-Kickback Act.** The Anti-Kickback Act of 1986, 41 U.S.C. § 52(2)(A), imposes liability on any person who makes a payment to any other person involved in the federal procurement process for the purpose of obtaining favorable treatment. The AKA defines the term "kickback" as follows: (a)  The term "kickback" means any money, fee, commission, credit, gift, gratuity, thing of value, or compensation of any kind which is provided, directly or indirectly, to any prime contractor, prime contractor employee, subcontractor, or subcontractor employee for the purpose of improperly obtaining or rewarding favorable treatment in connection with a prime contract or in connection with a subcontract relating to a prime contract. The AKA, 41 U.S.C. § 53, further provides that "[i]t is prohibited for any person- 1) to provide, attempt to provide, or offer to provide any kickback; 2) to solicit, accept, or attempt to accept any kickback; or 3) to include, directly or indirectly, the amount of any kickback prohibited by clause (1) or (2) in the contract price charged by a subcontractor to a prime contractor or a higher tier subcontractor or in the contract price charged by a prime contractor to the United States.

e. **Truth in Negotiations Act.** TINA, 10 U.S.C. § 2036a and 41 U.S.C. § 254b, provides, among other things, that: (a)  A person required, as an offeror, contractor, or subcontractor, to

7

submit cost or pricing data under paragraph (1) . . . shall be required to certify that, to the best of the person's knowledge and belief, the cost or pricing data submitted are accurate, complete and current.

      f. Organizational Conflicts of Interest. 48 C.F.R. 9.505, provides, among other things, that: The general rules in 9.505-1 through 9.505-4 prescribe limitations on contracting as the means of avoiding, neutralizing, or mitigating organizational conflicts of interest that might otherwise exist in the stated situations . . . Each individual contracting situation should be examined on the basis of its particular facts and the nature of the proposed contract. The exercise of common sense, good judgment, and sound discretion is required in both the decision on whether a significant potential conflict exists and, if it does, the development of an appropriate means for resolving it. The two underlying principles are-

        (iii)     Preventing the existence of conflicting roles that might bias a contractor's judgment; and

        (iv)     Preventing unfair competitive advantage. [*16] In addition to the other situations described in this subpart, an unfair competitive advantage exists where a contractor competing for award of any Federal contract possesses-

Proprietary information that was obtained from a Government official without proper authorization; or Source selection information (as defined in 2.101) that is relevant to the contract but is not available to all competitors, and such information would assist that contractor in obtaining the contract.

      **g.**      **The Service Contract Act.** The SCA, codified in 41 U.S.C. §§ 351-358, "requires government contractors to pay service employees minimum wages and benefits determined by the Secretary of Labor." United States ex rel. Sutton v. Double Day Office Svcs., Inc., 121 F.3d 531, 533 (9th Cir. 1997) (citing 41 U.S.C. § 351(a)). Though there is no private right of action for damages under the SCA, a party may bring an action under the False Claims Act as a qui tam Relator for the United States to recover damages to the government related to false claims arising out of contracts entered into pursuant to the SCA. See Sutton, 121 F.3d at 534 ("Double Day violated the FCA when it submitted a claim for payment to the United States falsely stating that it had complied with the SCA. The FCA attaches liability to the claim for payment, not to the underlying activity"); see also United States v. Universal Fruits & Vegetables Corp., 370 F.3d 829 (9th Cir. 2004) [*18] (citing Sutton with approval); Koren v. Martin Marietta Svcs., Inc., 997 F. Supp. 196 (D.P.R. 1998) (citing Sutton with approval); Miller v. United States, 213 Ct. Cl. 59 (1977) (noting the government could counterclaim under false claims act for violations of SCA).

9.      In order to qualify for government procurement contracts (or GSA Schedule contracts,) contractors and subcontractors must certify and provide the government with the "best price" for their work when compared to work performed for their commercial customers. If a company does not submit the best price when entering the GSA Schedule or when submitting bids for GSA Schedule contracts, then it has violated 48 C.F.R. § 552.215-72 because the information provided during price negotiations was not "current, accurate, and complete." See id. at § (a)(2); see also Gelco Space, GSBCA 7916, 91-1 BCA P23,387, 1990 WL 145816 (1990) (defective pricing "occurs where a vendor submits false or misleading data for the purchaser to use in evaluating the proposed prices"). SBA Section 8(a) Certification Program for Minority and Female Set Asides.

10.     "The U.S. Small Business Administration, Section 8(a) Minority Small Business Development Program (Section 8(a) Program)] allows federal agencies and entities to 'set aside' certain contracts for the sole benefit of Section 8(a) program participants. This process allows small, minority-owned businesses to obtain government contracts with little to no competition." United States ex rel. Fisher v. Network Software Assocs., 217 F.R.D. 240, 246 (D.D.C. 2003).

11.     **Cognitive Code Corporation is a Section 8(a) in violation of the statute, and upon information and belief, Northrop Grumman is aware of it.** As Cognitive Code is a Section 8(a) and this was instrumental in gaining vendor status and approval with Northrop Grumman, Section 8(a) is applicable to these facts and this action. "To qualify as a Section 8(a) program participant, the company must meet three requirements. First, the company must be 'socially and economically disadvantaged.' 15 U.S.C. § 637(a)(4)(A). For a company to be socially and economically disadvantaged, either one or more socially and economically disadvantaged persons must 'unconditionally' own at least 51% of the company, or 51% of the publicly traded stock must be 'unconditionally owned by one or more socially and economically disadvantaged individuals.' 15 U.S.C. § 637(a)(4)(A)(i)-(ii).".

12.     "Second, the 'management and daily business operations' must be 'controlled by one or more socially and economically disadvantaged individuals.' 15 U.S.C. § 637(a)(4)(B). Socially disadvantaged individuals are those individuals who have been 'subjected to racial or ethnic prejudice or cultural bias because of their identity as a member [sic] of a group without regard to their individual qualities." Id. (emphasis added) (citing 15 U.S.C. § 637(a)(4)(B); 15 U.S.C. § 637(a)(5)); see also 13 C.F.R. 124.106 (noting that control includes the day to day management of the company). Northrop Grumman essentially during summer of 2011 took over control of the day to day operations of the company by doing all of the engineering work and helping to create SILVIA FOR UNITY (OR SILVIA 2.0) because Defendant Spring didn't have the know-how, despite fact Relator Odish had lined up money and engineers to assist pursuant to his status as shareholder and Board Member.

13.     "Finally, each Section 8(a) program participant must certify on an annual basis that each of the above-mentioned requirements concerning ownership and control of the company still exist. The Section 8(a) program requires each participant to submit the following annually:

(i)     a personal financial statement for each disadvantaged owner; (ii) a record of all payments made by the Program Participant to each of its disadvantaged owners or to any person or entity

affiliated with such owners; and (iii) such other information as the Administration may deem necessary to make the determinations required by this [*21] paragraph." Id. at 246-47 (citing and quoting  15 U.S.C. § 637(a)(4)(C);  15 U.S.C. § 637(a)(6)(B)).

14.    Under United States Code and Code of Federal Regulations, an applicant for Section 8(a) certification and those companies seeking government contracts for these set aside programs have certain obligations, including not making false statements or misrepresentations of material facts concerning the certification process and also when bidding and contracting for payment of monies under these set aside contracts. See 15 U.S.C. § 637;18 U.S.C. § 1001; and  15 U.S.C. § 645.

15.    As required under the False Claims Act qui tam Relator will be providing and/or has provided the Attorney General of the United States and the United States Attorney for the Eastern District of Michigan and other states and the District a statement of all material evidence and information related to this complaint. That disclosure statement was supported by documentary evidence that verifies the wrongdoing. As stated above regarding the "compromised nature of this action," Relator however must state that the disclosure statement and the provision of documentary evidence as required by the Federal statute is slightly compromised for reasons outside of the control of Relator: Relator former attorney as delineated below [attorney Robert Rosen] has and continues to wrongfully refuse to turn over Relator client files that belong Relator after nearly 5 months of requests for those files. Relator estimate that those client files [which are now essentially the property of US Government] are at least 25% of the documents that must be submitted to the United States Attorney General pursuant to this action. Relator will of course fully cooperate with the relevant governmental agencies in every aspect of the statute and seek the submission of those documents to the United States Attorney General and Department of Justice as well as Federal Bureau of Investigation subsequent to the filing of this amended complaint.

16.    As set forth below NUANCE DEFENDANTS and co-conspirators transact business nationally, in every state as well as internationally and NUANCE sells in products and services in every state and in nearly every country and has unlawfully misappropriated and engaged in unlawful conduct, NUANCE is specifically targeting government and state agencies and hospitals in healthcare the bringing of this action on behalf of the States and the District is proper. Defendants actions and the actions of their co-conspirators, agents, employees, officers, and related affiliates constitute violations of the California False Claims Act, Cal. Govt. Code § 12650 et seq.; the Connecticut False Claims Act, September Special Session, Public Act No. 09-5; the

Delaware False Claims and False Reporting Act, 6 Del. C. § 1201 et seq.; the Florida False Claims Act, FL Stat. § 68.081 et seq.; the Georgia False Medicaid Claims Act, Ga. Code Ann. § 49-4-168 et seq.; the Hawaii False Claims Act, Haw. Rev. Stat. § 661-21 et seq.; the Illinois Whistleblower Reward and Protection Act, 740 Ill. Comp. Stat. § 175/1 et seq.; the Indiana False Claims and Whistleblower Protection Act, Ind. Code Ann. § 5-11-5.5-1 et seq.; the Louisiana Medical Assistance Programs Integrity Law, Louisiana Rev. Stat. § 46:437.1 et seq.; the Massachusetts False Claims Law, Mass Gen. Laws ch. 12 § 5 et seq.; the Michigan Medicaid False Claims Act, Mich. Comp. Laws § 400.601 et seq.; the Montana False Claims Act, Mont. Code Ann. § 17-8-401 et seq.; the Nevada False Claims Act, Nev. Rev. Stat. Ann. § 357.010 et seq.; the New Hampshire False Claims Act, N.H. Rev. Stat. Ann. § 167.61-b et seq.; the New Jersey False Claims Act, N.J. Stat. § 2A:32C-1 et seq.; the New Mexico Medicaid False Claims Act, N.M. Stat. Ann. § 27-14-1 et seq.; the New Mexico Fraud Against Taxpayers Act § 44-9-1 et seq.; the New York False Claims Act, N.Y. State Fin. § 187 et seq.; the North Carolina False Claims Act, NC Gen. Stat. § 1-607(a) et seq.; the Oklahoma Medicaid False Claims Act, Okla. Stat. tit. 63 § 5053 et seq.; the Rhode Island False Claims Act, R.I. Gen.Laws § 9-1.1-1 et seq.; the Tennessee Medicaid False Claims Act, Tenn. Code Ann. § 71-5-181 et seq.; the Texas Medicaid Fraud Prevention Law, Tex. Hum. Res. Code Ann. § 36.001 et seq.; the Virginia Fraud Against Taxpayers Act, Va. Code Ann § 8.01-216.1 et seq.; the Wisconsin False Claims for Medical Assistance Law, Wis. Stat. § 20.931 et seq.; and the District of Columbia False Claims Act, D.C. Code Ann. §2-308.14 et seq.

17.    **ORIGINAL SOURCE OF INFORMATION WITH UNIQUE SET OF CONTRACTUAL RIGHTS MAKING RELATOR ODISH THE ONLY PERSON CAPABLE OF BRINGING THIS ACTION.** Relator is absolutely an "Original Source" of the Information as contemplated by the statute and even possess unique contractual rights making Relator the only Person/Plaintiff that could bring this action on behalf of the United States as Relator Odish is a shareholder and constructively and wrongfully discharged Board Member of Cognitive Code Corporation.

18.    The present action brought by United States involves **INSIDER TRADING**, and the wrongful and unlawful misappropriation of a patent and the intellectual property (software) that was in large part created and perfected by the United States government and is now illegally being used by Defendants to perpetuate fraud and unlawful misconduct upon a number of government

agencies including but not limited to defense and healthcare sectors in violation of the false claims act and other federal statutes as described below. Relator on behalf of the United States government seeks through this action to recover damages and civil penalties arising from the Defendant's submission of false claims for payment or approval. In this case, such claims were submitted to federally funded health care programs such as TRICARE, Medicare, United States Army, Department of Defense, Department of Justice, Federal Bureau of Investigation, Department of Veterans Affairs, Department of Human Health and Services, the Securities and Exchange Commission for payment and/or approval and a number of other government agencies.

*19.*      QUI TAM Relator, as stated herein, believe both Relator and United States have suffered significant damages as a result of unlawful misconduct and theft of billion dollar intellectual property relating to information systems with cross platforming capability. *The importance of "information systems" to the government in defense, healthcare [especially in light of President's Obama initiative and new law Affordable Care Act] computing, cellular, automotive, enterprise solutions and other areas that implicate and involve government agencies.*

20.      The Government contracts with these Technology Vendors directly for purchases of hardware and software, and also indirectly through prime contracts with Systems Integration Consultants.

21.      The contracts executed by Defendants, their co-conspirators, agents, officers, and related affiliates involve the applicable federal regulations contain express provisions regarding Federal Acquisition Regulation prohibitions against Kickbacks,  Organizational Conflicts of Interest ( 48 C.F.R. 9..500 et seq.), as well as various other Federal Acquisition Regulations ("FARs"), as well as Antitrust prohibitions. These prohibitions serve to assure that the Government obtains the products and services that it needs and that its vendors, subcontractors and the entities it is in business are compliance with "**all applicable local, state and federal laws, rules and regulations.**"

## JURISDICTION AND VENUE

22.      This is an action by the United States against defendants pursuant to the False Claims Act, 31 U.S.C. § 3729 - 3732 et seq. ("FCA") As a result, this Court has jurisdiction over this matter pursuant to  31 U.S.C. §§ 3729- 3732 et seq, and its general common law and equitable jurisdiction.

23. Personal jurisdiction and venue for this action are predicated upon 31 U.S.C. § 3732 (a) which provides that "any action brought under § 3730 may be brought in any judicial district in which the defendant, or in case of multiple defendants, any one defendants can be found, resides, transacts business or in which any act proscribed by § 3729 occurred." Thus Venue is proper in this District as all of the defendants either transact business in this district or reside in this district, and multiple violations of §3729 have taken place in this district where Relator reside.

## THE PARTIES.

24. Relator Joseph Odish is an individual and resident of Michigan. Relator Odish is record shareholder of Defendant Cognitive Code Corporation and presently a frozen out/wrongfully discharged Board Member and officer of the Defendant Corporation. Relator and his Cranbook Capital Consulting Group, LLC, is a Michigan limited liability company controlled and owned by Odish. Relator LLC. The LLC is an affiliate of the Defendant Cognitive Code Corporation pursuant to the Shareholders Agreement. Relator's LLC has lawful claims, in addition to non-dilutable stock in Cognitive Code that they presently own and a lawful and proper claim and beneficial interest in additional 7.5% non-dilutable equity stake in Cognitive Code, as well as a lawful claim for at least 20% equivalent to damages of the value of the Cognitive Code Corporation.

25. Defendant Cognitive Code Corporation is a Delaware Corporation that conducts business in Alabama, Michigan, and New Jersey. Defendant Cognitive Code Corporation is a corporation with its headquarters in New Jersey. Defendant Cognitive Code is a technology company and has developed a software program predicated upon a patent known as SILVIA™ with interactive artificial intelligence capabilities on multiple platforms, including medical applications for Healthcare, Defense industry and sector, mobile/cellular, automotive telematics, gaming, toys, enterprise solutions, computing such as laptops, cloud capabilities.

26. Defendant Spring is an individual who resides in Sherman Oaks, California. He is one of the three founders and controlling shareholders of Defendant Corporation. He is also its only engineer. Defendant Spring is married to defendant Defendant Mimi Chen, also a resident of Sherman Oaks, California.

27. Defendant Mimi Chen is an individual residing in California. Along with Spring, one of the three founders and controlling shareholders of Defendant Corporation.

28.     Defendant John Chen resides in Flemington, New Jersey. He is the brother of Defendant Mimi Chen Chen and one of the three founders and controlling shareholders. Of the three founders, John Chen along his general counsel, Defendant Difazio, operate the headquarters of Cognitive Code corporation out of New Jersey.

a.      Defendant Sal DiFazio resides in Flemington, New Jersey and is the General Counsel of Defendant  Corporation. He is not a shareholder in the Defendant Corporation but has issued himself backdated warrants on two separate occasions. Defendants Spring, Defendant Mimi Chen Chen and John Chen each own 25% (250,000 shares) of the capital stock of the Defendant Corporation for a total of 750,000 shares and 75% of the capital stock of Defendant Corporation. Given the familial relationship between the Husband-Wife relationship between Defendant Spring and Defendant Mimi Chen Chen and John Chen as her blood brother, for all intents and purposes these three Individual Defendants constitute the Controlling Majority Shareholders of the Defendant Corporation. The corporation has only issued and authorized 1,000,000 shares in total.

29.     Defendant NUANCE COMMUNICATIONS, INC, a publicly traded company with ticker symbol (NUAN) and originally funded by Morgenthaler Ventures. Morgenthaler Ventures is a multi-billion dollar VC that has over a 40 year relationship with tech giant APPLE, as it was one of APPLE's earliest investors and continues today to own significant stock in APPLE, a material fact to this action.

a.      Nuance is the global leader in dictation services and now with APPLE, INC., hereinafter simply referred to simply as "Apple", is looking to effectuate a monopoly over EHRs through its products and services in conjunction with Nuance. The relationship between Morgenthaler Ventures and Apple remains very strong today and as Nuance actively markets Apple products and is rumored to be sold to APPLE SOON. Gary Morgenthaler sold the free app SIRI to Apple for 250 million.

30.     DEFENDANT NORTHROP GRUMMAN CORPORATION is a Delaware Corporation that is a prime US defense contractor.

31.     Defendant John Bourbeau, a Michigan individual.

32.     Defendant Robert Rosen, an attorney residing in Los Angeles, California.

33.     Agency with respect to corporate defendants.  Relator is informed and believe and, based thereon, allege that at all times herein mentioned, the Defendants, and each of them, were and are

(for purposes of the law of tort, contract and otherwise) agents, principals, representatives, servants, masters, partners, trustees, associates, co-conspirators, employers and/or employees of each other, as well as predecessors-in-interest and/or successors-in-interest to each other, all acting within the course and scope of such capacities, within actual and/or apparent authority of such capacities, within the course and scope of such conspiracies, and with actual and/or constructive notice of the knowledge of their predecessors-in-interest and/or each other.

## RELATED ENTITIES, NON-PARTY CO-CONSPIRATORS AND DESCRIPTION OF THE UNLAWFULLY MISAPPROPRIATED INTELLECTUAL PROPERTY AND ITS MULTI-BILLION DOLLAR VALUE IN VIRTUALLY ALL VARIOUS BUSINESS SECTORS, FROM CONSUMER TO HEALTHCARE TO GOVERNMENT SOLUTIONS.

34.    **SILVIA™.**  The software based on a very valuable patent that makes Cognitive Code worth at least one to two billion dollars. SILVIA™ is a CROSS-PLATFORMING SOFTWARE PIECE, and by that it is stated the SILVIA™ Has MULTIPLE PLATFORMS [as a platform it has the ability to create as many applications as possible] where its world class and revolutionary software can benefit any industry or business sector, such primarily the defense sector and healthcare, the two prime areas of false claims acts. SILVIA™ ALSO HAS PLATFORM ABILITY IN CELLULAR/MOBILE, IN AUTOMOTIVE TELAMETICS, TOYS, COMPUTING, ENTERPRISE, GAMING, etc. Any one of those industries could use or exploit SILVIA to make them a billion dollar in one industry alone.

35.    **SAdie™.** The Intellectual Property Northrop Grumman created and based from Cognitive code's SILVIA™. So they executed a 50 mm licensing agreement because it was ending 2012 according documents that the Relator possesses as well as personal information. Recently on December 8, 2013, Northrop Grumman and Cognitive Code executed a new licensing agreement.

36.    **NINA™.**  NINA is the "artificial intelligence" IP that the Nuance Defendants (from the morgenthalers close relationship with Cognitive Code defendants) unlawfully misappropriated in Conspiracy with Cognitive Code Defendants and are now marketing to US government and consumers everywhere. The global leader in voice, dictation and transcription is the DEFENDANT NUANCE, a 5 billion dollar publicly traded entity.  NINA™ is the new artificially intelligent digital assistant wrongfully and unlawfully being repackaged and sold for use to the global market and by NUANCE'S own SEC filings being marketed and sold to a number of United States government agencies.

37.     In addition to Relator being defrauded, the U.S. government is also a victim of this fraud and unlawful conspiracy and activity. The relevant government agencies victimized by the Principal Corporate Defendants fraud, directly or indirectly, **including a number of** title 18 violations relating to major fraud upon the government, at both the federal and state level.

38.     NORTHROP GRUMMAN after developing SADIE from SILVIA in 2011 is now on its website actively engaged in the commercial reselling of Intellectual Property, which is almost certainly how NINA from NUANCE came into existence - the nexus from Northrop Grumman to Nuance.

## GENERAL ALLEGATIONS AND FACTUAL BACKGROUND.

39.     Defendant Cognitive Code Corporation has developed software and intellectual property involving artificial intelligence technology known as SILVIA™ and had filed a patent application in 2008.  The closest market competitor to SILVIA™ was another supposed artificial intelligence product which operated more as an "app" or application, known as SIRI. SIRI is an inferior technology, as it is not as valuable, adaptable, or commercially viable as SILVIA™. In essence, SIRI is not true "artificial intelligence."

40.     On February 16, 2011, Relator received a "blast"-blind email from an named Jerry Newman out of California about an interesting business opportunity regarding the potential funding of a tech startup specializing in Artificial Intelligence software that supposedly had Cross-Platforming ability and "tremendous value" in multiple business sectors, including but not limited to Defense Sector, Healthcare, Enterprise Solutions, Automotive Industry, Moblie/Cellular, Gaming, Toys, Laptops/Computing, and a host of other potentially valuable "apps" or applications.

41.     Upon information and belief, the potential revenues and values that could be generated by such a valuable patent/IP/software such as SILVIA™ could exceed a billion dollars just from significant penetration in just one or two business sectors. In March 2011 Business Plan for Cognitive Code Corp. that Relator were sent, it stated that SILVIA TECHNOLOGY could create unlimited "apps" or applications in multiple sectors based upon its Artificial Intelligence.

42.     Relator would come to learn in recent events the significant difference in the value of Intellectual Property between a "Cross Multiple Purpose Platform" technology/IP/patent such as SILVIA™ [which creates "apps" or applications] and mere "apps" or applications, such as SIRI or EVERNOTE. The vast majority of "apps" or applications are either free, or generate

minimal/nomical income. SIRI was a free "app" that Gary Morgenthaler and Morgenthaler Ventures sold to APPLE, the world's largest tech giant, for approximately 250 million dollars.

43.     As a result of the email, which showed SILVIA™ technology to potentially outsmart IBM's Watson and curious about "artificial intelligence" technology, Relator contacted Newman. In early March 2011, Relator would incur a $175,000 obligation for opportunity to do business with Defendant Cognitive Code Corporation and its three founders, Spring Chen and Chen who controlled and owned 75% (750,000 shares out of a possible 1,000,000 issued shares).

44.     At the time these events began to unfold, Relator was 41 years old with a wife that was 4-5 months pregnant with the couple's first child. Relator was and is a licensed attorney in good standing in the state of Michigan, who focused on real estate and transactional work, but Relator after dealing with cancer in 2008 was not sure he wanted to continue practicing law.

45.     Newman introduced Relator to Defendant John Chen in late February 2011 and Chen arranged for a conference call on March 1, 2011 between Relator and the three founders, as well as Relator's former partner in Cranbrook LLC, Defendant John Bourbeau.

46.     On March 1, 2011, Defendant Chen sent Relator an email informing him of their attorney and their representation. The company was represented by Joel Bock, a partner specializing in Intellectual Property and patents of the global law firm SNR DENTON. Also on March 1, 2011, Defendant John Chen emailed Relator the Company's business plan, which specifically stated that the company was represented by law firms SNR DENTON and PERKINS COIE. The business plan further represented that potential value of SILVIA™ platform and discussed it's enormous potential in multiple business sectors of defense industry, medical/healthcare, mobile/cellular, gaming, toys, automotive telematics, and Enterprise solutions.

47.     The conference call on March 1, 2011 went well and on March 6, 2011, the parties executed a Letter of Intent for "Cranbrook" to seek and procure funding of 2.5 million dollars for 20% non-dilutable equity stake in Defendant Cognitive Code Corporation. See Index of Exhibits. The LOI provided for a window for Relator to conduct due diligence.

48.     During this period, and at all relevant times there were a number of documents sent through the mails, enormous amounts of electronic mail, and significant number of phone calls between Relator and Cognitive Code Defendants.

49.     On March 2, 2011, Defendant Spring sent Relator an email regarding information on Cognitive Code's patent and intellectual property, SILVIA™.

50.     Immediately subsequent to the execution of the March 6, 2011 LOI, Defendant Chen used the mail service to "overnight" some due diligence documents from New Jersey, where Cognitive Code was headquarted, to Relator's home in Michigan. The documents were not coherent, nor organized in a professional manner, nor were some important documents (such as Assignment of Patent) even signed. Some documents had been ripped out of a binder.

51.     Relator was also emailed a significant number of documents for the due diligence, both prior and subsequent to execution of March 6, 2011 Letter of Intent.

52.     Documentation submitted to Relator to conduct due diligence was impossible and Relator Odish would come to learn that Cognitive Code Defendants never had any intention of performing the agreements they signed.

53.     The submission of documents for due diligence was a bit overwhelming and asked his friend, a 3rd law student at time **[CONFIDENTIAL WITNESS 1]** and now a licensed attorney in good standing in State of Michigan to assist with the due diligence and Relator would pay him for his time.

54.     The documents submitted to Relator showed a company that truly was a startup and was essentially a mess as the company, by Defendant Chen, had signed a number of horrendous agreements, the most disturbing of which was the **INTELLITAR SOFTWARE AGREEMENT**, which had a venue and forum for any potential litigation to be conducted in Huntsville, Alabama.

55.     The only reason Relator took a gamble and "flyer" on the company was the fact that in 2010 it had become an approved vendor for **NORTHROP GRUMMAN**, arguably the United States Government's leading prime contractor for Department of Defense and defense sector in general.

56.     Defendant Spring emailed Relator an email correspondence from Jerry Waugh, a high-ranking executive at Northrop Grumman, the IMI Manager at NG for Virtual Training Systems (VTS) dated February 23, 2011, which stated in part:

*"our group at Northrop Grumman is pleased to be developing products for our customers using Cognitive Code's "SILVIA" technologies... in just over a week we will be demonstrating a new custom interactive military training system. This Northrop Grumman developed will be our first product line to use the SILVIA PLATFORM, and will be shown at the upcoming AUSA (Association of the United States Army) in Ft. Laurderdale. Because of the compelling nature of the product, we expect to begin taking a significant number of orders at, or soon after the show... In addition to our work on this upcoming product, our group at Northrop Grumman is also seeking an expanded R & D license for the SILVIA technology. In working with the SILVIA platform we recognize the broad range of intelligent applications... and will allow us to more rapidly develop those applications using SILVIA on a variety of hardware and software platforms..*

*Cognitive Code's technology is unique in the marketplace, and is proving to be ideal for our needs in creating conversational applications for training and defense. We have made great progess using the SILVIA PLATFORM and we believe that this first product line is only the beginning of what is possible for Northrop Grumman with the SILVIA technology... Cognitive Code is helpful as we move forward with SILVIA technology, offering free samples, code samples, and rapid response to requested enhancements of the software... given rapid success we are achieving  using SILVIA platform, we at IMI GROUP AT NORTHROP GRUMMAN look forward to a long and mutually beneficial relationship with Cognitive Code.*

*Best Wishes,*
*Jerry Waugh*

*Charles J. Waugh*
*IMI Manager*
*Northrop Grumman"*

Jerry Waugh Northrop Grumman Letter February 23, 2011. Subsequently Spring would introduce Jerry Waugh of Northrop Grumman to Relator Odish via email:

*From:  Leslie Spring [leslie@cognitivecode.com]*
*Sent:   Monday, March 07, 2011 2:44 PM*
*To:     Joseph Odish; Waugh, Charles J (IS)*
*Cc:      john@cognitivecode.com; mimi@cognitivecode.com*
*Subject:        Introductions*

*Joseph and Jerry,*

*Allow me to introduce you fine gentlemen to one another.*

*Joseph Odish and his group will be investing in Cognitive Code, once the standard due-diligence phase is complete.  Joseph is one of the "good guys", and we look forward to having him as our investment partner.*

*Jerry Waugh is the IMI Manager at Northrop Grumman, and is Cognitive Code's primary contact within the organization.  Jerry has also been a supportive champion of the SILVIA technology within Northrop Grumman, and has been a big part of why we enjoy working with them so much.*

*Joseph, to help you with your due-diligence, Jerry will be expecting your call, and is ready to talk with you about our relationship with his company.*

*Here is Jerry's phone contact info: 256-612-3402*

*And Jerry, thank you for your time in doing this for us.*

*All the best,*
*Leslie*

*Leslie Spring*
*Founder and CTO*
*Cognitive Code Corporation*
*818.321.3729*
_____

57. <u>Chrysler Confidentiality Agreement with Cognitive Code Corporation dated December 10,</u> <u>2010.</u> Additionally, Relator were given a CONFIDENTIALITY AGREEMENT between Cognitive Code and Chrysler signed in December 2010 by Defendant John Chen and Ralph Smith, Chief Patent Counsel for Chrysler. See Index of Exhibits, Confidentiality Agreement with Chrysler. As well as an agreement with Visteon, a significant supplier in automotive industry.

58. Defendant Spring and Relator become close friends the first few weeks of March 2011 but Relator after reading the Intellitar contract, the worst and most one-sided contract he had ever read, called Spring and stated he wanted to give him a release from the Letter of Intent and wish him the best of luck. Spring stated to Relator, *"joseph, I knew you would say that... I knew when you read that awful contract you would want to jump ship...".*

59. On March 16, 2011 Defendant Spring emails Relator asking him to be a partner in the company. [They offered Relator Odish ten equity points to be their partner. Relator Odish offered his former partner and now co-conspirator Bourbeau five points if he would procure the option money of $937,000 for the additional 7.5% non-dilutable points, but Bourbeau would never perform on that agreement and breached it as Relator Odish had to, through a relative of his, procure the option money.]

60. On March 18, 2011, the parties executed an addendum to the agreement that made Relator a shareholder and Board Member of the tech startup specializing in artificial intelligence. The Contractual Addendum was and is lawful under delaware law, pursuant to statutory code § 152 regarding lawful consideration, and federal law as well. The agreements signed by Relator, both individually and on behalf of his LLC with Cognitive Code were lawful under any applicable delaware, state and federal laws.

61. <u>The Dual Signature Rights of Relator Odish are contractual rights tied Relator's stock</u>. Relators contractual rights, which are tied to his non-dilutable stock rights, are relevant to the Defendants actions and this action brought on behalf of United States Government. In order to the protect the company from anymore bad contracts being signed by Defendant John Chen.

62.    Northrop Grumman CEO WESLEY BUSH gets presentation on SILVIA artificial intelligence Cross Platform software capability. On March 30, 2011, Defendant Spring emails Relator that the 'NORTHROP GRUMMAN PRESENTATION TO THE CEO TOMORROW", [See Index of Exhibits], and Spring informs Relator that NG wants a long-term licensing agreement.  Relator was told this would be a "multi-million" dollar licensing contract.

63.    April 1, 2011 First Morgenthaler Email and use of term "advisors."  First Email regarding Cognitive Code's "advisors" - the Morgenthalers, specifically Gary Morgenthaler, the lead partner of Morgenthaler Ventures, the VC fund that backed and still owns a piece of DEFENDANT NUANCE.  The April 1, 2011 Morgenthaler email from Mimi Chen specifically states as follows:

*[Fwd: RE: Gary & Todd -- any advice for Mimi?]*
*1 message*

*Joseph Odish <josephodish@gmail.com>*

*Mimi Chen <Mimi@cognitivecode.com>        Fri, Apr 1, 2011 at 2:23 PM Reply-To: Mimi@cognitivecode.com*
*To: Joseph Odish <josephodish@gmail.com>, John Bourbeau <johnbourbeau@hotmail.com>*
*Cc: leslie@cognitivecode.com, john@cognitivecode.com, Jason Green <welt_reisender@hotmail.com>*

*These are from our advisors, Lissa and Dave Jones.  They are both serial entrepreneurs; Lissa was my roommate in college, Dave was a bizdev guy for Apple.  Her family is behind Morgenthaler Ventures.  Papa M gave the kids a family rule not to invest in ventures by friends.  But they give us advice freely.*
*M*

*From: Gary J. Morgenthaler [garym@morgenthaler.com] Sent: Friday, April 01, 2011 12:24 PM*
*To: Lissa Morgenthaler-Jones; Mimi@cognitivecode.com; dave@livefuels.com; Todd Morgenthaler*
*Cc: leslie@cognitivecode.com*
*Subject: RE:  Gary & Todd -- any advice for Mimi? Hi Liss and Mimi,*
*I know of the IBM Watson team only indirectly, as I have not met them.*
*Nuance cut a deal with IBM to license the "Watson" technology, and they are busily productizing it.  Regarding dialog with the Watson team, reverse engineering is always a risk.  However, Watson was designed for a very specific goal of a statistical-based question answering system.  Beyond a basic ontology, very little semantics is involved.  Therefore, their architecture may not map well to what Leslie is doing with SILVIA.*

*In discussions like this, it's always best to establish the objective of the dialog beforehand.  Then, you can decide how much to disclose.  In my experience, IBM is very unlikely to remarket SILVIA.*

*It's equally unlikely that they will be effective in marketing AI avatars in the market.  So, you have both little to gain and little to fear.*

*Good luck! Gary*
*----Original Message-----*
*From: Lissa Morgenthaler-Jones [mailto:lissa@livefuels.com] Sent: Friday, April 01, 2011 9:25 AM*
*To: Mimi@cognitivecode.com; dave@livefuels.com; Gary J. Morgenthaler;*
*Todd Morgenthaler'*
*Subject: RE: Gary & Todd -- any advice for Mimi?*

*IBM Watson's team likes SILVIA.*

*Question is, what do you think of IBM Watson..........?*
_____

64.     On April 1, 2011, Relator was sent an horrific agreement signed by Defendant John Chen on behalf of the Company, the Mitch Leiser Agreement.

65.     In early April 2011, Relator is informed that Chrysler and potentially GM want to integrate SILVIA™ in test and trial applications in their smart cars.

66.     <u>**ONSTAR trial demo agreement from April 2011.**</u>  In April of 2011, Relator is sent the ONSTAR trial agreement which he review, revises, and adds the dual signature as he and Defendant Spring decide whether they can pursue the opportunity in light of Spring being the "only" engineer and the company's limited resources. See Index of Exhibits. Relator's version of the ONSTAR TRIAL DEMO AGREEMENT from April 2011.

67.     This ONSTAR TRIAL DEMO agreement submitted to Relator in April 2011 is the last and only Agreement Relator was ever provided to this date, irrespective of his Dual Signature rights, rights as Board Member and Shareholder of the tech startup.

68.     At the time of the filing of this action, Relator still has not received his stock certificates for his shares, a willful violation of Title 15 and federal securities laws.

69.     Relator Odish provided honest services and was retaliated against because he knew of and did not want to be part of any fraudulent or criminal activity or misconduct such as misappropriation of funds, embezzlement. Despite simply providing benefits, honest services and working over 3000 hours as a shareholder and Board Member for the startup Cognitive Code Corporation during 2011 and into 2012, Relator was only paid $8,000 over a 12 month span, in violation of Service Contract Act and federal minimum wage laws.

70.     On April 4th, 2011, Spring authorized Relator to speak to their IP attorney Joel Bock of SNR DENTON. On three occasions subsequent in April and May of 2011, Relator felt overwhelmed by all the work and offered Defendant Spring and other founders the willingness to give back the non-dilutable ten points that had been granted to him. Cognitive Code defendants refused and asked Relator to keep the points and continue the provision of benefits and honest services. Defendant Spring specifically told Relator in May of 2011 that "joseph, if you jump ship, I will shutter the doors of this company...".

71.     In the hiring of ALABAMA COUNSEL, Patrick Miller, Relator sends Miller an email and states that Miller can hold Relator personally liable for any and all legal fees that accrue from the ALABAMA-INTELLITAR-MEI DEFENSE TECHNOLOGIES, INC proceedings. Defendant Mimi Chen sends Relator Odish an email thanking him for this.

72.     Relator on or about April 7, 2011 had also sent Joel Bock an email requesting a timeline and amount of legal fees owed and paid and Relator promised Bock that they would be paid, making himself personally liable.

73.     **MAY 17, 2011 RELATOR LEARN OF COMMISSION OF FRAUD BY DEFENDANT JOHN CHEN AGAINST RELATOR - HE IS ASKED TO RESIGN.** On May 17, 2011, Relator learns that Defendant John Chen had committed fraudulent acts against Relator and Defendant Spring asked for Chen's resignation from the company. Relator asked for Spring to send him a copy of the Resignation Letter to make sure it comported with the truth and corporate formalities. Spring refused. Arguments ensured into June 2011, continuing to only days before Relator's son was born on June 23, 2011.

74.     Relator was disturbed this conduct would take place so close to the birth of his first child.

75.     In early June 2011, Defendant Spring seeks advice and counsel from his close friend and godparent of his children, Gary Morgenthaler of Morgenthaler Ventures. Relator is told that Spring gave Gary Morgenthaler the agreements that had been signed and Gary Morgenthaler advised Spring to try and get out of these agreements, that the non-dilution and other contractual rights Relator possessed would be issues if the company were ever to be acquired or go public.

76.     Spring sends emails acknowledging the vesting of Relator' stock rights, etc, on or about June 10, 2011.

77.     The litigation in Alabama is going well by the end of summer 2011 and the parties believe they are going to easily prevail over INTELLITAR and MEI DEFENSE TECHNOLOGIES, INC.

78.     On July 6, 2011, Spring sends Odish an email stating, *"looks like we will have to adjust our numbers upward for SILVIA FOR UNITY... Looks like UNITY just passed the 500,000 user mark and now they have a player install of 60 mm users. So that effectively doubles our original revenue estimates for SILVIA FOR UNITY that were based on 250k... In related news, the Army and Air Force have certified the Unity Platform and Web Player as a secure content delivery system... I'll have to talk to the NG folks about that one, and see how much their work is tied into that certification. ;)* ". Spring July 6, 2011 email to Odish, discussing SILVIA, NORTHROP GRUMMAN, UNITED STATES ARMY, and AIR FORCE use of Platform.

## OCTOBER 2011 - APPLE'S NEW IPHONE WITH MORGENTHALER-BACKED SIRI - HAILED AS "ARTIFICIAL INTELLIGENCE" AND DIGITAL "VIRTUAL ASSISTANT" BUT IT IS A FAILURE AND MORE IMPORTANTLY COGNITIVE CODE'S PENDING PATENT IS SUPERIOR.

79.     APPLE debuts new iphone with SIRI™, a feature that is supposedly a "virtual assistant" and heavily hyped by Gary Morgenthaler of Morgenthaler Ventures in articles and interviews. SIRI was sold by Gary Morgenthaler and Morgenthaler Ventures to Apple in 2010 for an approximately 250 million dollars.

80.     **SIRI is hailed as "artificial intelligence".** Gary Morgenthaler of Morgenthaler Ventures gives an enormous amount public support and a number of interviews stating that SIRI is true "artificial intelligence" and will change the way people live and work and is the next generation of voice generation investments, etc. But upon information and belief these statements and predictions turned out to be false as SIRI was merely an "app" that APPLE had problems with because SIRI was deemed a "data hog" and it could not run natively on devices.

a. SIRI was essentially all commercial hype and one needs look no further as to its commercial and business failure that Morgenthaler-backed NUANCE entity whose own website now mocks SIRI while touting the fraudulently and illegally procured and repackaged "NINA", as a true digital virtual AI assistant.

81.     On October 24, 2011, Defendant Spring informs Relator Odish that he has handed the sale of company over to their "advisor" Gary Morgenthaler. Relator Odish mildly objected and

stated in an email that this was a definitive conflict of interest on two fronts: 1) Odish and Spring had exchanged and discussed over a hundred emails and phone calls specifically stating that SIRI was by far the closest competitor (BACKED BY MORGENTHALER VENTURES and NOW THE TECH WORLD'S NEW "APPLE" DARLING THAT BY GARY MORGENTHALER'S OWN PUBLIC INTERVIEWS WOULD BE REVOLUTIONIARY) and 2) NUANCE, was specifically listed as a Competitor in the Cognitive Code Business Plan that Relator had been submitted by Defendant John Chen on March 1, 2011. Defendant Spring wrote an email to Relator Odish to allay his concerns that stated in essence as follows:

*"...Guys, I have told you many times that Gary Morgenthaler of Morgenthaler Ventures is a close friend and I trust him. I am always careful about the information I share with people...Gary is on the board of Nuance and is one of the most ethical men that I know..."*

[October 24, 2011 email from Defendant Spring to Odish.]

82.     The Raging Patent Wars Between Global Tech Giants such as Apple & HTC and Apple versus Samsung Cause the Valuation of the Corporation to Skyrocket in late 2011 when Cognitive Code's pending Artificial Intelligence patent is granted a Notice of Allowance, months prior to date United States issuance on February 28, 2012 by United States Patent Office.

83.     **<u>A "PARTNERSHIP" RELATIONSHIP BETWEEN THE MORGENTHALER-BACKED ENTITY NUANCE EXISTS WITH THE TECH GIANT APPLE</u>**. The Relationship Between Morgenthaler Ventures-Defendants and APPLE is much closer and profound than a mere Venture Capital Firm that has a significant financial interest in a tech behemoth and simply monitors its stock on a daily basis, there exists in a very real sense a true "partnership" between the two entities. NUANCE's executives recently stated exactly that: "that they are in partnership with Apple." This in and of itself is not illegal or improper but it does become so when Morgenthalers illegally misappropriate - through the exploitation of material, non-public information - and steal a multi-billion dollar patent and IP affording it potential monopoly power in area of digital AI voice transcription with learning capabilities. And of course this theft was blessed and made possible with the knowing conspiratorial acquiescence by their close family friends, the Cognitive Code Co-Conspirators have children and the Melissa Morgenthaler and her husband David Jones are the godparents.

        a. Relationship Synergy, illicit "tying" arrangements through the use of information and medical technology with the end result of procuring profits from the sale of the products and

services related to the lifeline of Apple's cellular products and tablets, especially in the healthcare industry where they can now exploit this artificial intelligence patent in the enormously profitable ACA statutory compliance provisions related to EHRs (or Electronic Health Records), Medicare, and TRICARE from Department of Defense.

b. As stated herein, the Morgenthalers own substantial stock in APPLE, who was at war with HTC, both of which are publicly traded companies making the misappropriation theory under US v HOGAN 538 U.S. 528, applicable. And they own a significant chunk of DEFENDANT NUANCE.

84.     On October 24, 2011, the United States Patent and Trade Office sends a Notice of Allowance to Defendant Spring. Relator relied on the fact that Gary Morgenthaler of Morgenthaler Ventures would act in an honest, lawful and appropriate manner in brokering the sale of the tech startup to either HTC or COMCAST. For obvious reasons that would become clear to Relator, a substantial number of them which Relator Odish only learned within the 60-90 days prior to the filing of this action.  Instead Relator has recently learned that DEFENDANT NUANCE IS NOW IN BUSINESS WITH HTC, COMCAST AND THE GOVERNMENT.

**NOVEMBER 2011. IN EARLY NOVEMBER, SPRING INFORMS ODISH THAT BOTH HTC AND COMCAST WANT TO BUY THE COMPANY AND WANT LICENSING AGREEMENTS IN ORDER TO EXPLOIT AND ACQUIRE THE SILVIA™ TECHNOLOGIES AND SOFTWARE.**

**SPRING ALSO REAFFIRMS THAT THE MORGENTHALERS ARE "BROKERING" THE SALE OF THE COMPANY.**

85.     Spring informs Relator that HTC and COMCAST want to buy cognitive code outright or acquire at the bare minimum a controlling 51% equity stake in the company.

86.     On November 9, 2011, Defendant Mimi Chen emailed Relator regarding the Morgenthalers and potential sale of company to tech giant, HTC and stated the following:

*meemersc@netzero.net on behalf of Mimi Chen [mimi@cognitivecode.com]*
*Wednesday ,November 09, 2011 6:07 PM*
*josephodish@gmail .com*
*mimi@cognitivecode.com;   jbourbeau@hestia.com Re: mimi, I've told you this before but...*

*Thanks Joseph_,*
*Very nice to hear from you and no worries, I'm the first one to watch how hard Leslie has been working . And yes, it's true, the cash flow problem has been a little tough to deal with, but as Leslie*

*knows, I'm the master at figuring out cash flow.    I've been dealing with this for more than I care to remember.    I will say the credit card companies have become tougher and nastier as of late_, but unbelievable as it may sound, I still have two usable credit cards left!    (isn't that how entrepreneurs fund their companies!?    grin) We still have a little left in the retirement account, but not much . Luckily_, I still have my pension! (so if all else fails...)*

*http://techcrunch.com/2811/11/89/gary-morgenthaler-siri-will-eat-google/*
*Meanwhile, here's an article featuring Gary M.    Google obviously needs to respond to SIRI and our job now is getting Eric Schmidt to realize he needs SILVIA.    Melissa M tells me that Eric is in Asia helping HTC on their lawsuit with Apple.    sounds like Google just purchased Motorola Mobility just to help HTC out.    Eric and Wendy live only a half a mile from Liss so I think we'll have to wait til he gets home.*

*From what I can glean, this whole lawsuit against HTC is just venom spewed from Steve Jobs (who from what all of my friends from Silicon Valley tell me, was a really unpleasant person - he's done stuff that would make anyone reel as to the horrible way he treated people).*

*The jury is out as to what HTC wants to do with SILVIA.    I may have made the first contact and they are definitely interested, but don't know what extent.    we'll keep you posted!*

*And yes, thanks for the chuckle on those emails.    I knew eventually we'd all get our misunderstandings straightened out.    And hopefully, we'll all get a nice exit on this to really have fun with .*

*Peace_,*
*Mimi :0*

*Leslie and I thought [CONFIDENTIAL WITNESS 2] rocks!    Great guy. Thanks for the connection.*

87. On that same exact date of November 9, 2011, an article is published which incorporates an interview by Gary Morgenthaler wherein he states that "SIRI is going to eat GOOGLE's lunch". The important statements, projections and assertions by Gary Morgenthaler are reprinted herein:

*Gary Morgenthaler Explains Exactly How Siri Will Eat Google's Lunch*
*Posted Nov 9, 2011 by Rip Empson (@ripemp)*

*The iPhone 4S is on the streets, and accompanying it is a helpful young virtual assistant named Siri. You've probably heard something about Siri by this point, as tech blogs and the media writ large, have been yammering about Siri's technology at full blast. Since the beginning, and even more so since Siri was acquired by Apple in 2010, there's been a lot of excitement about voice recognition technology.*
*This hit fever pitch with Siri's native launch on the 4S. Of course, Siri isn't perfect. She's been down and out and has experienced a backlash due to limitations in voice recognition, inability to open apps, etc. But many people (among them, one Eric Schmidt) take another stance: Siri is game-changing, and not only that, she poses a significant threat to Google (and beyond).*

*In his letter to the Senate Subcommittee on Antitrust, Competition Policy, and Consumer Rights, Google Executive Chairman Eric Schmidt talks quite a bit about Siri and how it represents "an entirely new approach to search technology" — one that is a "significant development". Basically, he says that Siri is the biggest threat to Google's control of search, well, ever. The writing, as they say, is on the wall.*
\*\*\*\*\*(Article continues)

88.   **AS STATED BEFORE COMCAST AND HTC WANT TO BUY COGNITIVE CODE, LARGELY BECAUSE OF THE PATENT**. In Early November 2011 Defendants Inform the Relator that both Comcast and HTC have contacted them about a Buyout or at least acquiring a majority equity stake in Cognitive Code Corporation. The valuation of the company skyrocketed in large part because its patent was only months away from being formally issued and its IP was far superior to SIRI.  HTC was at this time a 32 billion dollar company and the world's 3rd largest cell phone manufacturer but it has gotten beat up by Apple for having a weak patent portfolio. It desperately needed to make acquisitions to stay viable. They (the HTC executives) admitted to Spring who admitted to Relator that the pending patent and SILVIA™ technology was superior to APPLE's technology and more importantly, in light of the raging patent wars at that time between HTC and APPLE (which eventually on December 19, 2011 led the Federal Trade Commission to ban HTC cell phones through April 2012), the HTC executives specifically stated that they needed the patent and intellectual property to fight APPLE in court all over the world.

89.   During December of 2011, Relator does extensive research into the patents owned by APPLE related to SIRI and artificial intelligence. Relator learns that Apple may be infringing upon our (Cognitive Code's) patent. As stated previously, it was in late October 2011, the US Patent Office issues a Notice of Allowance on the pending patent of Cognitive Code, the latest official hurdle before the United States Patent and Trade Office formally grants official issuance of the patent. In this case, the US patent office would officially issue the artificial intelligence patent.

a. Relator Odish learned through own diligence on December 17, 2011 that, upon information and belief, the Cognitive Code Pending Patent would not only be superior to the APPLE'S SIRI patents, there was a potential serious issue of the SIRI patents filed by APPLE in 2010 (and stated as "Contextual Voice Commands") infringing upon the Cognitive Code Pending Artificial Intelligence patent filed in March 2008 and granted US issuance on February 28, 2012.

90.   HTC paid 300 million dollars for a 51% stake in BEATS AUDIO in August 2011. Audio is not HTC's core business. HTC's core business is cellular - the strongest area for Cognitive Code's patent and intellectual property.

91.     Upon information and belief, some of these companies have already entered into commercial licensing agreements with Cognitive Code in violation of the agreement [Exhibit 4] because the licensing agreements are not executed or approved by Relator. In the first week of November 2011, Defendant Spring informed Relator that two multi-billion conglomerates, COMCAST and HTC, wanted to have serious discussions about a possible buyout of the company.

92.     The day before Thanksgiving in November of 2011, Defendant Spring called Relator and informed him that Northrop Grumman, realizing that Cognitive Code was an acquisition target, wanted a long-term licensing agreement. Spring told Relator that licensing agreement with Northrop Grumman would be 5 million dollars for ten years and Northrop Grumman would pay them an "earnest money deposit" of several hundred thousand dollars in January 2012.

93.     Obviously, Relator knew Spring had once again been making fraudulent misrepresentations regarding these numbers. Only a month before in October 2011, Spring told Relator the Northrop Grumman licensing agreement was "a long way off, ten months off".

94.     In fact, only five days later Defendant Spring would call Bourbeau and inform him that the licensing agreement with Northrop Grumman was actually a ten (10) million dollar agreement for a few years with 6 million dollars to be paid by Northrop Grumman to Cognitive Code in January 2012. Spring would later mention these same numbers to Relator and inform him that the company was getting 6 million dollars in January 2012.

95.     These inconsistencies were just additional confirmations that Individual Defendants were willfully misrepresenting the truth and withholding material information.

96.     In Early November 2011 Defendants Inform the Relator that both Comcast and HTC have contacted them about a Buyout or at least acquiring a majority equity stake in Cognitive Code Corporation. The valuation of the company skyrocketed in large part because its patent was only months away from being formally issued and its IP was far superior to SIRI.  HTC was at this time a 32 billion dollar company and the world's 3rd largest cell phone manufacturer but it has gotten beat up by Apple for having a weak patent portfolio. It desperately needed to make acquisitions to stay viable. They (the HTC executives) admitted to Spring who admitted to Relator that the pending patent and SILVIA™ technology was superior to APPLE's technology and more importantly, in light of the raging patent wars at that time between HTC and APPLE (which eventually on December 19, 2011 led the Federal Trade Commission to ban HTC cell phones

through April 2012), the HTC executives specifically stated that they needed the patent and intellectual property to fight APPLE in court all over the world.

97.     On or about late November 2011, after the parties had learned that Comcast and HTC wanted to buy the company or at least acquire a 51% majority stake (what Defendant Spring termed a strategic partnership), Relator and Spring had discussions about the Relator' right to exercise the Option to buy the additional 75,000 shares as referenced in the LOI and extended in the Option Agreement.

98.     During these conversations, Relator politely asked Spring if he would be upset if Relator and Bourbeau exercised their Option rights to acquire the additional non-dilutable 75,000 shares for $937,000 dollars now that company was worth possibly 400 or 500 million. Spring told Relator he would not be upset and specifically stated that the Option Rights they possessed in late 2011 were still valid because the patent had not yet been formally issued.

99.     Relator informed Spring that Bourbeau and he were considering perhaps Assigning their Option Rights and upcharging the Assignee so that could make perhaps a few million dollars from the assignment of the Option Rights. Spring acknowledged that Relator and Bourbeau certainly had the right of assignability for these Option rights but made it clear he would be very upset if they assigned their option rights for a profit and that they would have no future with the company if they did that. Relator knew their Option rights under Cranbrook were valid and relied on Spring's statement expressly confirming the fact. It also gave them the absolute right of assignability to another corporation or entity within Relator sole and absolute discretion.

100.    Despite knowing that the Individual Defendants were still misrepresenting facts and withholding material information, the months of November and December 2011 saw an improvement in the relationship between the parties. Relator and Bourbeau knew they were still being lied to about material items but with the sale of the company for an enormous amount of money - they didn't want to rock the boat.  During these months, the parties exchanged numerous emails discussing valuation of the company for numbers such as 350 million dollars, based largely upon a comparative analysis of the sale of SIRI, which sold for, upon information and belief, 250 million dollars.

101.    After the November realizations that HTC and COMCAST wanted to buy the company and seek licensing agreements, Defendant Spring admits to Relator that he was right about Gary Morgenthaler about a potential conflict as Gary Morgenthaler admitted to Defendant Spring he

"had a conflict" and now the sale of the company was being handled by Gary Morgenthaler's brother, TODD MORGENTHALER. Relator originally thought Spring had said "Bob" but much later would go online and from website wikipedia see that it was "Todd". [**THIS SAME ALLEGATION IS IN THE OCTOBER 22, 2012 COMPLAINT FILED BY ATTORNEY ROSEN.**]

102.    On December 6, 2011, Relator emailed Defendant Mimi Chen and offered some advice. Relator stated the following the email where he specifically referred to the Morgenthalers as their "Advisors", a term repeated throughout.

*From: Joseph Odish [josephodish@gmail.com]*
*Sent: Tuesday, December 06, 2011 4:07 PM*
*To: Mimi@cognitivecode.com*
*Subject: Re: @BreakingNews, comcast doing deal with Verizon (sorry, for all these emails)*
*You are welcome. It sounds like you have quality advisors who are family friends, which is great. My only suggestion would be to use a top notch attorney in conjunction with your friends morganthalers. Whether its joel bock or maybe someone else in LA. I'd ask the morganthalers.*
*You are swimming with sharks re Comcast, HTC, NG. I despise attorneys (yeah I know) but they are a necessary evil. Especially now.*
*Now speaking of increasing valuation: leslie wants me and JB to set up web demonstrations and/or meetings with these fortune 500 tier ones. I just got off the phone with my friend at Magna. Number 2 tier one in the world. They have more money than chrysler. They've been interested in a demonstration (and eventual licensing agmt) for months, actually since the summer. I will email leslie later and cc [CONFIDENTIAL WITNESS 2] at Magna for dates, but one question: can we tell him about comcast and htc? Have we signed any confidentiality agmts with either comcast or htc?*
*I doubt we have but wanted to make sure. I'd like to use these names as leverage for a licensing agmt with magna but dont want to run risk of breaching any confidentiality agreement we may have in place. thanks!*
*Regards,*
*Joseph*

103.      Then on December 12 2011 Mimi Chen thanks Relator Odish "*for getting the company up and rolling*", via email. Previously on December 7, 2011, Chen and Odish had exchanged emails about the situation:

*Re: some tax advice for you and the kids, 2012 is a very important*

31

*2 messages*

*Mimi Chen <Mimi@cognitivecode.com>      Wed, Dec 7, 2011 at 3:01 PM Reply-To: Mimi@cognitivecode.com*
*To: Joseph Odish <josephodish@gmail.com> Cc: John Bourbeau <jbourbeau@hestia.com>If Comcast decides to make a bid, it would be interesting to see if HTC would make it a bidding war. Fun thoughts indeed!*
*Mimi*

*From: Joseph Odish <josephodish@gmail.com> To: Mimi@cognitivecode.com*
*Subject: Re: some tax advice for you and the kids, 2012 is a very important year tax wise + intellitar was blessing in disguise*
*Date: Wed, 7 Dec 2011 01:56:24 -0500*

*It's incredibly important stuff. Tax considerations drive 80% of the structure of deals and their acquisition. As leslie told me tonight SIRIsold for 250 nm, which is ridiculous because it was a FREE APP, with no potential for ever making money. Given my research a fair valuation of the company RIGHT NOW IS ABOUT 300 MM, not a penny less. Likely more, but that's the baseline from what I've seen. If we get lucky next month or so,the bottom line number will 300 nm. If you disregard tax consequences, you are looking at giving away anywhere from 40-70 million dollars. You will a*
*lot of good in the world that uncle sam. Now...*

*In a few months we will have Magna, Sony, Comcast under license as well as NG and Chrysler and Unity will be launched for the 500,000 game developers. That will easily add 100-200 in valuation. Valuation revenue multiples are less important in such special tech companies by the acquiring company is buying a massive expectancy interest. all that said, leslie did absolutely agree that if an offer came in for*
*250 or 300 nm tomorrow, we jump all over it. It would be crazy not to. And someting tells me comcast will make a significant offer very soon. Just a hunch after reading their acquisitions. Extremely aggressive company. Joseph*

104.     December 12, 2011 email from Spring to Odish discussing the 6 mm dollars [of the ten million dollars, which is likely Fifty Million] starting in January 2012. Spring also gives extensive detail about SILVIA™s platform over SIRI, and specifically mentions at the end of the email that "Beta SILVIA FOR UNITY" RUNTIME already being deployed in SILVIA products in use by the **US Army"**. See below in full:

*From:  Leslie Spring [mailto: leslie@cognitivecode.com]*
*Sent:   Monday, December 12, 2011 6:04 PM*
*To: josephodish@gmail.com*
*Subject:      Bullet point notes*
*'Joseph,*

*Here is are the bullet points from a current doc that I use for a "1 minute snapshot" of the business.*
*SILVIA is a platform for developing conversationally intelligent applications.*
*You can talk to the computer/mobile device/etc., it talks back, and does practical things for you.*
*Launch of SIRI by Apple as part of iOS validates the voice control market for consumer products, increasing market demand for SILVIA. SIRI is NOT a portable developer's platform, and requires massive server infrastructure.  Because of this, Apple is having serious scaling problems as more users come online.*

*SIRI is based on DARPA/Stanford research. Apple/SIRI just filed for patents in Dec. 2010.*
*In contrast, SILVIA is: a practical software developers' platform, is scalable, runs natively on desktops/servers/mobile/game consoles, and SILVIA is truly proprietary technology, developed solely by Cognitive Code, with patents already approved, having been initially filed in 2007.*
*Cognitive Code is self funded, with 2012 projected revenues of over $6M based on currently booked and closing business.*
*Current customers include Northrop Grumman and one of the "Big 3"automotive manufacturers.*
*SILVIA has been adopted as the standard for ALL Northrop Grumman training and simulation applications.*
*SILVIA-based applications products have already been deployed to the US Army.*
*Based on customer demand, Northrop Grumman is launching a new "Artificial Intelligence" division, dedicated to SILVIA-based applications.  We are negotiating a new licensing deal with NG for this new business unit.*
*SILVIA-enabled "Big 3" concept vehicle already in production, SILVIA integration to begin in Q1, 2012.*
*Additional markets for 2012 include mobile, gaming, and cable/home entertainment.*
*SILVIA for Unity - official launch early Q2, 2012, targeting over 500,000 **[NOW OVER 1,000,000]** registered gaming developers, ongoing revenue to include back-end royalty structure.*
*Beta "SILVIA for Unity" runtime already deployed in SILVIA products in use by US Army.*
*Hope some of these help frame the one-pager for you.*
*Leslie ".*

[December 12, 2011 email from Defendant Spring. Upon Relators recent October 2013 discovery regarding Nuance SEC filing, as delineated in detail below, the Amazon/Comcast/HTC/SONY/SILVIA FOR UNITY are now all taken over by DEFENDANT NUANCE per the SEC filing.]

105.     As Relator continued to work on the one minute snapshot for **MAGNA**, that Relator had

approached through a friend and they wanted four software SILVIA™ licensing applications.

Relator sent Spring another email on December 16, 2011 asking him to review the memorandum

he was drafting to Magna's counsel. Spring's response on December 16, 2011 is restated herein:

*From:  Leslie Spring [mailto: leslie@cognitivecode.com]*
*Sent:  Friday, December 16, 2011 4:22 PM*

*To: josephodish@gmail.com*
*Subject:        Re: Cognitive Code and Magna (draft email for leslie's review (to magna's in house Counsel)*

*"Hey Joseph,*
*Three Points:*

*1)        A little less detail on the NG relationship would be good. The NEW NG business unit and the new contract, I feel comfortable sharing verbally, under a CA, but not in writing (email), not yet). I think it's safe to mention we're in the process of closing a broader licensing, and that should be enough until I talk to them via voice.*

*2)        For setting the right tone, I would take out Denso as the alternative.*

*3)        These days I'm CEO, not CTO, which I think is helpful for them to know they are talking to a decision maker.*

*Leslie".* Spring December 16, 2011 email to Relator Odish.

106.    December 19, 2011 email from DEFENDANT MIMI CHEN saying "meeting with HTC" went great. December 19, 2011 Defendant Spring calls Relator and said his presentation to HTC EXECUTIVES went terrific and "they were drooling, joseph", "they had nothing like this in their portfolio".  On that same day of December 19, 2011 that same day FTC rules in favor of Apple against HTC in their patent infringement suit. NY TIMES article talks about ruling and how HTC has a weak patent portfolio.

107.    Relator is told that Spring is meeting with senior HTC executives on December 19, 2011. Relator sends Spring an email wishing him good luck. On December 19, 2011, HTC executives from Tiawan fly in to meet with Defendant Spring and after the meeting an excited Spring calls Relator and tells him "they were drooling, joseph... they admitted they needed this in their portfolio...".

108.    During this month, Relator is researching patents and emails Spring on December 17, 2011 stating that some of Apple's potential SIRI patents might infringe upon "our patent" as Cognitive Code's patent was filed in 2008, and predicated upon Artificial Intelligence while some of Apple's patents were filed later and related not truly to Artificial Intelligence but rather "Contextual Voice Commands".

109.    Not coincidentally, on this very same date of December 19, 2011, as HTC and APPLE had been dueling over patent infringement in US court, the Federal Trade Commission rules in favor of Apple that HTC has infringed on certain Patents owned or licensed by Apple and

imposes a ban on HTC [a tiawanese company] from importing their cellphones into United States until April of 2012. Sometime during 2012, the feud is quietly settled and APPLE and HTC quietly enter into a licensing agreement. Upon information and belief, and through Relators own personal information from this matter this licensing deal was likely "brokered" by NUANCE SHAREHOLDER AND FORMER BOARD MEMBER Gary Morgenthaler in an unlawful act of Insider Trading [from realization that Cognitive Code's technology was superior to SIRI and about to be acquired by HTC] as well as serious anticompetitive and likely antitrust violations.

110.    ON DECEMBER 19, 2011, the same day that Defendant Spring was meeting with senior HTC executives over SILVIA's revolutionary capabilities, the FEDERAL TRADE COMMISSION in an action brought by APPLE against HTC in their raging patent wars ruled in favor of APPLE and issued a ban on HTC from importing their cell phones into the United States that would last until April 2012.

111.    Upon information and belief and personal knowledge of Relator, the licensing agreement was likely brokered the confidential licensing settlement agreement between the two companies that almost certainly involves and is a result of the unlawful activities described in this action.

112.    When SIRI debuted in the new iphone by APPLE with billion dollar publicity and fanfare, Gary Morgenthaler as the architect fo the

**BY AUTUMN OF 2011, NORTHROP GRUMMAN  DEDICATES AN ENTIRE BUSINESS UNIT TO COGNITIVE CODE'S SILVIA™ IP, CREATING A REPACKAGED ARTIFICIAL INTELLIFENCE ASSISTANT OF THEIR OWN KNOWN AS "SAdie™".**

113.    Northrop Grumman made a significant commitment to the state of the art Intellectual property of Cognitive Code's software SILVIA™. After the October 2011 emails relating to Gary Morgenthaler handling sale of company, when HTC and COMCAST expressed acquisition.

114.    Subsequently in late 2011, when Northrop Grumman realizes cognitive code  is a serious acquisition target by htc and comcast, it moves for exclusivity of Silvia™ intellectual property in the defense industry with a 10-50 million dollar licensing agreement - that cognitive code defendants have, upon information and belief, misappropriated and embezzled with such funds being stashed overseas.

115.    During the middle of December 2011, HTC execs flight out to Los Angeles and meet with Spring and he tells Relator the meeting went great and they were drooling. Defendant Mimi Chen Chen sends Relator an email thanking him for getting the company up and running on December

12, 2011. HTC's true interest in the company was their desperate for our patent in order to fight off Apple. Cognitive Code's patent had received the Notice of Allowance which basically meant the patent was going to be issued in a few months.

116.    In this email, Defendant Spring unequivocally states that the 10 million dollar licensing agreement from Northrop Grumman with 6 million to be paid to the corporation in January 2012. Subsequently, after the emergence of Defendant Difazio during March 16, 2012 Defendant Difazio during the conference call will say the Northrop Grumman deal wasn't finalized and "wasn't as lucrative as originally thought… it was only worth 600,000 or 700,000 dollars…". **See Paragraphs below of this Complaint related to March 16, 2012  conference call.**

117.    Furthermore, despite the clear language of Defendant Spring stating the 6 million had already been "booked", and Defendant General Counsel Difazio repeated assurances that no contract has been executed,  in an email to Jeff Bezos, the founder of Amazon.com, Defendant Mimi Chen specifically uses the word "partnership" to describe the business relationship between Defendant Corporation and Northrop Grumman. During the months of November and December 2011, Defendant Spring makes several disturbing statements to Relator. Defendant Spring states to Relator that he and his wife and his brother in law already had plans to "invest the 6 million in conservative investments" to their own personal benefit. When Relator politely suggests that the money belongs to the Corporation and should be used to hire engineers and grow the company, Defendant Spring simply shrugs off the suggestion.

118.    During December 2011, Spring reaffirms that the option rights held by cranbrook are valid because the LLC, an affiliate of the company, are valid because of two weeks of formal issuance of patent.

119.    <u>Embezzlement and Misappropriation of the Northrop Grumman monies paid to Cognitive Code Defendants.</u> Spring states to Odish in december 2011, spring admits to Relator odish that the 6 million [initial payment of licensing agreement] coming from northrop grumman in january 2012, Defendant Spring admits that he and defendant mimi chen already had plans for the 6 million and they were planning to invest the money in very conservative investment devices. Relator Odish states that money belongs to the company. Spring just goes silent. Odish throughout this entire period tells his former partner Bourbeau of the embezzlement, misappropriation of funds, and unlawful misconduct and Bourbeau agrees that these people are "crooked". But now Defendant Bourbeau, because he is not an attorney like Odish, is willing to retaliate and destroy

his former partners rights and be in business with Cognitive Code defendants despite this unlawful misconduct and his long-time knowledge of it.

120.     Upon information and belief, they received the six million and refuse to acknowledge receipt of such funds. And this is why they cannot go through discovery. Relator objected slightly, reminding Spring that the 6 mm dollars belonged to the company. Spring shrugged it off and did not comment and Relator did not want an argument but simply hoped that with sale of the company or at least a majority stake being imminent, Morgenthalers and other attorneys.

121.     <u>The 10 million from NG is likely 50 million dollars, and has been buried and embezzled in overseas accounts</u>. Upon strong information and belief, the "10 million from Northrop Grumman" that Relators were told was coming was in fact likely to be 50 million dollars from Northrop Grumman given a conversation that Relator would have Defendant Difazio on February 9, 2012 as stated below.

## JANUARY 2012

122.     During the First Week of January 2012 Relator travels to Los Angeles to spend time with Spring and Defendant Mimi Chen Chen. During dinner on January 2, 2012, Defendant Spring stated to Joseph Relator that Jerry Waugh of NG was releasing money to the company while "they negotiated the licensing agreement".

### *January 4th, 2012 Phone call from Spring to Relator: HTC wants to buy at least 51% of the Company and Chrysler and Fiat may be shipping 3 million units in the Summer of 2012*

123.     Relator is still in Los Angeles on the 4th of January and he wants to arrange a lunch with his friend **[CONFIDENTIAL WITNESS 4]**, whom has access to Wistron, arguably the world's largest OEM. A potential licensing deal or any business arrangement with Wistron would significantly increase the valuation of the company. Defendant Spring calls Relator on this day of January 4th, 2012 and tells him he has some "great news" and makes the following extremely significant admissions and statements:

124.     Spring states that HTC definitely wants to buy at least a 51% stake in the company, if not the entire company. Spring states also that Chrysler and Fiat want to ship 3 million units of our

software this summer (summer of 2012), a statement consistent with the December 12, 2011 email Spring wrote to Relator regarding the state of the business.

125.    Additionally, Defendant Spring states to Relator that HTC - the world's 3rd or 4th largest cell phone manufacturer - "wants to be in the automotive business and Chrysler wants to be in the cellular business". Spring continues and states "isn't this amazing that our small company is the hub for all these huge things".

126.    It is during this call on January 4th, 2012, that Defendant Spring for the first time in a long time brings up the issue of Relator's dual signature rights and rights to review and approve every contract, saying "**joseph, we need to clean up the record books**". Relator says he is willing to consider it as long as the proper mechanisms are in place to protect the company and its shareholders so it couldn't be harmed by any disastrous contracts signed by John Chen. And that the company must abide by and follow corporate formalities. Essentially be run properly. Defendant Spring promises and assures Relator that he (Spring) will be running things out of Los Angeles and that Chen will not be involved. **Spring then states something about how the Company is setting up new bank accounts with 24 hour service. Relator finds this statement odd and it is not the first time he has heard it.** Why would the company need 24 banking service? They schedule a lunch date the following day with **[CONFIDENTIAL WITNESS 4]**, who has access to the largest engineering company in the world, WISTRON. However, before the call ends, Spring once again mentions how he's going to get his "consulting fees" and Relator is yet again convinced the Defendant Majority Shareholders are misappropriating Corporate funds for their own personal use, or worse just straight out embezzling and sending money overseas.

## JANUARY 5TH, 2012. SPRING STATES TO ODISH THAT COMPANY IS WORTH 400 MILLION.

127.    Relator and his friend **[CONFIDENTIAL WITNESS 4]** have lunch with Defendant Spring with the express purpose of setting a meeting with **[CONFIDENTIAL WITNESS 5]**, the head of North America for Wistron. Defendant Spring showed up unkempt as if he had just woken up. The lunch with CONFIDENTIAL WITNESS 4 for the following day to discuss the Wistron opportunity and meeting with CONFIDENTIAL WITNESS 5, the head of North America of Wistron, an engineering behemoth who did 21 billion in sales and revenues in 2011.

Relator set up lunch with CONFIDENTIAL WITNESS 4 for the following day to discuss the Wistron opportunity.

128.    <u>Lockheed Martin inquires about the technology.</u> On the way to the sushi restaurant, <u>Spring mentions that a second billion dollar defense company had contacted them</u>. When Relator asked who it was, Spring refused to answer. Upon information and belief, that company was almost certainly to be Lockheed Martin.

129.    During lunch Spring speaks openly to **WITNESS 4** about the impending HTC deal. **WITNESS 4** asks him what the company is worth and Spring replies, "400 million dollars". This is a realistic number given that HTC paid 300 million US dollars for a 51% stake in Beats Audio only six months prior - and that was not their core business. When **WITNESS 4** asked about the management of the company, Spring said he had a four member management team (which contradicts sal's statements and actions in how they are willfully ignoring our board and management rights). **Then Spring mentions yet again that the company is taking some measures to open up new bank accounts with 24 hour service.** UPON STRONG INFORMATION AND BELIEF, COGNITIVE CODE DEFENDANTS HAVE AND CONTINUE TO POSSESS AND MAINTAIN OFFSHORE BANK ACCOUNTS IN ASIAN COUNTRIES, UNLAWFULLY LAUNDERING MONEY.

130.    Huml asked about the present management team, Spring replied it was only four people – obviously referring to Bourbeau, Relator, Defendant Mimi Chen Chen, and Spring as Defendant John Chen had not been heard from or cc'ed on an email or taken part in a board meeting since his fraudulent conduct in May of 2011. Defendant John Chen had not yet reappeared.

131.    This comment disturbed WITNESS 4 and Relator. WITNESS 4 told Relator after they dropped Spring off that even the mere appearance of impropriety is unacceptable and why would he need to wire money at 2 am? WITNESS 4 will provide an affidavit and testify under oath to these statements and incidents.

132.    Incredibly, the following day Defendant Spring blows off the corporate opportunity of meeting WITNESS 5 and Wistron for second time. He doesn't even have the courtesy to call WITNESS 4 the following day. Defendant Spring had now repeatedly disregarded on multiple occasions corporate opportunities with two separate multi-billion dollar companies in Magna and Wistron.

a. The importance of Magna and Wistron and the business benefits Odish had provided to the company for over a year.

133.     **Amazon email, "partnership with northrop grumman."** In a January 2012 email to Jeff Bezos of Amazon, Defendant Mimi Chen **refers to her relationship with Northrop Grumman as a "partnership"**.

### JANUARY 12, 2012 - DURING THIS WEEKEND, SPRING STATES THAT COGNITIVE CODE IS NOW WORTH "SEVERAL HUNDRED MILLION DOLLARS".

134.     Spring calls calls Relator and tells him that HTC thinks the SILVIA™ IP is better than SIRI's, and that Spring will be traveling to Tiawan at end of January. Then out of the blue a bold-faced lie "joseph, I thought you transferred your board seat to John?" which he damn well knew I hadn't and said "transparency is a courtesy". Relator had to send him an email immediately after saying that transparency to a fellow board member was a fiduciary duty.

135.     Relator Odish emails Defendant Spring telling him I know "he's freaked out about the dual signature requirement and they will address it when he comes back from Tiawan".

136.     Spring tells Relator Odish that the HTC executives made a number of very significant admissions to him: the HTC executives told Spring that Cognitive Code's Intellectual Property, patent and software was far superior to SIRI and that they needed the patent and intellectual property to fight off Apple in their ongoing patent wars being waged here in the United States. Relator was excited over the news but wanted to know more and who would be handling all of this business, negotiation, etc. The subject of Defendant John Chen returning to the company came up it became awkward. Spring said the JV would handle all this business. Relator asked to be more involved and be entitled to more disclosure as Relator is a Board Member. Spring replied, rather absurdly, "Joseph, transparency is a courtesy".

137.     Then Defendant Mimi Chen fabricates a lie about me promising to give up dual signature at dinner (she was trying to play that foolish "there's three of us versus your one word"). I try to be polite, but she insists and lies some more. Understand they had been lying to John and I for several months now constantly. And I let her have it. I was just tired of all the lies, half-truths, all the bullshit. The fact she would exploit the nice dinner Relator had... So the next day I email Patrick something very similar to what I had emailed him before about being more aggressive, subject to Defendant Spring's approval on the strategy. He says Joseph "please do not contact Barbara Pearson". I immediately reply, "Okay. I wouldn't do it unless Relator were all on board."

Having returned home to Michigan, on January 12, 2012, Defendant Spring calls Relator and tells him the following good news. Defendant Spring had spoken to the Senior HTC executives and they wanted Spring to fly to Taiwan to meet with their engineers and the HTC acquisition and Portfolio Manager at the end of January to discuss the acquisition and train the engineers on our SILVIA software.

138.    *Spring admits to DEFENDANT BOURBEAU that the Company is worth "Several Hundred Million dollars" now that HTC wants at least 51% of the Company.* That same weekend, Spring called Bourbeau and told him the great news about HTC and how they would be flying him to Tiawan to meet with the HTC Portfolio and Acquisitions Manager. Bourbeau asked what that meant to the value of our company if HTC were to purchase a 51% stake in the company, Defendant Spring replied "several hundred million dollars".

139.    In January 2012, Cognitive Code Defendants essentially start to harass Relator Odish over his Dual Signature Rights, despite Relator not seeing a single contract since April of 2011 (the Onstar Agreement). The last document or contract Relator had seen or reviewed [but he and Spring did not sign] was the OnStar [GM] Agreement in late April 2011.

## JANUARY 17TH, 2012 - ACT OF RETALIATION AND CONSTRUCTIVE DISCHARGE, RECEIPT OF FRAUDULENT AND BASELESS "CEASE AND DESIST LETTER" FROM NEW GENERAL COUNSEL OF COGNITIVE CODE CORP., SAL DIFAZIO.

140.    The first conversation between Relator and Difazio was testy and revolved around Relator's dual signature rights. Defendant Difazio, supposedly General Counsel of the Corporation, was immediately threatening "to seek judicial relief to strip Relator of his dual signature rights" were contractually granted to him and part of the bargain as well as a part of his stock rights.

141.    During the first call with Defendant Difazio as the new "general counsel" for Cognitive Code Corporation threatens to seek judicial relief of dual signature rights and screams at him over the phone in an obvious attempt to intimidate and harass Relator into giving up something so that CC Defendants can cover up their fraud. Defendant Difazio states to Relator, "you don't need to know everything."

142.    Defendant Difazio promised in this email and in phone conversations with Relator Relator and Bourbeau that he would act ethically and in the best interests of the corporation. Defendant Difazio requested that Relator and Bourbeau send him "their version of the facts" and a "wishlist" as to what they wanted to see accomplished. Difazio stated he already had the individual

Defendants version of the facts but needed Relator in order to effectuate a resolution and draft a new shareholders agreement supposedly.

143.    Relator relied on Defendant Difazio's representations and began preparing their version of the facts and a supposed wishlist and their version of the events or "dispute". Defendant Difazio admits to Relator attorneys that he and Defendant John Chen are essentially running the company, a very disturbing proposition to Relator.

144.    After the initial confrontation, Relator relied upon Defendant Difazio's representations that he would act ethically as General Counsel. On January 18, 2012, Difazio sent Relator an email stating that the Cease and Desist Letter he sent Relator "created no causes of action against Relator". On January 20, 2012, Relator sent Difazio an email stating that he wished to discuss a buyout of his shares, he had basically had it with this disturbing conduct and it had taken a significant toll on him.  Difazio asked Relator to compile "their version of the facts" and a "wishlist" of what they wanted to see done with the company. Difazio was in retrospect trying to conduct free discovery.

### DIFAZIO AND COGNITIVE CODE DEFENDANTS REFUSE TO ALLOW ODISH TO LAWFULLY ASSERT DAMAGES IN THE ALABAMA LITIGATION AGAINST MEI DEFENSE TECHNOLOGIES THAT WOULD HAVE AFFORDED DAMAGES EQUAL 20% OF COGNITIVE CODE'S VALUE.

145.    Relator Odish had told his Alabama attorney Patrick Miller - repeatedly, in multiple emails - that he wanted to assert damages on behalf of Cranbrook in November and December 2011 in the ongoing Alabama litigation against MEI DEFENSE TECH, the billion dollar defense parent company. In light of the ridiculous cease and desist that Difazio sent to Odish, he was precluded from doing so because he knew if tried they would lie and create some additional fabrications. Relator respected the Cease and Desist despite it being baseless.

### FEBUARY 6TH, 2012 PHONE CONFERENCE BETWEEN RELATOR AND GENERAL COUNSEL DIFAZIO. One of many definitive instances of wire fraud by Defendant Difazio and other Cognitive Code Defendants.

146.    On a Monday February 6th, 2012, Shareholders Relator and Bourbeau had a conference call with their General Counsel Sal Difazio. During the call, Difazio did not at that time reveal his lifelong friendship with John Chen. But during that call, General Counsel explicitly acknowledged that Relator and Bourbeau each owned five equity points in the company. When shareholder

Bourbeau mentioned that Relator had only been given paper issuances of stock certificates dated April 11, 2011, General Counsel assured us that the issuance of the formal certificates was a mere formality and he would get those certificates out to us within the week or very soon. This was a fraudulent misrepresentation.

## FEBRUARY 9TH, 2012: REVELATION OF POTENTIAL 50 MILLION DOLLAR CONTRACT WITH NORTHROP GRUMMAN. *Another example of the many instances of wire fraud by Defendant Difazio and other Cognitive Code Defendants.*

*147.*    **On Feb 9th, 2012 at 4:58 PM**, Relator had a phone call with General Counsel Sal Difazio. The two spoke for some time. Shareholder Relator mentioned that he had offered to help Defendant Spring and Defendant Mimi Chen with their mortgage, Defendant Difrazio mentioned that "money is not an issue, Joseph, there is massive money coming into the company... you are going to be a very rich man, Joseph. Relax and take care of yourself... Now, I will need you to give up that dual signature requirement...". When Relator mentions his right to review and sign every contract and he asked to see the Northrop Grumman agreement, Defendant Difazio promised to send it to him. Difazio then said, *"I told John Chen, you spend $200,000 on a 50 million dollar contract."*

> *a. Upon strong information and belief, that 50 million dollar contract from NORTHROP GRUMMAN HAS BEEN MISAPPROPRIATED, EMBEZZLED AND BURIED IN OVERSEAS BANK ACCOUNTS.*

148.    Relator now realizes that the ten million dollar licensing agreement that Spring had told him about from Northrop Grumman agreement was almost certainly to be 50 million dollars and not the original ten million dollar figure, which was a fraudulent misrepresentation.

149.    Relator  was deeply disturbed that this new General Counsel was the lifelong friend of Defendant Chen, who had resigned for defrauding Relator and Bourbeau. And just as disturbing, for the first time Defendant Difazio explicitly stated he was after Relator's board seat.

## FEBRUARY 28, 2012 - EXHAUSTIVE DEMAND LETTER SENT OUT TO DEFENDANT DIFAZIO BY RELATOR' ATTORNEYS BILL HORTON AND SEAN WALSH VIA US MAIL AND ELECTRONIC MAIL. DIFAZIO RESPONDS VIA US MAIL AND ELECTRONIC MAIL.

150.    In the demand letter, sent out for a legal and proper purpose pursuant to Delaware Corporate General corporate statutory law § 220, it specifically requested information related to

the following corporations: HUWAEI, HTC, COMCAST, **NORTHROP GRUMMAN,** AMAZON, GENERAL MOTORS, CHRYSLER, FIAT, QUALCOMM, MATTEL, MAGNA, SONY, NBC, IBM, INTELLITAR, WISTRON, ETC. It was for a proper purpose and pursuant to Delaware Statutory Code § 220.

151.    On that same date of February 28, 2012, the US Patent for Cognitive Code was issued. Thus, pursuant to agreements signed by Spring and CCC Defendants the Relator now had fourteen calendar days in which to exercise their option to acquire additional shares through Cranbrook LLC and secure 7.5% of non-dilutable equity in Cognitive Code company.

152.    <u>On March 8, 2012 Relator rightfully exercise their Option to Purchase an additional 7.5 non-dilutable points (75,000 shares) in Defendant Corporation Cognitive Code for $937,000.00 at $12.50 per share.</u>  Relator exercise of their option for additional 7.5% non-dilutable equity stake, bringing Relators original non-dilutable equity interest to 17.5%[ this includes the 5% Relator gave to Bourbeau on condition that he procure the 937k in option money which he did not]. The closing date set for the Stock Purchase Agreement was May 1, 2012 in the eastern district of Michigan pursuant to a forum clause provision.

a.    The stock purchase agreement on Relator's affiliate entity Cranbrook LLC (pursuant to Shareholder Agreement) showed proof of funds of a seven million dollars in a capital account by a close relative (and attorney) of Relator, thus showing legitimate proof that Relator had access to close and fund Cognitive Code pursuant to the Letter of Intent.

b.    The Stock Purchase Agreement from Cranbrook also had a forum clause here in the Eastern District of Michigan.

c.    This was the stock purchase agreement that Defendant Bourbeau was supposed to procure the option money for the equity points that he and Odish had orally agreed to but Bourbeau did not perform and Odish had to procure 7 mm proof of funds from a family relative and attorney.

## MARCH 16, 2012 CONFERENCE BETWEEN DIFAZIO AND RELATOR'S ATTORNEY SEAN WALSH OF GIARMARCO, MULLINS & HORTON, P.C.

153.    On March 16, 2012, Relator's attorney Sean Walsh (AND DEFENDANT BOURBEAU) and the general counsel Sal Difazio held a conference call to update Relator's attorney.  The call was designed to have our supposed General Counsel update Relators on where things stood with the Corporation and all the terrific opportunities that were taking place. But during the call Defendant Difazio continued his pattern of harrassment, in a veiled attempt to extort Relator into

giving up his dual signature rights. Additional statements and representations made by Difazio during the call include the following:

a.      *Difazio stated that the Corporation was on the verge of "signing three huge deals, one particularly significant."*

b.      In willful violation of basic corporate laws and governance, Defendant Difazio refused to disclose or name any of the companies related to these "three huge deas", though one was obviously Northrop Grumman. Such refusal of disclosure regarding material information is a breach of his fiduciary duty.

c.      Defendant Difazio stated that "they" (Spring, Mimi Chen and John Chen) reject the demand for the option.

d.      Defendant Difazio then stated that if Relator Odish wanted his formal stock certificates he had to agree to give up dual signature rights, board seat, and the anti-dilution provision that protect his shares from being diluted. Difazio stated "so, sean, if the company is worth  500mm? these guys think there are entitled to 50mm? oh, c'mon..". Defendant Difazio then admitted that he was not just acting as General Counsel but he was in fact, with John Chen, "leading up" the charge to find people to negotiate the contracts. He essentially admitted that he and Defendant Chen were running the company out of New Jersey, a fact Relator find deeply troubling;

e.      Defendant Difazio admitted his primary participation in running the Corporation now as he said he was actively involved in finding a company to help negotiate deals moving forward... that there had been too much patience in getting a deal done. Marketing and negotiations will be handled by a 3rd party. Relator did not know it at the time but upon receipt of April 30, 2012 documentation as discussed below, the third parties heading up this negotiation or special committee were the individual Morgenthaler family members: Gary Morgenthaler, Todd Morgenthaler,  Gaye "Lissa" Morgenthaler and David Jones.

f.      During March 16, 2011 call, Defendant Difazio admits HTC had made a formal tender offer or [DEMAND] for the Company and had given Spring "a number" but refused to disclose what that number was, but that Spring had countered with his number and HTC said Spring's number was too high and preferred to acquire a majority stake, 51%. Again, Difazio refused to say what the numbers were, but upon information and belief, Spring asked for "700 million dollars" the latest valuation number he had stated in January 2012.

g.     Defendant Difazio then fraudulently states that Northrop Grumman deal is likely dead and it won't be worth anything more than "only 600,000 or 700,000 dollars". This was and is a fraudulent misrepresentation.

h.     Difazio states that NORTHROP GRUMMAN had developed the prototype for Chrysler. What Defendant Difazio didn't know was that Relator was aware of the fact that **NORTHROP GRUMMAN had also created a prototype cellphone employing SILVIA™ for HTC.**

154.    Upon information and belief, and certain tax documentation and bank statements, Cognitive Code Defendants have been misappropriating and embezzling corporate funds for their own personal use, while also intentionally violating federal currency transaction reports that financial institution are required to file. See Bank Statements from Cognitive Code's Account, in documentary of exhibits to be submitted to US attorney general. They have also of course as stated in herein previously set up overseas and offshore accounts and likely buried the 50 million from Northrop Grumman and done same with new licensing agreement.

*155.*    Subsequently, the parties agree to an April 17th Inspection date of books and records in the headquarters in New Jersey at Difazio's office. Difazio would lie and cancel. Then Difazio would promise to come to Detroit after flying to San Francisco to meet with **Nixon Peabody** on April 25th, but that was also a false promise, and other instances of mail and wire fraud.

### *a. NEARLY ALL OF THE PHONE CONVERSATIONS AND WRITTEN CORRESPONDENCES FROM DEFENDANT DIFAZIO CONSTITUTED MAIL AND WIRE FRAUD AS HE USED THE MAILS TO SEND OUT THE CORRESPONDENCES BUT ALSO SENT THEM THROUGH ELECTRONIC EMAIL WIRES.*

156.    On March 27, 2012, Defendant Difazio sends Relator's attorney Sean Walsh a formal correspondence essentially stating that they have no intention of performing on the Option to purchase the additional 7.5 equity points because "it had lapsed". This material misrepresentation in writing by Difazio completely contravenes the representations made by Defendant Spring in late November 2011 when he told Relator that their Option rights were absolutely still valid as the patent had not yet been issued.

157.    The statements in this March 27, 2012 letter from Difazio stating the grounds for the company's non-performance (that time had lapsed) are in direct contrast to the representations made by Spring in December 2011 to Relator that the Option rights were still good until two weeks after the issuance of the US patent for Cognitive Code, per the agreement the parties had signed.

158.    **Defendant Difazio offers Relator Odish 5 million dollars for Relator's shares and rights, which is rejected as it was not provided with full disclosure**. This was a personal offer made by Difazio, not the corporation, to Relator's attorney and almost certainly backed up the Morgenthalers. Under Delaware law, the buyout of a minority shareholder's shares must come with full disclosure. And given the valuation's being thrown around by Spring and Chen and the others, the shares were worth at least 20-25 mm, if not more - based upon projections from Spring and valuation opinions as the company was a target acquisition by two multi-billion dollar companies. **(See Affidavit executed by attorney Sean Walsh, Exhibit B-1)**

159.    On April 10, 2012, Relator attorney Walsh sends Difazio a written correspondence.  On April 12, 2012, Relator Attorney Walsh sends  Difazio another written correspondence. In correspondences Relator's attorney Sean Walsh urges Defendant Difazio to respect Relator's lawful contractual rights and status as a lawful shareholder and Board Member of Cognitive Code Corporation. These correspondences reference NIXON PEABODY on two separate occasions. These correspondences, like the rest of the documents and emails in Relator Odish's possession create an important "paper trail"  of the facts and the circumstances of the bringing of this action. In recent discoveries by Relator, NIXON PEABODY'S SAN FRANCISCO ADDRESS is listed on SEC FILINGS on behalf of NUANCE AND SHAREHOLDERS/AFFILIATES.

160.    All the dates of inspection of books and records. Several weeks pass and Difazio had not sent a single document pursuant to the exhaustive Demand Letter sent by Relator attorneys. Difazio cancelled the April 17th, 2012 inspection. Difazio then promised he fly to detroit with the Book and Records on April 25, 2012 but this was yet another empty and false promise.


**APRIL 30TH, 2012  - ELECTRONIC WIRE SUBMISSION OF DOCUMENTS BY DEFENDANT DIFAZIO TO RELATOR'S ATTORNEY SEAN WALSH. RELATOR SEES MORGENTHALER NAME OF FRAUDULENTLY BACKDATED STOCK WARRANTS AND REALIZE MORGENTHALERS HAVE EFFECTUATED A SERIOUS INSIDER TRADER VIOLATION.**

161.    Then on April 30th, 2012, Defendant Difazio sends Relator attorneys a mere fraction of the documents requested and not a single contract or even draft of a contract. In April 30th, 2012 Defendant Difazio outrageously writes in a letter to Relator attorneys that Relator's board seats and dual signature rights are "mere perceptions". The warrants sent by Defendant Difazio were fraudulently backdated. And the warrants were issued only weeks after Relator exercised their Stock Option Rights at 12.50 per share. The documents display Defendant Difazio issued warrants

to himself, to Gaye "Lissa" Morgenthaler, David Jones, for a price per share less than the option price Relator were prepared to pay for the 7.5 non-dilutable equity points.  [See Issuance of the backdated Warrants which were issued for a price less than what Relator LLC was prepared to pay.] <u>Relator Odish showed proof of funds of 7 million, and these funds are from a close family relative of Relator who also serves as his attorney and attorney for his family. See Exhibit B-2, Lawful Exercise Relator Cranbrook LLC's rights to purchase 7.5% of Cognitive Code stock for $937,000.</u> The proof of funds of 7 million far exceeded the 2.5 million contemplated by Original LOI.

162.    A warrant is a contract - and every contract must be reviewed and signed by Board Member Relator Odish and Spring per the contractual addendum, a contractual right that flows with his stock rights. As the Cognitive Code Defendants engaged in serious misconduct of misappropriation and embezzlement of corporate funds as Relator would ultimately learn, that dual signature right was a problem for them and a source of the retaliation against Relators.

163.    For a General Counsel to freeze out a Board Member who possesses dual signatory rights in order to issue fraudulently backdated warrants is outrageous. Moreover, they were executed without Board Member Relator's signature and with Defendant John Chen's signature making them legally null and void.

164.    **"Mere Perceptions"**. Willfully and with utter disregard for Relator's rights, Defendant Difazio in an accompanying letter to Relator's attorney Sean Walsh on states that Relator's board seat and his dual signature rights are "mere perceptions" that will not forestall this company's operations. In this same set of documents, Defendant Difazio sends the Corporate Stock Ledger of Defendant Corporation showing Relator as a shareholder of the company. No corporate record books or copies of corporate minute books were sent by Difazio. To this day, Relator still have not received a copy of Relator corporate record book. The meager and fraudulent collection of April 30, 2012 did not display a single contract with any business entity such as Northrop Grumman. The Demand Letter even went so far as to request emails and other date related to the ongoing business. It easily requested well over 200 documents - and Defendant Difazio sent 12 documents.

165.    The April 30, 2012 documents submitted by Difazio show that the stock options/warrants issued to Gaye Morgenthaler and David Jones, in lieu of putting Gary Morgenthaler's name on them, is essentially one of many likely violations of the AKA, Anti-Kickback Statute.

166.     Relator had offered $12.50 per share for the exercise of their stock option rights. By the April 30, 2012 submission of documents, it is clear that one day prior to sending the Rejection Letter on March 27, 2012, Difazio and the three other founders-directors issued warrants to Difazio and other individuals at significantly less an amount than Relator option price. See Index of Exhibits, Issuance of Warrants. And these warrants were fraudulently backdated with an exercise date of November 1, 2011. There were additional disturbing factors of the documents emailed by Difazio to attorney Walsh as stated below.

167.     **Fraud Upon the Corporate Stock Ledger**. The Corporate stock ledger showed Relator's name on it. Additionally, the corporate stock ledger provided by Difazio had fraudulent entries besides the stock warrants. Laura Pelletier had loaned the company 50,000 dollars which was converted to stock. She only owned ten thousand shares, but Difazio fraudulently gave her debt instrument and treated as an equity purchase from 2009, giving her an additional 10,000 shares she does not own. The word "ownership" was also misspelled on the document.

168.     **Fraud Upon the Financial Statements Provided by Difazio**. In addition to the fraudulent entries on the corporate stock ledger, Difazio sent financial statements of the corporation which had obvious fraudulent entries, such as the Peter Winslow entry.

169.     **Fraudulently backdated Stock Warrants** issued to Difazio and Gaye "Lissa" Morgenthaler and her husband David Jones. The stock warrants the Difazio issued to himself, and two of the Morgenthaler Defendants.

170.     **Fraud Upon the Transaction Log submitted by Defendant Difazio**. Difazio submitted a transaction log for the corporation that stated it was current through Dec 31, 2011 but in a rather absurd fashion, the transaction log cut off somewhere in the middle of 2009. It was an intentionally utterly incomplete document.

171.     Upon information and belief, Nuance Defendants instructed Difazio in exercise of control authority to engage in intentional dilution and issuance of bogus stock warrants to prevent the Cognitive Code Company from Relator's LLC having or being able to lawfully exercise its right to purchase the additional non-dilutable 75,000 shares for $937,000.00 at a per share price of $12.50. The fraudulently issued warrants to Difazio and two of the Morgenthaler-Nuance defendants were issued to them at a heavily manipulated price which would constitue a "kickback" in violation of the anti-kickback statute, at prices of $5.00 per share and $7.00 per share as delineated below and in the March 26, 2012 "Consent in Lieu of Meeting of Directors".

172.    The stock options/warrants were executed on March 26, 2012, after Relator's LLC (Cranbrook) lawfully exercised it's option rights on March 8, 2012 and these stock options and warrants were fraudulently backdated to November 1, 2011.The stock options and warrants from March 26, 2012 document sent to Relator's attorney Sean Walsh on April 30, 2012 were in part listed as follows: SAL DIFAZIO granted himself 5000 shares at $7.00 per share with an expiration date of October 31, 2015 and a fraudulent backdate of November 1, 2011, and an additional 2,000 shares to himself for $ 5.00 per share. 10,000 fraudulent stock options/warrants were issued each to Gaye Morgenthaler and her husband David Jones at a price of $ 7.00 per share, for a total of 20,000 shares to Gaye Morgenthaler and her husband.

173.    The entire list of fraudulent stock options/warrants totaled 33,000 shares and distributed as shown in the document, to be provided to Attorney General; Cognitive Code Corporation's March 26, 2012, List of Fraudulently Backdated Stock Options issued to destroy Relator's LLC rights in acquiring an additional 75,000 shares.)

## JULY 5, 2012 - FORBES MAGAZINE ARTICLE ON COGNITIVE CODE "Riding the Wave of Artificial Intelligence. Forbes specifically states that Spring and CC are in business with Northrop Grumman. See Exhibit B-3.

174.    On July 5, 2012, Cognitive Code was featured in Forbes Magazine and specifically stated that the company was in business with Northrop Grumman and "one of the big three" and had received money from an "angel investor". Upon information and belief, the "angel investor" is likely Nuance Defendants (and/or their agents and officers, likely the Morgenthaler family), who wrongfully and illegally exploited MATERIAL, NON-PUBLIC information in violation of insider trading laws and then used that misappropriated information [that Cognitive Code was about to be acquired by APPLE competitor HTC] and realized that CC's SILVIA technologies and virtual artificial intelligence software [as perfected by Northrop Grumman's engineers] actually did work and decided to "gut" and misappropriate the IP/Patent and technology for himself and his VC company, and upon strong information and belief, for APPLE. The FORBES article on Cognitive Code Corporation and Defendant Spring has specifically acknowledge the Cognitive Code is in "business with Northrop Grumman, one of the big three (which was obviously known to Relator to be Chrysler) and an angel investor". Forbes Article on Cognitive Code Corporation. See Index of Exhibits.

175.    Defendant Spring said to Relator in December 2011 that Relator and Bourbeau were - in complete contravention to the contractual grant of their stock - going to get tagged and 1099'd each for 250,000 dollars for a total of 500,000 dollars. They backed off this when it became obvious that their "advisors", upon information and belief, told them this would constitute massive tax fraud.

176.    **Subsequent revelations after April 30,2012 submission of documents by Defendant Difazio - Fraudulent concealment and actions of Cognitive Code Defendants**. These revelations of fraudulent actions by Defendants prove unequivocally that they never had any intention of ever performing on their agreements signed with Relator, creating an undeniable securities fraud claim under 10b5. At the time of filing of this action, the Defendants still have not tendered Relator their Formal Stock Certificates.

a. They withheld the material fact that they had executed another agreement only five days [March 1, 2011] before the Relator Cranbrook LLC's Letter of Intent.  *See Prescient Capital Group Agreement signed by John Chen.* The revelation that Defendant John Chen had signed this Agreement was fraudulently inducing Relator Odish to agree and sign the Newman agreement that initially obligated to pay Newman $175,000 US dollars upon funding but then exposed Relator Odish to "damages above and beyond that amount", constitutes a 10b5 violation under United States Supreme Court under **_WHARF HOLDINGS v UIH, 532 U.S. 528_**, as it is clear that Cognitive Code Defendants from the get-go never had any intention of performing on the agreements they signed. Despite all other resolutions and appropriate corporate docs being signed, Relator still does NOT have his official and formal stock certificates. They have been trying to extort him into giving up his rights for those certificates, constituting other acts of retaliation based solely on the fact that Relator Odish, as an attorney, wanted the company to be run in a proper and lawful manner. Cognitive Code defendants wanted the company to run like their personal slush fund.

177.    This present Federal Matter is a distinct and Separate Case, but certain prior and pending proceedings are relevant for this case in establishing additional fraudulent claims as well as the motive and Scienter of Cognitive Code and Nuance Defendants.

## THE ALABAMA LITIGATION INVOLVING COGNITIVE CODE VERSUS MEI DEFENSE TECH/INTELLITAR - 1) AGAIN, RELATOR ODISH AND HIS LLC ARE

**PREVENTED FROM ASSERTING RIGHTFUL DAMAGES, 2) FRAUD AND ABUSE OF PROCESS.**

178.    For much of year while working to save and build the tech startup, Relator Odish also assisted Patrick Miller, Alabama Counsel for Relator Odish and Cognitive Code in those proceedings.  Defendant spring admitted this to Relator in October 2011 that the ten points they had offered him were being used to assert additional damages against Intellitar  and its parent company **MEI DEFENSE TECHNOLOGIES, INC.** Patrick Miller in those Alabama proceedings asked Relator to sign **two separate sworn affidavits** which stated he was a shareholder in the company and those affidavits were used in the proceedings.  Patrick Miller and Robert Rosen would NOT use those sworn affidavits in the LA proceedings. Furthermore, despite owing Odish and Cranbrook a fiduciary duty as their counsel, Miller willfully breached and engaged in a manipulative scheme at the behest of Cognitive Code Defendants as soon as the DEMAND LETTER was sent out in late February 28, 2012 - as Miller immediately, in conspiracy with Difazio, filed a protective order in the Alabama action. Patrick Miller would also file a FRAUDULENT DECLARATION AGAINST RELATOR ODISH IN THE LOS ANGELES PROCEEDINGS. The action invokes principles of and related to:

> a. Judicial Estoppel.
>
> b. Interrogatories name Odish as a shareholder.
>
> c. Two Sworn Affidavits under penalty of perjury executed by Odish stating he is a shareholder used in that litigation.
>
> d. Mail and Wire Fraud by Defendants: Use of Verizon Records and Emails to disqualify MEI's Alabama defense counsel.

179.    During summer of 2012, Relator engaged and hired a top securities fraud attorney in Los Angeles, California on August 17, 2012 to pursue his civil damages against Cognitive Code Defendants and Morgenthalers. Relator hired Attorney Robert Rosen, an attorney who was certified as securities fraud expertise and had been licensed to practice law since 1970. Relator was born in 1969 so the attorney he hired had over 40 years of commercial litigation experience.

180.     Relator knew he had securities fraud claims against the parties but Relator Odish was not a litigator, nor was he a securities fraud attorney and Attorney Rosen was engaged to a large extent on the fact that he was an attorney for the Securities and Exchange Commission during the 1970's.

181.     Attorney Rosen who filed a federal complaint against Cognitive Code defendants for 175 million US dollars in damages and in first complaint only Cognitive Code Defendants. Inexplicably, he did not file one federal law claim. They were all state law claims. The only reason to file in California was to obtain jurisdiction over the Morgenthalers. The complaint filed on October 22, 2012 had the Morgenthaler name and discussed Gary Morgenthaler and other Morgenthaler defendants extensively without naming them, though promising to name them - this was the sole reason of filing in California. **See Index of Exhibits**: October 22, 2012 COMPLAINT FILED BY ROSEN AGAINST COGNITIVE CODE DEFENDANTS SEEKING 175 MILLION DOLLARS IN DAMAGES.

182.     Relator' attorney Rosen had promised that he would name the Morgenthalers in subsequent amendments. But disturbingly he never did. Relator will turn over relevant information to the Attorney General regarding this matter.

183.     The proceedings as a result of Relator's own attorney and the opposing counsel, Howard Fredman, who represented the Cognitive Code Defendants were deeply disturbing and compromised. Not a single federal claim and virtually no discovery was done. Almost immediately after filing the complaint, Relator realized that his attorney Rosen had a serious conflict with Jerry Newman and he should have never accepted the engagement. Newman was expected to be named never was and Attorney intentionally breached attorney-client privilege by communications with Newman in early November 2012 only a few weeks after filing the complaint.

184.     **ADDITIONAL ACTIONABLE CONDUCT AFTER INITIATION OF LOS ANGELES PROCEEDINGS. Perjury on Delaware State Annual Franchise Tax Filings made by John Chen and Cognitive Code Defendants.** Chen filed these state documents in the commission of perjury and stated that the company has Zero members on the board of directors for year of 2012, filed on February 2013. John Chen committed perjury for 2012 filing when he didn't name Relator as a Board Member as required by the State of Delaware Annual Franchise Tax Report, 502(b), filed under penalty of perjury.

185.   **Morgenthalers on the Cognitive Code Advisory Board.** In the emails in possession of Relator, the Cognitive Code Defendants usually refer to Gary Morgenthaler, his siblings and David Jones as "their advisors". Presently, Cognitive Code's website listed Gaye Morgenthaler and her David Jones as members of the **ADVISORY BOARD** of Cognitive Code. As they are named in a prior and present separate civil action, Relator did not want to name them in this action, without the approval of the attorney general.

186.   Relator references to "corrupted" judicial proceedings is no way referring or including the Honorable Federal Justice Olguin. He is not aware of these facts despite Relator attempts to inform the Judge of the massive fraud being perpetrated upon him and the government. The corruption of the proceedings references the actions of Relator's own (former) attorney Robert Rosen, his own co-plaintiff Bourbeau (who is seeking to terminate Odish's rights through conspiracy with Rosen) and opposing counsel representing Cognitive Code Defendants, Howard Fredman, who have acted in collusion, fraud and deceit.

187.   Relator's wife was expecting their second in late January 2013 and his daughter was born on January 30, 2013. Subsequent to that, Relator actively sought new counsel but it was extremely difficult as his friendship and relationship with Bourbeau had broken down.

188.   Attorney Rosen without seeking Relator's consent signed a protective order in the matter. Then, in late January 2013-early February 2013, Gary Morgenthaler was sent a subpoena by Attorney Rosen. Relator Odish will turn over the contents of the subpoena to Department of Justice and FBI pursuant to the federal statute authorizing this action. Rosen also sent a subpoena to Gaye Morgenthaler and her husband Jones but Rosen never turned over the subpoena replies to his clients for his review.

189.   In February 2013, Attorney Rosen sent Relator correspondences that he "was propounding discovery". Relator sent Rosen a number of emails over the next few months inquiring about the status of any Subpoenas to all the relevant entities including Northrop Grumman, HTC, Comcast, Chrysler.

190.   The deadline for amending the complaint and adding and naming new parties was April 8, 2013 per the scheduling order. Rosen waited until the few days before this deadline to inform Relator he was not naming any of the Morgenthalers. Relator was deeply upset by this ommision and it only confirmed that his attorney was compromised.

191.  **A Single Page of Discovery after 14 months of litigation**. After fourteen months of civil litigation, the entire scope of discovery attorney Rosen had conducted could be summarized in a single page: John Chen's Resignation Letter from June 2011 that Relator had insisted comport with the truth. This was the only document Fredman, Defendant Difazio and CCC defendants produced after a year.

192.  **Rosen does not send a single subpoena to a single business entity**. In another disturbing disturbing revelation, Relator's learned in June of 2013 after several months of filing the complaint that his Attorney had not sent a single subpoena to Northrop Grumman, HTC, Chrysler, Comcast or any of the entities listed in the Demand Letter and the voluminous emails and documentation. Rosen had filed a complaint for 175 million dollars and not sent a single subpoena to any entity.

193.  On the exact date of June 11, 2013, Relator, deeply disturbed by the revelation that his attorney Rosen had lied to him about "propounding discovery" and did not send a single subpoena to Northrop Grumman, HTC, Comcast or any other company listed in attorney Walsh's Demand Letter of February 28th, 2012, Relator continued his viligence in doing research into securities laws and for first time used the EDGAR feature on the sec.gov website.

194.  Relator stumbles on sec.gov and for first time in June 2013 starts scouring the "Edgar" function on the SEC site. As perhaps stated previously herein, Relator is a real estate and transactional attorney. As his attorney Robert Rosen was and is one of the top securities attorneys and a former attorney for Securities and Exchange Commission during the 1970's, Relator reasonably relied upon his expertise in the area of securities fraud and other matters.

195.  On that date of June 11, 2013, Relator learned the Cognitive Code defendants had filed a Fraudulent Sec Reg D Form They only filed their Reg D filed November 29, 2012, after the filing of our action in October 2012. Then Relator learned that John Chen committed two counts of perjury for 2012 and 2013 filings when he didn't name Relator as a Board Member as required by the State of Delaware Annual Franchise Tax Report, 502(b), filed under penalty of perjury. And the 2013 filing was absurd because Defendant Chen filed that report and named "zero present directors" running the company.

196.  On June 11, 2013, Relator went onto the SEC website and for first time used EDGAR research function. Relator is not a securities fraud attorney and was not aware of this search feature. On this date and using the EDGAR function Relator for first time saw that Cognitive Code Defendants had made a filing with the Securities and Exchange Commission, a REG D FORM

that contained a multiple fraudulent statements in the document. The date of "6/11/13" is listed in the left hand corner of the print off of the SEC filing.

197.     The fraudulent REG D FORM filed by Cognitive Code Defendants was filed on December 20, 2012, nearly two months after the filing of the California complaint Relator's attorney, Rosen. It is well settled that the intentional misstatements or omissions on documents with the Commission can constitute a Title 18 U.S.C.S. § 1001 violation. [It is patently obvious to determine that the Reg D Form has intentional fraudulent misrepresentations made by Cognitive Code Defendants by simply comparing it the Corporate Stock Ledger Difazio had created and sent Relator Odish's attorney Sean Walsh.]

198.     Relator immediately informs Rosen and specifically asks him as an attorney with 43 years of legal experience in securities fraud if he and the other members of his law firm had scoured the SEC website for any relevant information related to this matter.

199.     Rosen informs Relator that they "scoured the SEC website" and had found nothing. This was a fraudulent misrepresentation from an attorney to his own client.

200.     Relator would learn during the important months from October 2013 through December and into January 2014, that this was one of many lies and fraudulent misrepresentations by Relator's own attorney to his client.

201.     On or about August 1, 2103, Relator caught his attorney Rosen in yet another lie regarding the matter and disgusted by this Relator tries to "fire" his attorney and asks for his immediate withdrawal. His withdrawal is mandated by california court rules and case law. But in extremely bizarre manner, Rosen refuses to withdraw from the matter. While the matter of his disqualification commences pending in August of 2013, Relator emails opposing counsel that represents Cognitive Code Defendants.

202.     As Rosen refused to even acknowledge this, Relator was informed that his securities causes of action against individual Morgenthalers were still very valid and he could pursue them as a separate action. Thus, Relator began work on a separate and distinct action against the morgenthalers and continued research and diligence and filed a bare bones complaint on September 19, 2013.

203.     <u>Keenly Aware of Relator Odish and his Rights and Actions, the NUANCE DEFENDANTS (through Morgenthalers) take preventive action to construct false affirmative defenses by false and fraudulent filings with the SEC.</u> On August 27, 2013 and again on August 28,

2013, on two separate occasions Relator emails attorney Howard Fredman and specifically states his intention to file an action against the Morgenthalers in Eastern District of Michigan and perhaps consolidate the two actions. See Index of Exhibits. In the previous "90 days" of the calendar year of 2013 (and subsequent to the filing of Relator's own barebones complaint which constituted the original complaint in this action which was never served), Relator would come to learn that less than two days after Relator had emailed Attorney Fredman, Gary Morgenthaler and his lawyers on August 30, 2013 filed a bogus document with the SEC a document effectuating a "10b5-1 trading plan" on his behalf, through a related Morgenthaler entity that they had funded and controlled.

204.   Upon the discovery in November 2013 of this August 30, 2013 SEC Morgenthaler filing that was almost certainly a result of the emails to attorney Howard Fredman, Relator - not knowing what a 10b5-1 trading plan as he was still not a securities fraud attorney - learned from his own diligence that a "10B5-1 TRADING PLAN" is a device used by executives to create an affirmative defense to claims of INSIDER TRADING.

205.   **Both Rosen and attorney Fredman Cognitive Code Defendants tell Relator Odish that Cognitive Code is broke and has no money**, and has yet to sign any agreement - statements which are absurd in light of the Public documents a judge or court could take judicial notice such as the FORBES ARTICLE or MIMI CHEN'S TWITTER ACCOUNT [in which she has spent last two years telling the whole world all the deals they are signing]. See Mimi Chen's Twitter Account in Index of Exhibits.  The was the most disturbing component of what took place in those proceedings was the fact that Relator's own attorney, Rosen, and opposing counsel Fredman tried to convince Relator that Cognitive Code was "broke", there "was no money, the technology was worthless and "no agreements had been signed". Not with Northrop Grumman. Not with HTC. Not with the Morgenthalers.  These are all fraudulent misrepresentations.

206.   These assertions were being made despite the fact that judicial notice could be taken of the Forbes Article from July 2012 that specifically stated Spring and Cognitive Code was in business with Northrop Grumman, "one of the big three automotive companies" (which Relator knew was Chrysler even before the recent material revelations), and backed by "Angel Investor".

207.   Upon recent factual revelations within the Last 90 days prior to the filing of this action, it has become clear that the Morgenthaler were closely monitoring the proceedings but Relator's actions in this District as well for reasons delineated herein.

208.     On August 27, 2013, finally and desperately breaking free from attorney Rosen, Relator sent opposing counsel Howard Fredman an email expressly stating his intention to file a complaint against the Morgenthalers and consolidate the two actions. During the crucial month of November 2013 less than 45 days from date of filing of this complaint and during a period where Relator was working day and night to uncover just how far the "rabbit hole" goes, he came across this filing on the sec.gov website: on August 30, 2013, that same day, keenly aware of Relator Odish's actions Gary Morgenthaler files with the SEC a 10b5-1 Trading Plan. Relator odish does not learn of this filing until November 2013, which trigger the necessity of this action - AND AFTER HE HAD FILED HIS CIVIL ACTION AGAINST MORGENTHALERS.

*SEPTEMBER 19, 2013 - RELATOR ODISH FILES BARE BONES SECURITIES FRAUD COMPLAINT AGAINST MORGENTHALERS WHICH HE INTENDS TO AMEND. MONTHS LATER ODISH WOULD LEARN ON THAT SAME DATE THE MORGENTHALERS WOULD FILE DOCUMENTS WITH SEC FRAUDULENTLY CREATING AN AFFIRMATIVE DEFENSE BY FILING A 10B51 TRADING PLAN.*

*THIS IS WHY ONLY NUANCE WAS NAMED IN THIS QUI TAM ACTION - BECAUSE THERE IS A SEPARATE CIVIL SUIT RELATING TO MORGENTHALERS AND MORE IMPORTANTLY, UPON STRONG INFORMATION AND BELIEF, THEY HAVE TAKEN ACTION TO INSULATE THEMSELVES FROM INDIVIDUAL EXPOSURE IN SUCH A QUI TAM SUIT - SUCH ACTIONS WILL BE DISCLOSED TO THE ATTORNEY GENERAL.*

209.     At the time of the filing of the complaint, Relator was not aware of the material facts he discovered in early October 2013 and would continue to discover up through the filing of this action. Relator was not aware of the NUANCE and Relator was not familiar with False Claims Act and its applicability.

210.     But Relator continued to do research on Lexis Nexis, enormous amounts of research and then revisited the SEC website when in early October 2013 he discovered the filings and actions of the NUANCE Defendants (And their agents and officers) that would trigger the filing of this action.

## RELATOR ODISH BEGINS TO LEARN THE PARTIAL TRUTH IN SECOND WEEK OF OCTOBER 2013.

211.     Relator's october 2013 "revelations" - the sec-nuance filing discoveries that trigger and mandate the filing of this action. Relator odish first  learns of the unlawful misappropriation and evil scheme by nuance's 10-k sec filing.

212.     In early October 2013, Relator realized he could not trust anything his attorney Rosen had told him about this matter so he revisited the SEC EDGAR website for additional SEC complaints to model the action over when he reviewed NUANCE'S RECENT SEC FILINGS.

213.     Relator was genuinely shocked and disturbed to read in NUANCE'S SEC FILINGS a list of companies that match the companies listed in the FEBRUARY 28, 2012 DEMAND LETTER that his attorney Sean Walsh had sent out to Defendant Difazio.

214.     Nuance Communications, Inc. (NUAN), a multi-billion dollar publicly traded entity and as stated in Leslie Spring's email to Relator Odish had Gary Morgenthaler on its Board, was effectively being used [as RELATOR ODISH would learn over the next two months] as one of many either private or publicly traded entities that Gary Morgenthaler and NUANCE Defendants were in conspiracy with the Cognitive Code Defendants. Such unlawful actions and conspiracy are being used to generate enormous revenues through the unlawful and fraudulent use of stolen IP which was now being used on the government, private entities at both the state and federal level - and fraud of course against Relator.

215.     But the fraud being perpetrated directly against and as result of Relator Odish's contractual stock and dual signature rights was also now a multi-billion dollar fraud upon the government via the Federal False Claims act, as well as highlight the Antitrust law violations and numerous federal securities laws violations, as this was undeniable proof of a classic Insider Trading case - the "wrongful use or misappropriation of MATERIAL, NON-PUBLIC INFORMATION".

216.     THE NUANCE SEC 10-K FILING FROM SEPT 30, 2013 in conjunction with Relator Odish's own personal documentary evidence, Demand Letter and other items unequivocally prove that NUANCE Defendants (and officers, and related entities, and agents) in civil and criminal conspiracy with Cognitive Code Defendants unlawfully misappropriated MATERIAL, NON-PUBLIC INFORMATION (the information being that Cognitive Code was an acquisition target and was to be purchased by HTC and COMCAST, Two entities that are now disturbingly and unlawfully "embedded" as customers of NUANCE) and exploited it for their own tremendous gain.

217.     While this constitutes illegal and unlawful insider trading per the SEC rules, this is far more egregious than trading the stock. Gary Morgenthaler and the Nuance Defendants exploited their access to this Material, Non-Public Information and then essentially manufactured an unlawful scheme to use this Cross Platform technology in multiple entities that they control and generate

billions from the Defense Sector, Heathcare, Mobile/Cellular, Automotive Telematics, Toys, Gaming, Medical, Enterprise Solutions, Cloud etc.

a. A Detailed Review and verbatim recital of Nuance's SEC 10-K FILING DATED SEPT. 30, 2013 is necessary to appreciate the fraud upon Relator Odish and the government agencies. First and foremost, as stated above, the companies that NUANCE now could call a customer included the United States Army, HTC, ONSTAR [the last agreement Relator Odish was given by Cognitive Code Defendants in April 2011] Comcast, Amazon, Chrysler, Fiat, Mercedes, Denso.

b. A number of these companies match the companies in the February 28, 2012 Demand Letter.

218.    The relevant government agencies that are defined are the United States Army, the Federal Bureau of Investigation, the United States Department of Justice, UPS, Department of Veteran Affairs, TRICARE, and a number of references that Nuance was using it's new artificially **intelligent voice applications** [WHICH WAS OBVIOUSLY THE WRONGFULLY MISAPPROPRIATED SILVIA TECHNOLOGIES] "embedded" in the products and services and aggressively selling them to the Government and all other agencies and government programs.

219.    Upon strong information and belief, as Northrop Grumman's engineers effectively took over control of the technology (and therefore the company), Northrop Grumman is assisting and working with NUANCE DEFENDANTS in the embedding of the Intellectual Property as NG's website clearly discusses commercialization and licensing of IP. And NG's SADIE is almost certainly the same fraudulent product called NINA, owned and being marketed by DEFENDANT NUANCE.

220.    The unlawful misappropriation of Intellectual Property that the United States government paid for to help develop and create through payments to Northrop Grumman involved taking the SILVIA™, this multi-billion dollar artificial intelligence software with cross platform capabilities, and either embedding it into their Dragon Nuance products or repackaging it as something new and calling it NINA™.

221.    So first there was SILVIA™, the original platform, and then Northrop Grumman develops Sadie™ and the NUANCE DEFENDANTS, in bed with Apple, and desperately needing the best and most cutting edge patents and intellectual property they can get their hands on, steal this IP and repackage it as NINA™ .

222.    Basically the NUANCE DEFENDANTS, in conspiracy with Cognitive Code Defendants, have used Nuance as an "intellectual property laundromat" and this is why there is word on the street APPLE will likely acquire Nuance in the not to distance future - as contemplated by recent articles and the multi-billionaire Wall Street Investor Carl Icahn taking huge stake in Nuance. Relator will turn over information to Attorney General regarding this.

223.    If there was any doubt that NUANCE DEFENDANTS were keenly aware of Relator Odish's rights it must be stated that after reviewing the SEC filings and the website and seeing all same automotive companies that Relator was familiar with and conspicious by its absence is MAGNA. Denso is on the Nuance website, but Magna is nowhere to be found. Because they know Relator Odish brought Cognitive Code SILVIA™ to Magna and they wanted four licensing applications. [See the December 12, 2011 and December 16, 2011 emails from Leslie Spring to Odish about pitching the SILVIA software to Magna. So they specifically made a note not to approach Magna because Odish has a friend there and this would get back to him.

224.    Nuance's SEC 2013 filings also show that its customers now include APPLE and HTC, two tech giants that were formerly battling each other in court and around globe over patent infringement. As stated previously herein, in 2012 Apple and HTC subsequent to their 2011-2012 litigation entered into a quiet licensing agreement that upon information and belief is related to and potentially a result of the unlawful activities complained of herein.

225.    **Relevant Sections from Nuance's September 30, 2013 SEC Filing lifted verbatim:**

→ _We are a leading provider of voice and language solutions for businesses and consumers around the world. Our solutions are used in healthcare, mobile, consumer, enterprise customer service, and imaging markets. We offer market-leading accuracy in automated speech recognition, capabilities for natural language understanding, dialog management, text-to-speech, domain knowledge and implementation capabilities, built on our significant, long-term investments in research and development._ Our solutions are based on our proprietary voice and language platforms and are used every day by millions of people and thousands of businesses for tasks and services such as requesting information from a phone-based self-service solution**, _dictating medical records, searching the mobile Web by voice, entering a destination into a navigation system, or working with PDF documents._** We continue to develop more intuitive and comprehensive speech and natural language solutions that broaden our markets by expanding the types of solutions we offer. We offer our solutions to our customers in a variety of ways, including through products, hosting, professional services and maintenance and support**. _Our product revenues include embedded original equipment manufacturers ("OEM") royalties, traditional enterprise perpetual licensing, term-based enterprise licensing and consumer sales._** Our hosting revenues are primarily generated through on-demand service models, comprised of hosted transaction-based pricing arrangements that typically have multi-year terms. Our hosting, term license and maintenance and

support revenues are recurring in nature as our customers *use our products on a repeat basis to handle their needs in medical transcription, medical coding and compliance, enterprise customer service and mobile connected services. Our professional services also offer a visible revenue stream, as we have a backlog of assignments that take time to complete. We are seeing several trends in our markets, including (i) the growing adoption of cloud-based, connected services and highly interactive mobile applications, (ii) deeper integration of virtual assistant capabilities and services, and (iii) the continued expansion of our core technology portfolio from speech recognition to natural language understanding, semantic processing, domain-specific reasoning and dialog management capabilities.*

*Healthcare*
*The healthcare industry is under significant pressure to streamline operations, reduce costs and improve patient care. In recent years, healthcare organizations such as hospitals, clinics, medical groups, physicians' offices and insurance providers have increasingly turned to improving their clinical documentation process from capturing the physician voice to creating documentation through the use of the information to improve the delivery of care, quality measures, coding accuracy and appropriate reimbursement.*

*We provide a comprehensive set of solutions and services that support the clinical documentation process from capturing the patient encounter with their physician, to improved clinical documentation, coding, revenue cycle management and other functions.* Our hosted and on-premise solutions provide platforms to generate and distribute clinical documentation through the use of advanced dictation and transcription features, and allow us to deliver scalable, highly productive medical transcription solutions. *Our Clintegrity suite of products offer solutions that leverage captured information with state-of-the-art coding, compliance and record management, which streamlines health information management ("HIM") processes to assist compliance and reimbursement through professional services and time-based licenses. Through Clinical Documentation Improvement ("CDI") programs, computer-assisted coding ("CAC"), and computer-assisted physician documentation ("CAPD") we bridge the gap between physicians and coders. These solutions significantly streamline speed and completeness of documentation so that providers can shorten the time between the patient visit and the payment for that visit. Our solutions should enable future innovation to transform the way healthcare providers document patient care, through improved interface with electronic medical records and extraction of clinical information to support the billing and insurance reimbursement processes.* We also offer speech recognition solutions for radiology, cardiology, pathology and related specialties, that help healthcare providers dictate, edit and sign reports without manual transcription.

*We are subject to laws and regulations worldwide, changes to which could increase our costs and adversely affect our business. We are subject to laws and regulations affecting our domestic and international operations in a number of areas. These U.S. and foreign laws and regulations affect various aspects of our business including, but not limited to, areas of labor, advertising, digital content, consumer protection, real estate, billing, e-commerce, promotions, quality of services, telecommunications, mobile communications and media, intellectual property ownership and infringement, import and export requirements, anti-corruption, foreign exchange controls and cash repatriation restrictions, data privacy requirements, anti-competition, environmental, health and safety.*

*Compliance with these laws, regulations and similar requirements may be onerous and expensive, and they may be inconsistent from jurisdiction to jurisdiction, further increasing the cost of compliance and doing business. Any such costs, which may rise in the future as a result of changes in these laws and regulations or in their interpretation could individually or in the aggregate make our products and services less attractive to our customers, delay the introduction of new products in one or more regions, or cause us to change or limit our business practices.* <u>We have implemented policies and procedures designed to ensure compliance with applicable laws and regulations, but there can be no assurance that our employees, contractors, or agents will not violate such laws and regulations or our policies and procedures</u>. [End of SEC filing languageSee NUANCE SEC 10-K FILING submitted for acceptance and approval on September 30, 2013, in violation of the False Claims Act regarding money, payment or approval. The applications in healthcare are obvious and unlawful. Nuance's Dragon dictation products were always simply dictation and nothing more - they had no "digital assistant" or artificial intelligence applications until and as a result of their unlawful misappropriation of the SILVIA IP technology which is a true digital assistant and true artificial intelligence software and platform.]

226.     *NUANCE'S SEC 2013 FILINGS show their profits surging in 2013 by 'hundreds of millions of dollars'* that strong and information and belief is a result of this unlawful misconduct and wrongful misappropriation of intellectual property. See Financials of Nuance SEC filings.

227.     NUANCE'S SEC FILINGS show that its "Customers and Resellers" include Government agencies such as FBI, U.S. Department of Justice, Department of Defense, Department of Health and Human Services (healthcare), Department of Veteran Affairs, the United States Army (which was from email sent from Spring to Odish a client of Cognitive Code that Northrop Grumman used the SILVIA technologies for) and a multiple of other government agences and programs.

228.     <u>DEFENDANT NUANCE'S (IN CONSPIRACY WITH COGNITIVE CODE DEFENDANTS) Actions are unlawful and exploitive of President Obama's ACA and related government programs of digitizing health records.</u> President Obama's massive, revolutionary healthcare reform in affordable care act aka "ACA" which created for the lawful and beneficial government interest of providing healthcare to americans, and has lawful and legimate government interest requiring the "digitizing" of health records, coding and compliance - which is absolutely being exploited by NUANCE, its agents and officers, by the acts discussed herein. If there is any doubt, an interview in late November 2011 with Gary Little, partner in Morgenthaler Ventures, specifically states intention to exploit components of President Obama's ACA. In an interview with CNN Money titled the "Future of Morgenthaler Ventures", Little [unaware of the fraud that Gary Morgenthaler had commenced] states that the Venture Capital company had acquired a company called Practice Fusion, a business related to e-health records. Little specifically states the new law

being pushed by President Obama and how it implements FOUR YEARS of incentives for companies, then FOUR YEARS OF PENALTIES.

229.   Thus, there is over a hundred billion dollars that NUANCE DEFENDANTS are chasing, but their actions constitute healthcare fraud - exactly as contemplated by the Letter written and signed by US Attorney General Eric Holder and Madam Secretary of HHS Katherine Sebelius. And that is why NUANCE has gone on a massive acquisition spree - and their profits are surging.

230.   There is no mention of cognitive code ip and SILVIA in SEC filings by nuance or other related Entities. In extensive review of NUANCE'S SEC FILINGS there is absolutely no mention of the name of Cognitive Code. 2013 SEC FILINGS by Nuance and Morgenthalers mention extensive acquisitions of other entities, one for 100 mm, another for nearly 300 mm US dollars, but absolutely no mention of the name Cognitive Code or SILVIA™ IP technologies, for obvious reasons.

## NO SAFE HARBOR FOR NUANCE OR ANY OTHER PUBLICLY TRADED COMPANY NAMED HEREIN - AND SCIENTER IS EGREGIOUS, UNLAWFUL AND UNDENIABLE GIVEN THE FACTS.

231.   Obviously given the fraud, NUANCE DEFENDANTS are not entitled to any Safe Harbor in their SEC filings. Moreover, the evil and nefarious motive and Scienter is obvious: Nuance DEFENDANTS engaged in this unlawful conduct because they realized they make billions of the stolen CROSS PLATORM IP known as SILVIA™ in a multiplicity of business sectors and by using this stolen IP in countless other entities presently and in future, far beyond the entities named herein as Defendants and potential defendants.

232.   Obviously all of these filings submitted with the SEC are false claims filing seeking "approval" and as Relator continued to research this fraud he realized that Gary Morgenthaler and and NUANCE Defendants had created a deceptive scheme in an attempt to cover up their fraud and insulate him: improper use of CTOS, improper use of his CORPORATE partners as "Straw Men" on a great number of false filings with the SEC, improper use of NIXON PEABODY San Fran office splattering their address ONE EMBARCARDERO CENTER all over the "Name" Section of the SEC filings.

233.   NUANCE and Cognitive Code Defendants continue to perpetuate this fraud by actively marketing these corrupted products and services sold by Nuance to a number of government agencies above and beyond healthcare and defense, as they are marketing their corrupted products

which contain or are now embedded with stolen Intellectual Property in Enterprise (computing, IT, Cloud) and Imaging solutions that are also used by such agencies as FBI and United States Department of Justice that are specifically listed as "Representative Customers" in Nuance's SEC filings.

234.    NUANCE has four business segments, HEALTHCARE, MOBILE, ENTERPRISE and IMAGING. A review of the NUANCE'S 2013 SEC filings show it's profits surging in the last calendar, upon information and belief, as a result of the unlawful activities described herein.

235.    After learning of this proverbial smoking gun and it being obvious what Cognitive Code Conspirators have done, Relator Odish sent opposing counsel Howard Fredman an email asking him for an explanation, (See Index of Exhibits). Fredman never responded to Relator. In a subsequent conversation with Fredman when Relator discusses "suing the Morgenthalers" Fredman states "well, you have sued them" in reference to the September 19, 2013 filing of the original complaint in this action and an obvious admission that Relator's rights and actions are being closely monitored and scrutinized by the Nuance-Morgenthalers and their attorneys.

236.    Over the next few months and leading up to the filing of this action, Relator came to appreciate the magnitude of the fraud and false claims as well as the scope of violations of other federal statutes. During the months of November and December and into the first week of January 2014, as Relator conducted more and more research and diligence he came to realize that he did not want to pursue this matter.

237.    Relators scoured the SEC, NUANCE site and all over the web to see if Nuance had made any "public disclosure" regarding an acquisition or collaboration agreement with Cognitive Code. Obviously none were stated. NUANCE'S RECENT SEC FILINGS vaguely and intentionally omit any mention of Cognitive Code, in furtherance and acknowledgment of their unlawful actions. There is simply only a vague but undefined reference to "Other Collaboration Agreement" in NUANCE'S SEC 10-K FILING from Sept. 30, 2013 and even the previous year Sept. 30, 2012.

238.    From Relator Odish's own unique personal knowledge, substantiated by his contractual rights (the stock rights with dual signature, affording him the right to review and sign every contract on behalf of Cognitive Code) and the documents within Relator Odish's possession, it is plainly clearly of that massive fraud that has taken place and will continue to take place until unless immediately enjoined and disgorged.

239.    But he realized it would essentially constitute an act of Silent Fraud on his part if as **[CONFIDENTIAL WITNESS 6 - GOVERNMENT OFFICIAL WHO ADVISED RELATOR TO FILE THIS ACTION]** of the Office of Inspector General he did nothing. She advised him in late November 2013 when Relator was beginning to realize the scope of the fraud that Relator, as an attorney, had to file this Qui Tam action and walk into the FBI office in Detroit or simply walk into the FBI office.

240.    A review of material portions of NUANCE's SEC 10-K FILING OF SEPT. 30, 2013 clearly displays that massive fraud and false claims being submitted and exploited to the Government through Nuance dictation product, which now is tainted because they [by Nuance's subtle admissions] have "embedded" new state of the art artificial intelligence or digital assistant technology and Intellectual property.

241.    The correspondences drafted by Relator's attorney Sean Walsh during the spring of 2012 specifically refenence the law firm of NIXON PEABODY, San Francisco, California office and Difazio's stated intention of traveling to San Francisco to meet with lawyers at Nixon Peabody on behalf of Cognitive Code Corporation. Nixon Peabody San Francisco specializes in "Life Sciences", technology, defense and other industries.

242.    Nuance Defendants unlawful use and exploitation of legitimate government interests, such as the SEC affording companies to file CONFIDENTIAL TREATMENT ORDERS (or CTOs). As Relator Odish scoured the SEC site and all over the net looking for more information, it became clear that with their private or public entities, such as NUANCE DEFENDANTS, are benefitted by the wrongful use of CTOs and using CTOs to perpetuate their fraud. In reviewing the sec.gov site, it became clear that they use CTOs for an improper purpose, which is to bury the Cognitive Code patent and protect by CTOs.

243.    The vague Collaboration or Equity agreements that is not revealed in the NUANCE SEC FILINGS between Cognitive Code defendants and Nuance Defendants, especially the "Colloboration Agreement" vaguely referenced in NUANCE'S SEC FILINGS which of course does not specifically mention Cognitive Code at any point, is obviously illegal and potentially violative of the Sherman Act, securities laws and other federal statutes - while actively constituting Healthcare Fraud.

244.    **DEFENDANT NUANCE AND ITS OFFICERS, RELATED AFFILIATES SEC
FILINGS WITH 'ONE EMBARCARDERO CENTER' LISTED "NAME" SECTION.**  In
recognition of Nuance Defendants liability in this matter, the Morgenthalers and Nixon Peabody
law firm filed a number of what now can rightfully be deemed fraudulent SEC filings/forms that
simply had **"ONE EMBARCARDERO CENTER"** listed on the NAME section of SEC
documents. One Embarcardero is the street address for the location of Nixon Peabody's San
Francisco, California office.


**FEDERAL STATUTORY PROGRAMS AND CONTRACTUAL COMPLIANCE
LANGUAGE IN NORTHROP GRUMMAN PROCUMENT CONTRACTS AND
MANDATED BY US GOVERNMENT.**


245.    NUANCE is effectively a subcontractor for the United States Government now. Like
Cognitive Code it must be "in compliance with all federal, state, and local laws" to receive money
from the United States Government. Defendants Nuance and Cognitive Code have obviously
violated a number of federal and state laws, thereby precluding them (disbarring them) from
receiving federal funds.

246.    *VIOLATIONS OF SECTION 8(A).* In 2010 when Cognitive Code became an approved
Vendor for Northrop Grumman it did so on the basis of it being a qualified Minority Business
under the Small Business Administration and pursuant to Section 8(a).

247.    Compliance Language NORTHROP GRUMMAN'S INFORMATION SYSTEMS
subcontractor language, wherein such contract language is unambiguous. **The requirement to be in
compliance with all local, state, and federal laws, rules and regulations:** Standard Subcontract
Terms and Conditions for Federal Procurement. The standard subcontract terms and conditions
for federal procurement in Northrop Grumman's INFORMATION SYSTEMS contract are
recited in THE CONTRACT. They include CLAUSE NO. 22 - Organizational Conflict of
Interest,  CLAUSE NO. 23 - Compliance with Laws, CLAUSE NO. 24 - Procurement Integrity.
Clause No. 23 - Compliance with Laws reads as follows: "Subcontractor warrants that is shall
comply with all applicable federal, state, or local laws" and Clause No. 24 regarding Procurement
Integrity essentially recites the same principle: Subcontractor shall fully with any and all applicable
federal, state, and local laws, rules, regulations, and ordinances, including, without limitation,

Section 27 of the Office of Federal Procurement Policy Act, 41 U.S.C. 423 and its implementing regulations.

248.    The language in standard procurement contracts by Northrop Grumman not only requires "all contractors to be compliance with all state, federal, local laws, rules and regulations..", it also requires that the subcontractor specifically not engage in any unlawful anti-competitive activity that is in violation of the Sherman Anti-trust Act. The material provision of the Sherman Anti-trust Act reads in part: "*Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal. Every person who shall make any contract or engage in any combination or conspiracy hereby declared to be illegal shall be deemed guilty of a felony, and, on conviction thereof, shall be punished by fine not exceeding $100,000,000 if a corporation, or, if any other person, $1,000,000, or by imprisonment not exceeding 10 years, or by both said punishments, in the discretion of the court*." Nuance and Cognitive Code defendants have engaged in such anti-competitive behavior, with the either the knowing assistance or reckless disregard of Northrop Grumman.

249.    Upon information and belief, Nuance Defendants are attempting to effectuate a "niche" monopoly in the healthcare sector related to coding, and needing the artificial intelligence patent to follow through on their unlawful activity.

250.    On Northrop Grumman's website, they actively engage in the process of commercially reselling or licensing their Intellectual Property. There are very curious similiarities (relating to healthcare IT on NG's website) that coincide with NUANCE'S website relating to Healthcare, and their aggressive marketing of Healthcare products and services to government agencies. **See Index of Exhibits.**

**IN LAST FEW MONTHS PRIOR TO FILING OF THIS ACTION - DESPITE THE FRAUDULENT ASSERTIONS - OF BOTH ROSEN AND ATTORNEY FREDMAN THAT COGNITIVE CODE WAS BROKE AND  HAD NOT SIGNED A SINGLE DEAL,    NOR HAD ATTORNEY FREDMAN PRODUCED A   SINGLE CONTRACT DURING DISCOVERY - NORTHROP GRUMMAN AND COGNITIVE  CODE ANNOUNCE A NEW LICENSING AGREEMENT ON DECEMBER 8, 2013**

251.    On December 8, 2013, less than a month prior to the filing of this action, Cognitive Code and Northrop Grumman announced a **new** licensing agreement**, likely the third** major licensing agreement Cognitive Code Defendants have signed with Northrop Grumman, unlawfully given Cognitive Code fraudulent conduct and violations of securities state and federal securities laws

dating back to incipience of company, fraudulent filing of REG D FORM with the SEC after being sued in October 22, 2012 (which contained material representations), ongoing securities fraud, and conspiracy to defraud the government, acts of perjury in the state filing required by Delaware, embezzlement and misappropriation of funds, their unlawful "collaboration agreement" Nuance Defendants (and their personal friends the Morgenthalers) as discussed herein. As well violating Section 8(a) which requires the Small Business to actually do the work, which Cognitive Code has not - as they (with knowing acquiescence of Northrop Grumman) allowed Northrop Grumman to do all the work. Willful violations of securities laws (such as refusing to issue Relator his stock certificates after nearly three years constitute criminal penalties thereby disbarring Cognitive Code from being a lawful subcontractor. Additionally, there knowing violations of contracts signed with Relator (stock, dual signature) constitute fraud.

252.    SILVIA has significant applications in the healthcare sector and in many other sectors.

253.    **VTS (Virtual Training Systems) from Northrop Grumman.** The technology they have used SILVIA for has applications for them way beyond defense, including medical and healthcare, cellular, etc. Basically all the various and multiple uses of SILVIA Northrop Grumman can exploit.

254.    From Northrop Grumman's website it is clear that SAdie is nothing more than a perfected version of the **SILVIA™ PLATFORM**. [And NUANCE'S "NINA' is nothing more than a re-packaged and stolen version of SILVIA™]. The information regarding NG's SAdie is lifted directly from the NG's website and restated below.

255.    All such submitted cost reports, invoices, reimbursement claims and the like constitute false claims under the False Claims Act because they were and continue to be aware of their fraud.

256.    Relator has personal knowledge, documentary evidence and upon information and belief states that Northrop Grumman likely has some degree of liability in this action in light of what Relator know, the circumstances surrounding this fraud and unlawful misconduct could not have taken place without some degree of acquiescence on Northrop Grumman's part.  Cognitive Code SILVIA™ has since spring-summer of 2011 been worked on exclusively by Northrop Grumman's engineers and they are the world's best and most knowledge experts on this valuable cutting edge artificial intelligence software. Relator does not believe that these actions could have taken place without NG officials, engineers and executives not knowing anything. NG as stated herein just gave Cognitive Code a new license on December 8, 2013, less than a month before filing and triggering

of this action. Northrop Grumman also sponsored Cognitive Code Corporation a few months ago at its technology convention [the WBT Convention in October of 2013 in San Diego] as a new and shining tech star. As far back as 2011, Relator felt the company was nothing more than a 'de facto' subsidiary of Northrop Grumman.

257.    Any such determination of potential liability of additional defendants likely has to be determined by the Department of Defense in conjunction with Department of Justice as Relator has no interest in seeking possession of potentially classified Government information. SILVIA™ has certainly been used for classified Department of Defense initiatives, that assertion is undeniable.

258.    Relator has the strong belief that Northrop Grumman obviously knew of the fraudulent misconduct, of the government violations and the likely violations of their own procurement contracts, because of the integral role that Northrop Grumman's engineers played in the development of the **SILVIA FOR UNITY** (effectively **SILVIA 2.0, THE SECOND VERSION OF THE INCREDIBLY VALUABLE PATENT/INTELLECTUAL PROPERTY/SOFTWARE** that belongs to Cognitive Code).

259.    As stated herein previously, Northrop Grumman dedicated an **ENTIRE BUSINESS UNIT** to Cognitive Code's software known as **SILVIA** in late 2011, when NG executives, even the CEO, learned that Cognitive Code was a serious acquisition target (that two global tech behemoths such as HTC and COMCAST wanted not only to buy the company outright but wanted long-term significant licensing agreements) .

260.    Cognitive Code essentially exists as a "de facto subsidiary" of Northrop Grumman and the fraud described herein with the Nuance Defendants could not take place without the knowing and wrongful acquiescense of Northrop Grumman, it's top executives and engineers, or at a bare minimum gross negligence or reckless disregard for the truth as contemplated by the False Claims Act.

261.    In 2011 Spring did not have the capability, engineering ability/muscle or know-how to complete **SILVIA 2.0** (aka **SILVIA FOR UNITY**).

262.    On Northrop Grumman's website, it refers to Sadie™, the digital artificial assistant created by Northrop Grumman using Cognitive Code's intellectual property known as SILVIA™.

*"Sadie™ FROM NORTHROP GRUMMAN*
*Looking for an easier, more affordable and more intuitiveuser interface to access and manage your*

*computerbased data? Whether the task is meeting training needs, performing maintenance tasks, issuing safety alerts or conducting mission support; Northrop Grumman's SAdIE has the answer. SAdIE provides a human computer interface that increases the quality and availability of the data being accessed while reducing costs and manning requirements, critical in today's tight budget environment. SAdIE is an articulate and adaptablevoice and visual interface to computer-based data. SAdIE verbally interacts with users in a natural conversational manner, answers questions concerning any topic and delivers overviews or seminars on specific subjects.Having a natural conversational interface to computerized data delivers important advantages. You can make queries verbally and without an in-depth understanding of the data, database structure or search tools. When you ask SAdIE a question, the interface rapidly locates the information in documents or SAdIE accessible databases.In addition, SAdIE will also query you to further understand a topic or question to offer related information pertinent to the conversation. Depending on your preference, SAdIE can be manifested as an intelligent voice, text interface or can be visually portrayed as a speaking, animated male or female avatar. SAdIE readily interfaces with and executes commands controlling other external hardware and software applications.SAdIE "learns" and grows smarter through conversations. As SAdIE performs required tasks, new data and data relationships are stored for future reference.*

*A virtual assistant for multiple uses:*
*Northrop Grumman's SAdIE supports a wide range of uses requiring access to computerbased data. SAdIE is the perfect interface for training systems, and can be an intelligent digital substitute for a live trainer."*

See Index of Exhibits, "SAdie from Northrop Grumman"[1].

263.     As Northrop Grumman procures money from the federal government for nearly all of its projects, Northrop Grumman's engineers "took over" development of Cognitive Code's software SILVIA, upon information and belief, during summer of 2011, much to dismay of Relator. Relator was concerned with NG outright stealing the property and patent and cloaking such theft behind FAR regulations that allow a U.S. Defense contractor to procure intellectual property.

264.     Northrop Grumman's engineers developed the prototype for Chrysler, in late 2011. Northrop Grumman's engineers also developed the prototype cell phone for HTC in early 2012. As the emails from Spring to Relator on December 12, 2011 and December 16, 2011, written into this complaint above, clearly indicate.

265.     This is an obvious violation of SECTION 8(a), the Small Business Administration Act that requires minority-owned businesses to receive contracts from the government, wherein SECTION 8A specifically requires that the owners of the small business actually do the work. In this instance, that was not the case here.

---

[1] The False Claims Act specifically refers to money or property, thereby including intellectual property and other items easily deemed property such as stock and SEC filings, matters related to money or property. The False Claims Act also refers specifically to contractual rights, express or implied, such as the rights that belong to Relator.

266.    It was Northrop Grumman's engineers who did all the work on the development of the software/patent/intellectual property of Cognitive Code Corporation which commenced some time during summer of 2011. And Northrop Grumman is certainly aware of SECTION 8A requirements as it had defendant John Chen in 2010 sign purchase orders and other agreements relating to Cognitive Code's status as a SECTION 8A small and minority-owned business. Relator is in possession of such documents and exhibits and will turn said documents over to the US attorney general.

267.    Relator Odish met with prominent attorney CONFIDENTIAL WITNESS 6 in late October 2011 through December 2011 to procure funding on behalf of his company, Cognitive Code Corporation. The attorney represented a number of wealthy clients that had money to invest.

**THE LIKELIHOOD OF "REVERSE ENGINEERING".**

268.    Relator Odish states that Mimi Chen said to him in a phone conversation or possible email that her "advisor friends", the Morgenthalers, specifically Todd Morgenthaler, was an expert in "reverse engineering". Reverse Engineering of course is the unlawful theft and piracy of software and intellectual property patented in one country [UNITED STATES] that respect and honor patent right and deconstructed for unlawful theft, misappropriation and use in a foreign country that does not protect patent rights and potentially encourages such behavior. NUANCE has nearly 300 worldwide subsidiaries, a number of countries of which it could and likely did reverse engineer this technology to protect itself when this day came. Recognition of this likely fact makes the remedy of disgorgement and return of the patent and intellectual property a hollow penalty upon the Defendants and the parties mentioned herein.

269.    As recently as less than a month ago (a month prior to filing of this complaint on) on December 8, 2013 Cognitive Code made a press release announcement regarding a (NEW AND ADDITIONAL) licensing agreement with U.S. prime defense contractor NORTHROP GRUMMAN. The press release is restated herein for the Court and government agencies to appreciate the value of Cognitive Code's artificial intelligence

270.    Cognitive Code's website has for the past year specifically touted it's licensing agreement from 2011 and now Cognitive Code, after burning through the 50 million dollars (upon strong information and belief) that they received from Northrop Grumman in 2011-2012, has now signed

a new licensing agreement with Northrop Grumman. On it's website, Cognitive Code links to a new licensing agreement announced December 8, 2013. The link from the website to the announcement specifically states the following:

*"Cognitive Code Signs Licensing Agreement With Northrop Grumman - December 8, 2013*

*Northrop Grumman to Develop Products Utilizing Cognitive Code's SILVIA Technology
(PRWEB) December 08, 2013*

*Cognitive Code Corp. announced today that Northrop Grumman (NGC) and Cognitive Code have signed a software licensing agreement that gives Northrop Grumman broad access to Cognitive Code's patented SILVIA® Platform and Technologies for Northrop Grumman's use in defense and other government markets. SILVIA is a cross-platform system for developing and deploying conversationally intelligent applications. Unlike other voice solutions, Cognitive Code's SILVIA can be deployed in compact and secure environments, and includes native unconnected operation on mobile devices and embedded systems. The SILVIA Platform's developer friendly tools and superior natural language capabilities allow for the rapid development and deployment of applications for almost any market, in almost any language.*

*"For the past several years, Northrop Grumman has been an important customer for Cognitive Code, and applications using our SILVIA technologies have already been developed and put into the field by NGC. Applications incorporating our SILVIA technologies include Northrop Grumman's 'SAdIE' line of products for government and defense markets," said Defendant Spring Spring, CEO and Founder of Cognitive Code. "This licensing agreement with Northrop Grumman is the next logical step in our relationship, and Relator at Cognitive Code look forward working with Northrop Grumman on the next generation of SILVIA-enabled intelligent applications."*

*Cognitive Code offers flexible licensing programs that give companies access to its patented SILVIA technologies, including SILVIA Studio developer tools, the cross-platform SILVIA Core runtime, and SILVIA Server for web-based deployment of conversational applications. Our technologies allow those companies to build applications and services that can work seamlessly with each other, across a number of devices and operating systems.*

*Cognitive Code provides software, services, and solutions centered on its SILVIA Platform, a system for developing and deploying commercial conversationally intelligent applications. More information about Cognitive Code and the SILVIA Platform is available at www.cognitivecode.com.*

*SILVIA: Intelligence on Command".*

271.    The article specifically quotes Defendant Defendant Spring Spring as stating that Cognitive Code has been in business with Northrop Grumman "for several years".. Cognitive Code Defendants through their attorney Howard Fredman inexplicably stated and continues to state

there is no agreement with Northrop Grumman.

**FAIR MARKET VALUATION OF MISAPPROPRIATED "CROSS-PLATFORM" INTELLECTUAL PROPERTY OF COGNITIVE CODE CERTAINLY EXCEEDS ONE BILLION , LIKELY NORTH OF 2 BILLION: SPRING SAID COMPANY [IP] WAS WORTH "SEVERAL HUNDRED MILLION DOLLARS" IN JANUARY 2012. TWO YEARS LATER, WORTH SIGNIFICANTLY MORE - AND U.S. GOVERNMENT HAS RIGHTFUL CLAIM TO PROPERTY.**

272.     As stated previously herein, Relator were told by Defendant Spring in January 2012, two years ago, that the value of the Company [based almost entirely on PATENT/IP and software] was "several hundred millons". The commercial value of this Artificial Intelligence PLATFORM-building software cannot be overstated. One billion dollars is almost certainly well below the fair market valuation of the Cognitive Code Company, which is supposed to be the lawful holder of the SILVIA™ patent, software and Intellectual Property.

**AS A RESULT OF THE VALUATION OF COGNITIVE CODE CORP. LIKELY EXCEEDING ONE BILLION DOLLARS, RELATOR' CIVIL DAMAGES WHICH STEM FROM RIGHTFUL CLAIMS TO A NON-DILUTABLE 17.5% (PLUS 20% DAMAGES) EXCEED 100 MILLION DOLLARS, before trebling, ARE ENORMOUS AND UNDERSCORE WHY PEOPLE WOULD EXPOSE THEMSELVES TO SUCH ENORMOUS CIVIL AND CRIMINAL LIABILITY.**

273.     The valuation of the company is based on the value of it generating revenues and comparable items. By Defendant Spring's own statement in January 2012 that the company was worth "several hundred million dollars", it most certainly has exceeded that valuation now two years later. [Comparison to the Morgenthalers Investment in Evernote, a singular "app" or application and not an incredibly valuable Cross-Platforming technology such as SILVIA™. In May of 2012, the Morgenthaler-backed "app" Evernote procured 72 million dollars in funding predicated upon a One Billion dollar valuation as stated previously herein.]

**ROSEN AND BOURBEAU HAVE EXPLICIT KNOWLEDGE BECAUSE OF A LEGAL MALPRACTICE SUIT ODISH FILED AGAINST ROSEN AND BECAUSE RELATOR ODISH DESPERATELY TRIED TO INFORM THE LOS ANGELES JUDGE OF THE MASSIVE FRAUD BEING PERPETRATED IN A CONFIDENTIAL FILING THAT IS LISTED AS DOCKET ENTRY 94 IN THE LOS ANGELES MATTER.**

274.     In docket Entry 94, in a confidential filing with the judge, Relator Odish desperately tried to inform the judge yet a third time of the massive fraud being perpetrated. And in that confidential

filing, he mentioned the name of GOVERNMENT OFFICIAL WHO ADVISED HIM TO FILE A QUI TAM ACTION. Relator specifically on multiple occasions has tried to inform the judge of the fraud and request that a grand jury be seated as the law requires when federal laws are violated, but he was ignored. In that filing, Relator mentioned a potential Qui Tam action. The judge required Relator to deliver a copy of it to his former (but yet still attorney of record) Robert Rosen, who continued to represent Defendant Bourbeau, so Rosen and Bourbeau both know of this action and - as stated below - are obviously acting in complicity with Cognitive Code Defendants.

275.     As the funds used to perfect the technology came from the United States government, the government does have a lawful claim to it. And given the fraud, permanent injunctive relief and a governmental custodian is required to take over Cognitive Code.

276.     In the last month, outrageously Rosen and Bourbeau have conspired to defraud Relator and have brought "terminating sanctions" in the Los Angeles proceedings. It was predicated upon a fraudulent declaration Rosen procured through threats and intimidation.

277.     Thus, Relator Odish acting in good faith and honesty, has his co-Plaintiff along with his former attorney files motions against him to terminate his claims because they are aware of what Relator knows and upon information and belief are conspiring with Cognitive Code Defendants to protect the Morgenthalers and Nuance and the fraud that is being perpetrated. And upon information and belief, receive potential promised benefits. Defendant Bourbeau has been promised Odish's board seat and a three year salary, which may constitute a "kick-back" to terminate Odish's rights.

278.     Relator Odish had filed a legal malpractice action against Rosen in September 2013 which is currently pending and he provided Rosen's attorneys pursuant to rule 26 documentation that absolutely gave them knowledge of the fraud being perpetrated. And this knowledge, upon information and belief, was imparted to Bourbeau.

279.     Cognitive Code Defendants have engaged in violations of anti-kick back statute by giving Odish's rights to Bourbeau because they know he is not an attorney and he has no concerns about all the fraud that Cognitive Code Defendants have engaged in: Odish told Bourbeau they engaged in embezzlement and he had agreed. Bourbeau openly acknowledged that Cognitive Code Defendants had defrauded them before their relationship had broken down, but now he has no

qualms whatsoever being in business with them and retaliating against his former partner and friend of ten years.

280.    **Through their unlawful actions, Corporate Defendants have conspired and violated the False Claims Act by:** (1)making, using or causing to be made or used, false statements and representations about their pricing and bidding in order to secure Government contracts and payments, (2) failing to fulfill contract bidding and performance requirements and related laws and rules, that preclude contractors from engaging in anticompetitive and collusive activities, including bid-rigging, price fixing and related agreements, and that require contractors to attest affirmatively that they are not party to any such arrangement, (3) offering inducements, coercing or otherwise inducing companies which submitted low bids for contracts to withdraw or otherwise curtail shipments under those contracts, and submitting or causing others to submit higher bids for the same work, (4) continuing on a regular and systematic basis to submit invoices and other documents to the Government seeking reimbursement for charges artificially established through non-arm's length agreements, and conspiring to and causing others to engage in one or more of the above.

**DEFENDANT NUANCE IS ACTIVELY AND AGGRESSIVELY MARKETING ITS HEALTHCARE, MOBILE, AND ALL ASPECTS OF ITS PRODUCTS AND SERVICES TO ALL GOVERNMENT AGENCIES, BOTH AT THE STATE AND FEDERAL LEVEL, AND IN ADDITION TO GOVERNMENT AGENCIES, PRIVATE ENTITIES AS WELL.**

281.    The SEC filings and the statements on the NUANCE WEBSITE show a company aggressively going after government money, despite their fraudulent conduct.

282.    On the NUANCE WEBSITE, FOR HEALTHCARE, DEFENDANT NUANCE IS AGGRESSIVELY MARKETING THE FOLLOWING PRODUCTS AND SERVICES (PREDICATED UPON THE STOLEN IP):

    a. Documentation Integrity; Clintegrity 360; Escription Transcription Services, numerous other products and services geared for health professionals.

    b. NUANCE AND ITS AFFILIATES have acquired Practice Fusion, Nextgen and a number of other entities to effectuate anti-competitive activity and monopolize the coding sector of

the new healthcare laws, while also receiving benefits from their other business segments in enterprise, cellular, mobile, imaging.

      c. NUANCE'S DRAGON MEDICAL and other products and services **IS NOW IN USE BY OVER 100,000** physicians and healthcare providers, at the state and federal level, by a number of government agencies and private entities.

      d. NUANCE'S and APPLE (wrongfully being unjustly enriched) are advertising "Access your EMR on iPad or iphone. NUANCE's SEC filings state that the company is making money off its embedded cellphone and "tablet" products. Upon information and belief, those tablets are iPads, the property of Apple. But as NUANCE'S related funding VC, Morgenthaler Ventures, owns a significant chunk of Apple Stock, preserving Apple's market domination inures to NUANCE'S benefit.

      e. A permanent injunction is necessary immediately prior to NUANCE being sold to APPLE, which is likely to take place upon information and belief.

## CAUSES OF ACTION AND COUNTS

**COUNT 1 - (False Claims Act Violation(s): Presentation of False Claims) (31U.S.C. § 3729(a)(1))**
**(Against Cognitive Code Defendants, Nuance Defendants, and their employees, agents and officers)**

283.    Relator repeat and reallege each allegation in previous paragraphs, as if fully set forth herein.

284.    The defendants knowingly presented or caused to be presented false or fraudulent claims for payment or approval to the United States, including but not limited to SEC, Department of Defense and other governmental agencies.

285.    The United States government unaware of the falsity of these claims, records, and/or statements made by the Defendant(s) and in reliance of accuracy thereof paid Defendants for the claims.

286.    By virtue of the false or fraudulent claims made by the defendants, the United States suffered damages and therefore is entitled to treble damages under the False Claims Act, to be determined at trial, plus a civil penalty of $ 5,500 to $ 11,000 for each false claim.

**COUNT 2 - (False Claims Act: Presentation of False Claims) (31U.S.C. § 3729(a)(2))**
**(Against Cognitive Code Defendants and Defendant Nuance, its employees, executives, agents and officers)**

287.    Relator repeat and reallege each allegation in previous paragraphs, as if fully set forth herein.

288.    The defendants, through their officers, employees, and agents knowingly made, used or caused to be made or used, false records or statements, to get false or fraudulent claims paid or approved, including but not limited to substantial government contracts and business.

289.    The United States government unaware of the falsity of these claims, records, and/or statements made by the Defendant(s) and in reliance of accuracy thereof paid Defendants for the claims.

290.    By virtue of the false or fraudulent claims made by the defendants, the United States suffered damages and therefore is entitled to treble damages under the False Claims Act, to be determined at trial, plus a civil penalty of $ 5,500 to $ 11,000 for each false claim.

## COUNT 3 - False Claims Act: Making or Using False Record or Statement; (31U.S.C. § 3729(a)(2))
## (Against Northrop Grumman Defendants, agents, employees, and officers)

291.    Relator repeat and reallege each allegation in all previous paragraphs, as if fully set forth herein.

292.    Upon information and belief, the defendant Northrop Grumman, knowingly made, used, or caused to be made or used, false records or statements to get false or fraudulent claims paid or approved by the United States.

293.    The United States government unaware of the falsity of these claims, records, and/or statements made by the Defendant(s) and in reliance of accuracy thereof paid Defendants for the claims.

294.    By virtue of the false records or statements made by the defendants, the United States suffered damages and therefore is entitled to treble damages under the False Claims Act, to be determined at trial, plus a civil penalty of $ 5,500 to $ 11,000 for each false claim.

295.    Under the false claims statute, Northrop Grumman knew that Cognitive Code was a Section 8(a) corporation and therefore by turning over the work to Northrop Grumman's engineers was it was knowingly violating Section 8(a), which requires the minority business to do its own work.

296.    Cognitive Code, its agents and employees and officers knew they were in violation as did Nuance and its officers and employees.

297.    The United States has suffered significant damages as result.

## COUNT 4 - (False Claims Act: Reverse False Claims)  (31 U.S.C. § 3729(a)(7))
## (Against Cognitive Code and Nuance Defendants, agents, officers and employees)

298.     Relator repeat and reallege each allegation in all previous paragraphs, as if fully set forth herein.

299.     The defendants knowingly made, used or caused to be made or used a false record or statement to conceal, avoid or decrease an obligation to pay or transmit money or property to the United States.

300.     The United States government unaware of the falsity of these claims, records, and/or statements made by the Defendant(s) and in reliance of accuracy thereof paid Defendants for the claims.

301.     By virtue of the false records or statements made by the defendants Cognitive Code and Nuance and their agents and officers, the United States suffered damages and therefore is entitled to treble damages under the False Claims Act, to be determined at trial, plus a civil penalty of $ 5,500 to $ 11,000 for each false claim.

## COUNT 5 - FALSE CLAIMS ACT VIOLATION - CONSPIRACY (31 U.S.C. § 3729(a)(3)) (against Cognitive Code and Nuance Defendants, officers, employees, and agents)

302.     Relator repeat and reallege each allegation in all previous paragraphs, as if fully set forth herein.

303.     Upon information and belief, Defendants, their agents, employees, officers and related affiliates conspired to defraud not only Relator but also the government and its agencies by agreeing to submit false or fraudulent claims, (or acquiescing) that were subsequently paid by federal agencies for their services.

304.     Defendants conspired to violate certain acts, federal statutes and submitted in conspiracy false claims, reports, including but not limited to SEC, SBA, Department of Defense, Department of Treasury, United States Patent Office and a number of other federal agencies.

305.     The United States government unaware of the falsity of these claims, records, and/or statements made by the Defendant(s) and in reliance of accuracy thereof paid Defendants for the claims.

306.     As Defendants Cognitive Code, Defendant Nuance and their agents, employees, officers, including Bourbeau knew of such violations and caused federal agencies to make payments,

knowingly, in violation of federal regulations, laws and statutes, Defendants conspired to violate False Claims act, and other statutes.

307. The United States government and its agencies would have never paid or been in business with these Defendants had they known of such illegal activity.

308. Defendants Cognitive Code Defendants, its agents, officers conspired to violate Service Contract Act, including other federal statutes as Relator Odish was only paid $8,000 dollars by Defendant Cognitive Code Corporation for over 3000 hours of work as stated herein.

309. Defendants, by and through their officers, agents, employees, to take actions in conspiracy and violation of federal laws, state laws. Moreover, Defendants as coconspirators, are individually and collectively liable for each others acts that were reasonably foreseeable and within the scope of these conspiracies.

310. The United States reasonably relied upon Defendants misrepresentations of compliance and or accuracy in paying all sums due and owing under the contracts and therefore, the United States government is entitled to full recovery of the fraudulent sums paid by its agencies.

311. As set forth in the preceding paragraphs, Defendants knowingly violated (31 U.S.C. § 3729(a)(3)) and have damaged the United States by their actions in an amount to be determined at trial.


## COUNT 6 -UNJUST ENRICHMENT
## (AGAINST ALL DEFENDANTS, except for Rosen)

312. Relator repeat and reallege each allegation in all previous paragraphs, as if fully set forth herein.

313. This is a claim for recovery of monies and/or property, or securities by which Defendants, their agents, officers have been unjustly enriched by the false procurement of government funds.

314. The United States government unaware of the falsity of these claims, records, and/or statements made by the Defendant(s) and in reliance of accuracy thereof paid Defendants for the claims.

315. By directly or indirectly obtaining government funds (and/or funds from Relator wrongfully procured) to which they were not entitled, the Defendants were unjustly enriched and are liable to

account and pay such amounts, or the proceeds or profits there from, which are to be determined at trial, to the United States.

316.    The United States Government and Relator have suffered significant damages.


## COUNT 7 - FALSE CLAIMS ACT VIOLATION RETALIATION VIOLATION, 31 U.S.C. § 3730 (h) (Against all Cognitive Defendants, agents, employees, officers, and Defendant Bourbeau)

317.    The allegations of the preceding paragraphs are realleged as if fully set forth herein and below.

318.    Defendants had a duty under the False Claims Act,  31 U.S.C. § 3730(h), to refrain from taking retaliatory actions against employees who take lawful actions in furtherance of a False Claims Act action, including investigation for, testimony for, or assistance in an action filed under this section.

319.    Defendants reasonably believed that submitting claims to the Department of Defense, Department of Justice, Federal Bureau of Investigation, and other relevant agencies that constituted a violation of the False Claims Act.

320.    In retaliation for protected activities, Defendants stripped Relator Odish of his board seat, refused to deliver stock certificates, refused to honor contractual obligations and annual salaries and stripped him management duties, harassed him, wrongfully denied granting him his stock certificates and took other actions to cover up their wrongdoing.

321.    And Bourbeau, outrageous Relator Co-Plaintiff in Los Angeles, proceedings is retaliating against him by instructing Relator Odish's former attorney Rosen to bring motion terminating Relator claims based upon fraudulent declarations and court materials.


## COUNT 8 - Wrongful Discharge/Public Policy Common Law (Against Cognitive Code Defendants, officers, employees, agents, and Defendant Bourbeau)

322.    The allegations of the preceding paragraphs are realleged as if fully set forth below.

323.    Relator Odish reasonably believes Defendants violated 18 U.S.C. § 1001 by making false statements to the federal government, including Department of Defense and SEC, regarding the filing of documents and other papers which violated the False Claims Act by submitting claims for

payment and/or approval. The REG D FORM filed by Cognitive Code, its agents and employees with SEC was fraudulent. Bourbeau and Rosen were made aware of its fraudulent and did not do anything, simply conspiring and acquiescing to destroy Relator rights when he was acting lawfully. The fraudulent REG D FORM is in violation of 18 U.S.C. § 1001 and False Claims Act.

324.    Defendants all participated in the decision to terminate employment because he exercised his right to report to the DOD OIG the commission or possible commission of federal crimes, including, violations of 18 U.S.C. § 1001 and the False Claims Act.

325.    In addition, Defendants have wrongfully terminated Relator Odish in violation of the public policy. In confidence Relator Odish contacted GOVERNMENT OFFICIAL CONFIDENTIAL WITNESS 6, of the office of Inspector General, in preservation of his rights as Qui Tam relator. In a confidential filing with a federal judge in Los Angeles, Relator preserved confidentiality of his confidential conversation with CONFIDENTIAL WITNESS 6 but was required by court order to deliver the document his (now former) attorney Rosen, acting in conspiracy with his former partner Bourbeau. Defendant Bourbeau was aware as were and are the Cognitive Code defendants.

326.    The termination of Relator's employment constituted a public policy violation.

327.    As a result of the retaliatory acts taken by Relator Odish has suffered damages, including, but not limited, to lost wages, lost benefits, diminished professional status, diminished job opportunities, mental anguish, and stress.


## COUNT 9 - GROSS NEGLIGENCE/RECKLESS DISREGARD OF TRUTH
### (Against Defendant Northrop Grumman, its agents, officers and employees, related affiliates)

328.    Relator repeat and reallege each previous paragraph as if fully set forth herein.

329.    Defendant Northrop Grumman is a prime contractor in the defense sector for the department of defense. Its officers, executives and employees as a prime defense contractor are duly aware of the strict federal laws, contractual requirements of its subcontractors and have a duty to the United States government to ensure that its subcontractors, such as Defendant Cognitive Code, is in compliance with said federal laws and compliance language in federal procurement contracts.

330.     Defendant Northrop Grumman breached negligently breached this duty (and potentially its own federal procurement clauses) in dealing with Cognitive Code Defendants.

331.     As a result of this negligence, the United States has been harmed a significant amount of money to be determined at trial.


## COUNT 10 - BREACH OF CONTRACTS AND AGREEMENTS)
## (AGAINST DEFENDANT BOURBEAU)

332.     Relator repeat and reallege each allegation in previous paragraphs, as if fully set forth herein.

333.     This is a claim for breach of contracts and agreements resulting in significant and unlawful unjust enrichment by Defendant Bourbeau's wrongful actions against Relator Odish. Relator Odish has spent the last three years of his life working on this matter while his former partner and now co-conspirator continued his employment with his father and was paid every week. Defendant Bourbeau has been unjustly enriched because the original ten equity points were offered to Relator Odish and he only gave the 5 points to Bourbeau pursuant to their agreement that Bourbeau would bring the $937,000 dollars to exercise the Option for the additional 7.5 points of non-dilutable equity in Cognitive Code.

334.     But Bourbeau breached the agreement, never brought the $937,000 and Relator Odish was required to bring the $937,000 for the exercise of the Option under Cranbrook's rights.

335.     Thus, by breaching the agreement and now retaliating against Relator Odish, Defendant Bourbeau has been unlawfully and unjustly enriched by his breach of contract and conspiratorial conduct.

336.     Defendant Bourbeau breached a number of contracts and now seeks to unlawfully, through abuse of process and filing of fraudulent documents with courts, seeks to strip Relator Odish of all his rights.

337.     Relator Odish must be made whole as a result of Defendant Bourbeau's fraud, non-performance and conspiratorial conduct against Odish. Odish has over 9000 hours into this matter at Bourbeau's original request.

338.     Recently in the past few months, and separately from above, Bourbeau has signed contracts regarding the sale of the cognitive code securities and cranbrook units/securities. Bourbeau

engaging in fraud and deceit, refused to perform on either contract, which is the subject of a 10b5 count below.

339.    Defendant Bourbeau cannot under the state and federal statutes profit and be unjustly enriched by his breach of contract and fraudulent misconduct.


## COUNT 11 - PAYMENT BY MISTAKE

### (Against Cognitive Code, Nuance and Northrop Grumman, agents and officers)

340.    Relator repeat and reallege each allegation in previous paragraphs as if fully set forth herein.

341.    This a claim for the recovery of monies paid by the United States to the defendants by mistake.

342.    The United States government unaware of the falsity of these claims, records, and/or statements made by the Defendant(s) and in reliance of accuracy thereof paid Defendants for the claims.

343.    The United States, acting in reasonable reliance on the accuracy and truthfulness of the information contained in the reports, claims and other documents submitted for payment or approval paid the participant defendants certain sums of money to which they were not entitled, and defendants are thus liable to account and pay such amounts, which are to be determined at trial, to the United States.

344.    The United States has suffered significant monetary damages.


## COUNT  12 - TRUTH-IN-NEGOTIATIONS ACT,  10 U.S.C. § 2306(f),

### (AGAINST COGNITIVE CODE and NUANCE defendants, agents, employees, officers)

345.    The United States and Relator reallege all previous paragraphs as if fully set forth herein.

346.    The United States is entitled under each sole source negotiated contract and the Truth-in-Negotiations Act to not only a downward adjustment but outright cancellation of an unlawful agreement and parties that are knowingly in violation of securities laws, tax laws, numerous other federal laws.

347.    The United States government unaware of the falsity of these claims, records, and/or statements made by the Defendant(s) and in reliance of accuracy thereof paid Defendants for the claims.

348.    As a result of this unlawful misconduct which prevented truth in negotiations, the United States has sustained damages likely in excess of 100 million dollars, plus pre-judgment interest.

## COUNT 13 - VIOLATION OF SUBCONTRACTOR PAYMENT METHODOLOGY
### (Against Northrop Grumman, Cognitive Code Defendants, Nuance Defendants, their agents, employees and officers)

349.    Relator repeat and reallege all previous paragraphs as if fully set forth herein.

350.    According FAR regulations, federal legislation and rules and law, subcontractors must be paid lawfully. Defendants violated subcontractor payment methodology.

351.    Defendants knew or should have known that by failing to pay the subcontractors, knowing that it was false and presenting the same directly or indirectly for payment by the United States, the action was in deliberate ignorance of the truth or falsity thereof, and/or in reckless disregard of the truth and was in violation of 31 U.S.C. § 3729(a)(2).

352.    Cognitive Code through its relationship with Northrop Grumman is a subcontractor which violated subcontract payment methodology willfully and unlawfully.

353.    Nuance through its unlawful misconduct is a subcontractor to the United States which has violated subcontractor payment methodology, as well as other violations of federal law.

354.    Each such documents, upon presentation of each such claim for payment, or used to get payment of the above referenced false claims, constitutes a separate violation of the False Claims Act.

355.    Pursuant to 31 U.S.C. § 3729(a) the defendants are further liable to the United States for a civil penalty of not less than $ 5,500.00 and not more than $ 11,000.00 for each month of false payments, for each violation of the False Claims Act.

## COUNT 14 - DEFENSE CONTRACT AUDIT AGENCY CLAIMS
### (Against Cognitive Code defendants and Nuance Defendants)

356.   Relator repeat and reallege all previous paragraphs as if fully set forth herein.

357.   For previous years, defendants in conspiracy have unlawfully misappropriated funds from department of defense and other defense programs, and then wrongfully embezzled those funds and failed to account for them.

358.   The financial impact on federal projects is approximately $ 100,000,000 (at least) as a result of the routine and willful failure to comply with accounting standards.

359.   Defendants knew or should have known that by failing to comply with accounting standards, knowing that it was false and presenting the same directly or indirectly for payment by the United States was false, and/or an action in deliberate ignorance of the truth or falsity thereof, and/or in reckless disregard of the truth and was in violation of 31 U.S.C. § 3729(a)(2).

360.   Defendants knowingly made or used, or caused others to make or use, false records or statements to get, or have false and/or fraudulent claims approved by the federal government.

361.   Each such documents, upon presentation of each such claim for payment, or used to get payment of the above referenced false claims, constitutes a separate violation of the False Claims Act.

362.   Pursuant to 31 U.S.C. § 3729(a) the defendants are further liable to the United States for a civil penalty of not less than $ 5,500.00 and not more than $ 11,000.00 for each month of false payments, for each violation of the False Claims Act.


## COUNT  15 - VIOLATION OF FEDERAL WAGE AND HOUR LAWS
### (Against Cognitive Code Defendants, Empoyees, Officers and Agents)

363.   Relator repeat and reallege all previous paragraphs as if fully set forth herein.

364.   Defendant Cognitive Code employed and engaged Relator Odish for honest services which would eventually violate federal wage and hour laws. Relator Odish spent over 3000 hours working as shareholder, Board Member from March 2011 through February 2012 and was only paid 8000 dollars. Moreover, the stock he was promised was never issued.

365.   At all times mentioned herein, the Defendant had an annual; gross volume of sales made or business done of not less than $ 500,000.00, exclusive of excises taxes.

366.    By reason of the foregoing, relator Odish is a shareholder and frozen out board member from Cognitive Code. He did NOT want to be part of embezzlement, misappropriation of funds and unlawful conduct as he is a licensed attorney.

367.    The Relator was never paid for overtime work or received other compensatory time or payment. Nor was relator Odish provided any other benefits as promised to him contractually and orally.

368.    Under the provisions of the Fair Labor Standards Act, 29 U.S.C.A. § 207 and  216, there is due and owing to the Relator from the Defendant compensation for overtime work, plus and additional equal amount as liquidated damages, together with attorney's fees and costs, and other rights that would make Relator whole.

## COUNT 16 - VIOLATION OF THE ANTI-KICKBACK ACT
## (Against Cognitive Code, Nuance Defendants, agents, officers and Defendant Bourbeau)

369.    All previous paragraphs of this Complaint are hereby realleged and incorporated as though set forth in full herein.

370.    This is a claim against above named Defendants under the Anti-Kickback Act.

371.    Upon information and belief and facts stated herein, all of the named defendants have violated the anti-kickback act.

372.    The arrangements and activities described above in connection with Defendants' were knowingly carried out by Defendants "for the purpose of improperly obtaining or rewarding favorable treatment in connection with a prime contract or in connection with a subcontract relating to a prime contract,"41 U.S.C. § 52(2), and thus constituted illegal kickbacks in violation of 41 U.S.C. § 53, as well as in violation of Defendants' contracts with the Government.

373.     By reason of the conduct alleged herein, Defendants knowingly engaged in conduct prohibited by 41U.S.C. § 53 with respect to kickbacks received from certain parties by Defendants on Government contracts and subcontracts.

374.    By reason of the conduct alleged herein, Defendants knowingly caused, directly or indirectly, the kickbacks to be included in the charges to the United States Government, in violation of 41. U.S.C. § 53(3).

375.    Upon information and belief, Defendant Bourbeau has unlawfully received kickbacks in order to destroy Relator's rights, and facilitate the fraud of Cognitive Code Defendants, such as being given a Board Seat that belonged to Relator Odish and three years annual salary, as kickbacks in order to conspire against Odish.

376.    The United States is entitled to recover from Defendants double the amount of the kickbacks plus $10,000 per kickback. In the alternative, pursuant to section 55(a)(2), the United States is entitled to recover the amount of the kickbacks from Defendants.

## COUNT 17 - VIOLATION OF SECTION 10(b) of the Exchange Act
## [15 U.S.C. § 78(j)(b) and Rule 10b-5 thereunder 17 C.F.R. § 240.10b-5]
## (against Cognitive Code Defendants, agents, employees, officers)
## (both claims by Relator)

377.    Relator hereby reincorporates all previous paragraphs as if fully set forth herein and incorporated by reference.

378.    Relator Odish has yet to receive his stock certificates and Cranbrook LLC is entitled to 7.5% stock option purchase (as well as 20% from original letter of intent). Cognitive Code Defendants in connection with the purchase and sale of securities described herein, by the use of the means and interstate commerce and by use of mails, directly and indirectly:

a-employed devices, schemes, and artifices to defraud;

b-made untrue statements or omitted to state material facts necessary in order to make the statements made, in light of the circumstances made, in light of the circumstances under which they were made, not misleading; and

c-engaged in acts, practices, and courses of business which would and did operate as a fraud and deceit upon the purchasers of such securities, all as more particularly described above.

379.    Defendants knowingly, intentionally, and/or recklessly engaged in the aforementioned devices, acts, schemes, and artifices to defraud, made untrue statements or omitted to state material facts, and engaged in fraudulent acts, practices and courses of business. In engaging in such conduct, Defendants were aware of Relator's rights and acted with scienter, that is, an intent to

deceive, manipulate or defraud with a severe disregard for the truth. And further, Defendants knew Relator was acting in reliance upon Defendants actions.

380.    By reason of the foregoing, Defendants, directly and indirectly, acting with Scienter, have violated and unless enjoined will continue to violate Section 10(b) of the Securities Exchange Act and Rule 10b-5 thereunder [17 C.F.R. § 240.15].

381.    Loss Causation-Economic Loss. Defendants actions pursuant to the violation of this statutory section has been the proximate cause constituting loss causation and significant economic damages incurred by the Relator. Defendants presented a fraudulent picture that they would be handling sale of the company. Instead, Defendants took the opportunity for themselves and engaged in fraud upon Relator causing enormous damages.


## COUNT 18 - VIOLATION OF SECTION 10(b) of the Exchange Act
## [15 U.S.C. § 78(j)(b) and Rule 10b-5 thereunder 17 C.F.R. § 240.10b-5]
## (against Defendant Bourbeau)
## (Relator claims against Bourbeau)


382.    Relator hereby reincorporates all previous paragraphs as if fully set forth herein and incorporated by reference.

383.    Relator and Defendant Bourbeau had originally agreed that he would bring option money for the five points Odish awarded him. Then in the past few months Relator and Defendant Bourbeau have signed agreements for purchase and sale of securities that Bourbeau fraudulently refused to perform and never had any intention of performing in violation of Wharf case. Defendant in connection with the purchase and sale of securities described herein, by the use of the means and interstate commerce and by use of mails, directly and indirectly:

        a-employed devices, schemes, and artifices to defraud;

        b-made untrue statements or omitted to state material facts necessary in order to make the statements made, in light of the circumstances made, in light of the circumstances under which they were made, not misleading; and

        c-engaged in acts, practices, and courses of business which would and did operate as a fraud and deceit upon the purchasers of such securities, all as more particularly described above.

384.    Defendant Bourbeau knowingly, intentionally, and/or recklessly engaged in the aforementioned devices, acts, schemes, and artifices to defraud, made untrue statements or omitted to state material facts, and engaged in fraudulent acts, practices and courses of business. In engaging in such conduct, Defendant were aware of Relator's rights and acted with scienter, that is, an intent to deceive, manipulate or defraud with a severe disregard for the truth. And further, Defendant knew Relator was acting in reliance upon Defendant actions.

385.    By reason of the foregoing, Defendant, directly and indirectly, acting with Scienter, have violated and unless enjoined will continue to violate Section 10(b) of the Securities Exchange Act and Rule 10b-5 thereunder [17 C.F.R. § 240.15].

386.    Loss Causation-Economic Loss. Defendants actions pursuant to the violation of this statutory section has been the proximate cause constituting loss causation and significant economic damages incurred by the Relator. Instead, Defendant was supposed to act in good faith as partner and instead engaged in fraud upon Relator causing enormous damages.

387.    Relator has a right to be made whole as a result.

## COUNT 19 – INSIDER TRADING
### (Against Nuance Defendants, agents and officers)
### Violations of Section 10(b) of the Exchange Act
### [15 U.S.C. § 78j(b)]and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5]

388.    Previous Paragraphs are hereby re-alleged and are incorporated herein by reference.

389.    Nuance Defendants, in connection with the purchase and sale of securities described herein, by the use of the means and instrumentalities of interstate commerce and by use of the mails, directly and indirectly: employed devices, schemes, and artifices to defraud; made untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and engaged in acts, practices, and courses of business which would and did operate as a fraud and deceit upon the purchasers of such securities, all as more particularly described above.

390.    Moreover, Nuance Defendants exploited MATERIAL, NON-PUBLIC INFORMATION and siezed the opportunity for themselves in an unlawful misappropriation of intellectual property.

391.    Defendants knowingly, intentionally, and/or recklessly engaged in the aforementioned devices, schemes and artifices to defraud, made untrue statements of material facts and omitted to state material facts, and engaged in fraudulent acts, practices and courses of business. In engaging in such conduct, Defendants acted with scienter, that is, with an intent to deceive, manipulate or defraud or with a severely reckless disregard for the truth.

392.    By reason of the foregoing, Defendants, directly and indirectly, have violated and, unless enjoined, will continue to violate Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

393.    At time that Cognitive Code was about to be sold to HTC AND COMCAST, NUANCE DEFENDANTS, through their employees, executives, officers were in possession of material information regarding the tender offer, which Nuance Defendants knew or had reason to know was nonpublic, material, and knew or had reason to know was acquired directly or indirectly from an officer, director, partner, or employee or other person acting on behalf of the issuer.

394.    By reason of the foregoing, Defendants, directly and indirectly, acting with Scienter, have violated and unless enjoined will continue to violate Section 10(b) of the Securities Exchange Act and Rule 10b-5 thereunder [17 C.F.R. § 240.15].

395.    Loss Causation-Economic Loss. Defendants actions pursuant to the violation of this statutory section has been the proximate cause constituting loss causation and significant economic damages incurred by the Relator. Defendants presented a fraudulent picture that they would be handling sale of the company. Instead, Defendants took the opportunity for themselves and engaged in fraud upon Relator causing enormous damages.

## COUNT 21

## CIVIL CONSPIRACY

**(against Cognitive Code Defendants, employees, officers, agents, Rosen and Bourbeau)**

396.    Relator reincorporate by reference and re-allege the allegations of all previous paragraphs with the same effect as if fully set forth herein.

397.   Defendants and Conspirators owed Relator a duty. Defendants were well aware of that fiduciary duty, caused and intentional breach of that fiduciary duty and provided knowing and substantial assistance to Corporate Conspirators to the harm of Relator' rights.

398.   In such actions, the Defendants confederated and conspired with purpose, intent and effect of harming Relator and tortiously intefering with Relator's rights, activities, and prospective economic advantage. The Defendants took deliberate actions and continue to take deliberate actions in furtherance of their conspiracy.

399.   Each of the Defendants has now been acting as an agent for the other Defendants and each aided and abetted the actions of the other Defendants as well as the original Cognitive Code "Corporate Conspirators" named as Defendants in the pending actions, wherefore the Defendants are jointly and severally liable to the Relator.

400.   As a direct result and proximate result of such conspiracy, the Relator have suffered enormous damages and sustained significant economic losses.

## COUNT 22  - TORTIOUS INTERFERENCE WITH CONTRACTS, BUSINESS RELATIONSHIP AND PROSPECTIVE ECONOMIC ADVANTAGES
(Against Nuance Defendants, agents, employees and officers)

401.   Relator reincorporate by reference and re-allege the allegations of the previous paragraphs with the same effect as if fully set forth herein.

402.   The Relator have and continue to have a binding lawful contracts entitling him to federal securities and stock certificates which Defendants and their Corporate conspirators wantonly and illegally refuse to provide the Relator.

403.   Relator further has contractual rights and had and continues to have prospective economic advantages, including but not limited to the sale of the company to HTC or COMCAST or third

parties, which Defendants knew of and intentionally with said rights of Relator to their own benefit, thereby disrupting the lawful activities of Relator and his prospective economic advantage.

404.    As a direct and proximate result of such interference, Relator have suffered enormous damages and sustained losses.

405.    In such actions, Defendants confederated and conspired to tortiously interfere  with Relator rights with the purpose, intent, and effect of harming Relator.

406.    The Defendants acted willfully, wantonly and with reckless disregard for the Relator' rights and interests.

407.    Each of the Defendants was an agent for the other Defendants and each aided and abetted the actions of the other Defendants, wherefore, the Defendants are jointly and severally liable to Relator.


## COUNT 23

## COMMOM LAW FRAUD

## (against all defendants, except Northrop Grumman)

408.    Relator repeat and reallege each and every allegations contained above as if set forth fully herein and further alleges as follows.

409.    All of the misrepresentations and omissions detailed above were made with the intent to mislead Relator and with the specific intent to have Relator rely on said misrepresentations and omissions. At a minimum, the representations were made recklessly, without knowledge of their truth or falsity. Relator did rely thereon and made investments in the Cognitive Code Corporation Securities to their detriment resulting in substantial losses.

410.    Further, the Defendants Controlling Shareholders' misrepresentations and omissions constitute constructive fraud, which entails the use of a confidential or fiduciary relationship to take advantage of another.

411.    Defendants's wrongful conduct constitutes fraud and deceit, and was committed and perpetrated willfully, wantonly, and/or purposefully on Relator.

412.    Defendants represented to Relator that Cognitive Code would grant them seats on its Board of Directors, make them members of the Executive Management Team and to require

Relator approval and signature to any and all commercial agreements with third parties going forward.

413.    Defendants also represented to Relator at various times that commercial agreement negotiations were not taking place when in fact they were, that the terms and conditions of various commercial agreements that they eventually admitted to were of a certain quality or dollar amount when in fact they were materially different.

414.    Defendants made these representations to Relator with the intention of inducing them to support Cognitive Code, to provide professional services and business connections and otherwise work for its benefit.

415.    The representations were false or made with no present intention to honor them.

416.    The representations had their intended effect and caused and induced Relator to remain with and continue to provide services to Cognitive Code.

417.    Moreover, the Defendants attempted to defraud Relator throughout 2011 by promising them they would soon be rich if he would forfeit their non-dilution rights and their review, approve and signatory rights to all third party contracts.

418.    Outrageously, the fraud being perpetrated upon Relator is now being also joined by Bourbeau, his former partner and former attorney, Robert Rosen, who are aware of Relator and are now acting in complicity with Cognitive Code defendants.

419.    As a consequence of the Defendant Controlling Shareholders' Fraudulent Conduct, Relator have been injured for which they are entitled to recover damages from the Defendant Controlling Shareholders in an amount to be determined at trial.

420.    As a direct and proximate result, Relator have sustained and continue to suffer economic damages and sustained significant economic damages.


## COUNT 24

## STATUTORY CONVERSION

(against Cognitive Code Defendants, Nuance and Bourbeau)

421.    Relator repeat and reallege each and every allegations contained above as if set forth fully herein and further alleges as follows against named Defendants above.

422.    MCL 600.2919(a) states as follows:

(1)      A person damaged as a result of either or both of the following may recover 3 times the amount of actual damages sustained, plus costs and reasonable attorney fees:

(a)      Another person's stealing or embezzling property or converting property to the other person's own use...

(2)      The remedy provided by this section is in addition to any other right or remedy the person may have at law or otherwise.

423.      Defendants Spring, Defendant Mimi Chen, Defendant John Chen, Defendant Difazio, in conjunction with Nuance Defendants and Defendant Bourbeau, either acted as the principal tortfeasors who actively aided in the conversion, the taking and carrying away, of tangible financial instruments such as securities and other corporate assets claiming these corporate assets as their own all of which constitutes a conversion contrary to Relator's ownership and use without consent, justification or authorization.

424.      At no time did Relator consent or authorize one or more of the Defendants to unlawfully take and carry away, interfere with its strict ownership, control or dominion over the stocks or other corporate assets.

425.      The acts above constitute unlawful conversion of Relator' securities and other assets resulting in significant injury and damages to Relator.


# COUNT 25
# CONCERT OF ACTION
### (against all Cognitive Code and Nuance Defendants, employees, officers and agents)

426.      Relator repeat and reallege each and every allegations contained above as if set forth fully herein and further alleges as follows.

427.      At various and relevant times, several or all of the Defendants engaged in concerted activities described in previous paragraphs by express or implied agreements and concerted actions.

428.      The concerted activities engaged in by the Defendants as a result of their agreements were obvious, blatatant, and done with willful and malicious intent.

429.      Relator may not be able to identify all of the activities Defendants engaged in, but many of Defendants concerted activities were done with the malicious and specific intent to deprive Relator

of certain rights and privileges that they owned, namely securities rights, Board Seat, management rights, refusal to disclose material information, concerted activity to intentionally fabricate information with the hope Relator would rely on such lies, and they did, as such concerted activities in the form of material misrepresentations were damaging to Relator.

430. As a direct and proximate result of Defendants' concerted activities, Relator have sustained and will continue to sustain severe injury and damages as herein before described.

431. Due to the concert of action among all of the various Defendants, each is liable to Relator for injury and damages.

432. Defendants, jointly, severally and alternatively, are liable to Relator for all of their injuries and damages.


## COUNT 26
## CALIFORNIA STATUTE § 25502 - VIOLATION OF INSIDER TRADING ACT
**(Against Cognitive Code Defendants, employees, agents, officers and Nuance Defendants, employees, agents, and officers)**

433. Relator reallege all previous paragraphs as if fully set forth herein.

434. The Cognitive Code and Nuance Defendants led by their principal, through their officers, employees, agents in engaged in the wrongful misappropriation of material, non-public information in violation of California state insider trading provisions.

435. Pursuant to the California statute, as a result of unlawful insider trading activity, Relator and specifically Relator Cranbrook LLC, are entitled to treble damages as a result of the unlawful misconduct of the named defendants above.


## COUNT 27
## FRUSTRATION OF PURPOSE
**(Against Cognitive Code Defendants, employees, agents, and officers)**
**(Relator Claim for 20% of company)**

436. Relator incorporate the General Allegations _and_ all claims for relief herein by reference into this cause of action.

437.    Defendants entered into lawful agreements to provide financing to acquire 20% of Cognitive Code Corporation.

438.    Cognitive Code Defendants engaged in frustration of purpose Preventing Relator from performing when they did have access to the funds.

439.    As a direct  and proximate result of this wrongful activity to deny Relator rights, Relator have suffered substantial losses  and damages.


## COUNT 28

## (COLLUSION -  AGAINST ALL DEFENDANTS, EXCEPT NORTHROP GRUMMAN)

440.    Relator incorporate the General Allegations  and all claims for relief herein by reference into this cause of action.

441.    Defendants are the primary  and proximate cause of any  and all damages incurred by the Relator, as a result of the conspiracy, constructive fraud, malicious prosecution, defamation  and various other illegal actions taken  and/or perpetuated by named Defendnats and other co-conspirators, Relator incurred monumental losses  and damages.

442.     The Cognitive Code Defendants and Nuance Defendants entered into a deceitful agreement one with another in order to defraud  and gain an unfair advantage over Relator, while pretending to be independent of each other. Defendant collusively used the combined clout  and market dominance to intimidate  and terrorize Relator as well as others in order to fulfill there ulterior intents. Defendants continue to participate in a repeated pattern of illicit  and illegal activities with similar purposes, results, participants, victims, as well as methods that are not isolated events.

443.    And then Defendants Rosen and Defendant Bourbeau also engaged and are engaging in collusion against Relator.

444.    The defendants agreed or understood that the purpose of the actions were as described above,  and understood that both the purpose  and the methods of achieving those purposes were unlawful  and would result in injury to Relator. Defendants conduct was attended by circumstances of fraud, malice, and willful  and wanton conduct.


## COUNT  29

**(CONTRIBUTION/INDEMNIFICATION - AGAINST ALL DEFENDANTS)**

445.     Relator incorporate the General Allegations, all previous paragraphs  and all claims for relief herein by reference into this cause of action.

446.     Defendant is the primary  and proximate cause of any  and all damages incurred by the Relator, as a result of the conspiracy  and fraud perpetuated by Defendants  and there co-conspirators.

447.     The Relator is entitled to indemnification from Defendants, jointly and severally.

448.     The defendants understood that the purpose of their actions as described above,  and understood that both the purpose  and the methods of achieving those purposes were unlawful, reckless, deliberate and/or negligent  and would result in injury to Relator. Defendants conduct was attended by circumstances of fraud, malice,  and willful  and wanton conduct as well as gross negligence.

**COUNT 30**
**(Common Law Civil Conversion - Theft - Property, Securities)**
**(Against All Defendants, except Northrop Grumman)**

449.     Relator incorporate the previous paragraphs  and all claims for relief herein by reference into this cause of action.

450.     Defendants have repeatedly refused to return the stolen properties (securities) to Relator and to date have failed to turn over the property. As a result of Defendants willful  and wanton refusal and egregious misconduct, Relator have  and will continue to suffer significant and Exponential damages. Accordingly, Relator are entitled to damages for this wrongful conversion of his securities and property.

451.     The defendants agreed or understood that the purpose of there actions were as described above,  and understood that both the purpose  and the methods of achieving those purposes were unlawful  and would result in injury to Relator  and others. Defendants conduct was attended by circumstances of fraud, malice, and willful  and wanton conduct.

**COUNT 31**

(Abuse of Process)

(against All Defendants, except for Northrop Grumman)

452.     Relator incorporate the previous paragraphs and all claims for relief herein by reference into this cause of action.

453.     Defendants, by and through current pending actions and prior actions, are engaging in fraud upon Relator and fraud upon the court system to defraud Odish because he is an attorney who will not be a party to unlawful misconduct.

454.     Defendants are the primary  and proximate cause of any  and all damages incurred by the Relator, as a result of the ongoing abuses of process undertaken for ulterior purposes as well as to conceal various other illegal actions undertaken  and/or perpetuated by the Nuance Defendants and there co-conspirators, Relator have incurred monumental losses  and damages.

455.     The Cognitive Code and Nuance Defendants entered into a deceitful agreement one with another in order to defraud  and gain an unfair advantage over Relator, while pretending to be independent of each other. Defendants used the combined clout  and market dominance to intimidate  Relator as well as others in order to fulfill there ulterior intents. Defendants continue to participate in a repeated pattern of illicit  and illegal activities with similar purposes, results, participants, victims, as well as methods that are not isolated events.

456.     The defendants agreed or understood that the purpose of there actions were as described above,  and understood that both the purpose  and the methods of achieving those purposes were unlawful  and would result in injury to Relator  and others. Defendants conduct was attended by circumstances of fraud, malice, and willful  and wanton conduct.

## COUNT 32

(Intentional Infliction Of Emotional Distress)

(against all Defendants, except Northrop Grumman)

457.     Relator incorporate the General Allegations, all previous paragraphs and all claims for relief herein by reference into this cause of action.

458.     Defendants are the primary  and proximate cause of any  and all damages incurred by the Relator, as a result of the Intentional Infliction Of Emotional Distress as well as various other

illegal actions taken  and/or perpetuated by the Nuance Defendants  and the co-conspirators, Relator have incurred monumental losses and damages.

459.     The Defendants conspired on than executed a campaign of fraud  and misrepresentation with a clear intent to cause harm to Relator. Defendants willfully participated in  and/or supported the slanderous dissemination  and publication of damaging information as well as material facts that defendant knew were false or was aware that they did not know weather the information was true of false. These statements were neither innocent nor harmless. Defendants collusionaly bargained with their perceived honorable standing in the industry to unjustly portray Relator in a false light.

460.     The conduct of the defendants was extreme  and outrageous.

461.     Defendants acted recklessly and with the intent of causing Relator severe emotional distress.

462.     Defendants conduct did cause Relator severe emotional distress,  and did cause Relator to suffer injuries and damages, including: emotional anxiety, insomnia, depression, humiliation, tremendous stress, anxiety, panic attacks, heart pains, resulting in Relator Odish having to take medication to treat high cholesterol and last year started a prozac regime for the panic attacks.

463.     The defendants agreed or understood that the purpose of there actions were as described above,  and understood that both the purpose  and the methods of achieving those purposes were unlawful and would result in injury to Relator  and others. Defendants conduct was attended by circumstances of fraud, malice,  and willful  and wanton conduct.


## COUNT 33
### (Negligent Infliction Of Emotional Distress)
### (against all Defendants)

464.     Relator incorporate the General Allegations  and all claims for relief herein by reference into this cause of action.

465.     Defendants are the primary  and proximate cause of any  and all damages incurred by the Relator, as a result of the negligent infliction of emotional distress.

466.     Defendants conduct did cause Relator severe emotional distress,  and did cause Relator to suffer injuries  and damages, including: emotional anxiety, insomnia, depression, humiliation, post

traumatic stress syndrome, stress induced damage to heart, lungs and nervous system among others.

467. The defendants agreed or understood that the purpose of there actions were as described above, and understood that both the purpose and the methods of achieving those purposes were unlawful and would result in injury to Relator and others. Defendants conduct was attended by circumstances of fraud, malice, and willful and wanton conduct.

## STATE AND DISTRICT FALSE CLAIMS ACT COUNTS AND CAUSES OF ACTION.

**468.** The state statutory false claims act are set against Nuance Defendants, agents, employees, officers and co-conspirators such as Cognitive Code Defendants. As set forth below DEFENDANTS and co-conspirators transact business nationally and internationally and NUANCE sells in products and services in every state and in nearly every country and has unlawfully misappropriated and engaged in unlawful conduct, NUANCE is specifically targeting government and state agencies, hospitals, healthcare providers and aggressively marketing in areas of medicare and medicaid; aggressively pursuing federal funds in healthcare and therefore the bringing of this action on behalf of the States and the District is proper and necessary.

**469.** <u>TO AVOID CONFUSION, ALL OF THE STATE FALSE CLAIMS ACT ARE APPLIED AGAINST NUANCE DEFENDANT, ITS AGENTS, OFFICERS, AND EMPLOYEES, AND CO-CONSPIRATORS.</u>

## COUNT 34 - NEW YORK FALSE CLAIMS ACT N.Y. STATE FIN. § 189(1)(a) AND (b)

470. Relator repeats and incorporates by reference the allegations of all previous paragraphs as fully as though the same were set forth at length herein.

471. This is a claim for treble damages and penalties under the New York False Claims Act.

472. By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the New York State Government for payment or approval.

473.    By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the New York State Government to approve and pay such false and fraudulent claims.

474.    Each medical claim or invoice that was written as a result of Defendants' illegal marketing practices or unlawful activities represents a false or fraudulent record or statement. In addition, each claim for reimbursement for such medical claim s submitted to a state health insurance program represents a false or fraudulent claim for payment.

475.    The false or fraudulent claims were presented by numerous separate entities across New York and Relator has no control over or dealings with such entities and has limited access to the records in their possession.

476.    The New York State Government, unaware of the falsity of the records, statements and claims made, used, presented, or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for Defendants' illegal off-label marketing practices.

477.    By reason of the Defendants' acts, the State of New York has been damaged, and continues to be damaged, in substantial amounts to be determined at trial.

478.    The State of New York is entitled to the maximum penalty of $ 12,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendants.


## COUNT 35 - VIRGINIA FRAUD AGAINST TAXPAYERS ACT  VA. CODE ANN § 8.01-216.3(A)(1) AND (2)


479.    Relator repeats and incorporates by reference the allegations of all previous paragraphs as fully as though the same were set forth at length herein.

480.    This is a claim for treble damages and penalties under the Virginia Fraud Against Taxpayers Act.

481.    By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the Commonwealth of Virginia's Government for payment or approval.

482.    By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Commonwealth of Virginia's Government to approve and pay such false and fraudulent claims.

483.    Each medical claim  that was written as a result of Defendants' illegal marketing practices represents a false or fraudulent record or statement. In addition, each claim for reimbursement for such medical claim s submitted to a state health insurance program represents a false or fraudulent claim for payment.

484.    The false or fraudulent claims were presented by numerous separate entities across Virginia and Relator has no control over or dealings with such entities and has limited access to the records in their possession.


## COUNT 36 - DISTRICT OF COLUMBIA  FALSE CLAIMS ACT D.C. CODE ANN. § 2-308.14(a)(1) AND (2)

485.    Relator repeats and incorporates by reference the allegations of all previous paragraphs as fully as though the same were set forth at length herein.

486.    This is a claim for treble damages and penalties under the District of Columbia False Claims Act.

487.    By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the District of Columbia for payment or approval.

488.    By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the District of Columbia to approve and pay such false and fraudulent claims.

489.    Each medical claim  that was written as a result of Defendants' illegal marketing practices represents a false or fraudulent record or statement. In addition, each claim for reimbursement for such medical claim s submitted to a state health insurance program represents a false or fraudulent claim for payment.

490.    The false or fraudulent claims were presented by numerous separate entities across the District of Columbia and Relator has no control over or dealings with such entities and has limited access to the records in their possession.

491.   The District of Columbia, unaware of the falsity of the records, statements and claims made, used, presented, or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for Defendants' illegal off-label marketing practices.

492.   By reason of the Defendants' acts, the District of Columbia has been damaged, and continues to be damaged, in substantial amounts to be determined at trial.

493.   The District of Columbia is entitled to the maximum penalty of $ 10,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendants.

## COUNT 37 - CALIFORNIA  FALSE CLAIMS ACT CAL GOVT CODE § 12651(a)(1) AND (2)

494.   Relator repeat and incorporate by reference the allegations of all previous paragraphs as fully as though the same were set forth at length herein.

**495.**   This is a claim for treble damages and penalties under the California False Claims Act.

496.   By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the California State Government for payment or approval.

497.   By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the California State Government to approve and pay such false and fraudulent claims.

498.    Each medical claim, invoice or reimbursement  that was written as a result of Defendants' unlawful activities or illegal marketing practices represents a false or fraudulent record or statement. In addition, each claim for reimbursement for such medical claim s submitted to a state health insurance program represents a false or fraudulent claim for payment.

499.   The false or fraudulent claims were presented by numerous separate entities across California and Relator has no control over or dealings with such entities and has limited access to the records in their possession.

500.   The California State Government, unaware of the falsity of the records, statements and claims made, used, presented, or caused to be made, used or presented by Defendants, paid and

continues to pay the claims that would not be paid but for Defendants' illegal and unlawful practices.

501. By reason of the Defendants' acts, the State of California has been damaged, and continues to be damaged, in substantial amounts to be determined at trial.

502. The State of California is entitled to the maximum penalty of $ 10,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendants.

## COUNT 38 - DELAWARE FALSE CLAIMS AND REPORTING ACT 6 DEL C. § 1201(a)(1) AND (2)

503. Relator repeat and incorporate by reference the allegations of all previous paragraphs as fully as though the same were set forth at length herein.

504. This is a claim for treble damages and penalties under the Delaware False Claims And False Reporting Act.

505. By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the Delaware State Government for payment or approval.

506. By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Delaware State Government to approve and pay such false and fraudulent claims.

507. Each fraudulent claim that was written as a result of Defendants' illegal marketing practices and unlawful activities represents a false or fraudulent record or statement. In addition, each claim for reimbursement for such medical claims submitted to a state health insurance program represents a false or fraudulent claim for payment.

508. The false or fraudulent claims were presented by numerous separate entities across Delaware and Relator has no control over or dealings with such entities and has limited access to the records in their possession.

509. The Delaware State Government, unaware of the falsity of the records, statements and claims made, used, presented, or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for Defendants' illegal and unlawful misappropriation and theft and off-label marketing practices.

510.    By reason of the Defendants' acts, the State of Delaware has been damaged, and continues to be damaged, in substantial amounts to be determined at trial.

511.    The State of Delaware is entitled to the maximum penalty of $ 11,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendants.

## COUNT 39 - FLORIDA  FALSE CLAIMS ACT FL. STAT. ANN. § 68.082(2)(a) AND (b)

512.    Relator repeat and incorporate by reference the allegations of all previous paragraphs as fully as though the same were set forth at length herein.

513.    This is a claim for treble damages and penalties under the Florida False Claims Act.

514.    By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the Florida State Government for payment or approval.

515.    By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Florida State Government to approve and pay such false and fraudulent claims.

516.    Each medical claim  that was written as a result of Defendants' unlawful misappropriation and illegal marketing practices represents a false or fraudulent record or statement. Each claim for reimbursement for such medical claim s submitted to a state health insurance program represents a false or fraudulent claim for payment.

517.    The false or fraudulent claims were presented by numerous separate entities across Florida and Relator has no control over or dealings with such entities and has limited access to the records in their possession.

518.    The Florida State Government, unaware of the falsity of the records, statements and claims made, used, presented, or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for Defendants' illegal unlawful practices.

519.    By reason of the Defendants' acts, the State of Florida has been damaged, and continues to be damaged, in substantial amounts to be determined at trial.

520.    Additionally, the Florida State Government is entitled to the maximum civil penalty of $11,000 for each and every violation alleged herein.

## COUNT 40 - GEORGIA  FALSE MEDICAID CLAIMS ACT GA. CODE ANN. § 49-4-168.1(a)(1) AND (2)

521.    Relator repeat and incorporate by reference the allegations of all previous paragraphs as fully as though the same were set forth at length herein.

522.    This is a claim for treble damages and penalties under the Georgia False Medicaid Claims Act.

523.    By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the Georgia State Government for payment or approval.

524.    By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Georgia State Government to approve and pay such false and fraudulent claims.

525.    Each medical claim  that was written as a result of Defendants' unlawful acts and illegal marketing practices represents a false or fraudulent record or statement. In addition, each claim for reimbursement for such medical claim s submitted to a state health insurance program represents a false or fraudulent claim for payment.

526.    The false or fraudulent claims were presented by numerous separate entities across Georgia and Relator has no control over or dealings with such entities and has limited access to the records in their possession.

527.    The Georgia State Government, unaware of the falsity of the records, statements and claims made, used, presented, or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for Defendants' unlawful misappropriation and illegal off-label marketing practices.

528.    By reason of the Defendants' acts, the State of Georgia has been damaged, and continues to be damaged, in substantial amounts to be determined at trial.

529.    The State of Georgia is entitled to the maximum penalty of $ 11,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendants.

## COUNT 41 - HAWAII  FALSE CLAIMS ACT HAW. REV. STAT. § 661-21(a)(1) AND (2)

530.    Relator repeat and incorporate by reference the allegations of all previous paragraphs as fully as though the same were set forth at length herein.

531.    This is a claim for treble damages and penalties under the Hawaii False Claims Act.

532.    By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the Hawaii State Government for payment or approval.

533.    By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Hawaii State Government to approve and pay such false and fraudulent claims.

534.    Each medical claim  that was written as a result of Defendants' unlawful misappropriation and activities and illegal marketing practices represents a false or fraudulent record or statement. In addition, each claim for reimbursement for such medical claim s submitted to a state health insurance program represents a false or fraudulent claim for payment.

535.    The false or fraudulent claims were presented by numerous separate entities across Hawaii and Relator has no control over or dealings with such entities and has limited access to the records in their possession.

536.    The Hawaii State Government, unaware of the falsity of the records, statements and claims made, used, presented, or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for Defendants' unlawful theft of intellectual property and illegal off-label marketing practices.

537.    By reason of the Defendants' acts, the State of Hawaii has been damaged, and continues to be damaged, in substantial amounts to be determined at trial.

**538.**    The State of Hawaii is entitled to the maximum penalty of $ 10,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendants.

## COUNT 42 - ILLINOIS WHISTLEBLOWER REWARD AND PROTECTION  ACT 740 ILL.COMP. STAT. § 175/ 3(a)(1) AND (2)

539.    Relator repeats and incorporates by reference the allegations of all previous paragraphs as fully as though the same were set forth at length herein.

540.    This is a claim for treble damages and penalties under the Illinois Whistleblower Reward And Protection Act.

541.    By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the Illinois State Government for payment or approval.

542.    By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Illinois State Government to approve and pay such false and fraudulent claims.

543.    Each medical claim  that was written as a result of Defendants' illegal marketing practices represents a false or fraudulent record or statement. In addition, each claim for reimbursement for such medical claims submitted to a state health insurance program represents a false or fraudulent claim for payment.

544.    The false or fraudulent claims were presented by numerous separate entities across Illinois and Relator has no control over or dealings with such entities and has limited access to the records in their possession.

545.    The Illinois State Government, unaware of the falsity of the records, statements and claims made, used, presented, or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for Defendants' unlawful activities and illegal off-label marketing practices.

546.    By reason of the Defendants' acts, the State of Illinois has been damaged, and continues to be damaged, in substantial amounts to be determined at trial.

547.    The State of Illinois is entitled to the maximum penalty of $ 11,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendants.


## COUNT 43 - INDIANA  FALSE CLAIMS AND WHISTLEBLOWER PROTECTION ACT IND. CODE ANN. § 5-11-5.5-2(b)(1), (2) AND (8)

548.    Relator repeat and incorporate by reference the allegations of all previous paragraphs as fully as though the same were set forth at length herein.

549.    This is a claim for treble damages and penalties under the Indiana False Claims and Whistleblower Protection Act.

550.    By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the Indiana State Government for payment or approval.

551.    By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Indiana State Government to approve and pay such false and fraudulent claims.

552.    Each medical claim  that was written as a result of Defendants' illegal marketing practices represents a false or fraudulent record or statement. In addition, each claim for reimbursement for such medical claim s submitted to a state health insurance program represents a false or fraudulent claim for payment.

553.    The false or fraudulent claims were presented by numerous separate entities across Indiana and Relator has no control over or dealings with such entities and has limited access to the records in their possession.

554.    The Indiana State Government, unaware of the falsity of the records, statements and claims made, used, presented, or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for Defendants' unlawful activities and illegal off-label marketing practices.

555.    By reason of the Defendants' acts, the State of Indiana has been damaged, and continues to be damaged, in substantial amounts to be determined at trial.

556.    The State of Indiana is entitled to, at a minimum, the penalty of $ 5,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendants.


## COUNT 44 - LOUISIANA MEDICAL ASSISTANCE PROGRAMS INTEGRITY LAW LA REV. STAT. 46:438.3(A) AND (B)

557.    Relator repeat and incorporate by reference the allegations of all previous paragraphs as fully as though the same were set forth at length herein.

558.    This is a claim for damages and penalties under the Louisiana Medical Assistance Programs Integrity Law.

559.    By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the Louisiana State Government for payment or approval.

560.    By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Louisiana State Government to approve and pay such false and fraudulent claims.

561.    Each medical claim  that was written as a result of Defendants' unlawful and activities and illegal marketing practices represents a false or fraudulent record or statement. Each claim for reimbursement for such medical claim s submitted to a state health insurance program represents a false or fraudulent claim for payment.

562.    The false or fraudulent claims were presented by numerous separate entities across Louisiana and Relator have no control over or dealings with such entities and has limited access to the records in their possession.

563.    The Louisiana State Government, unaware of the falsity of the records, statements and claims made, used, presented, or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for Defendants' illegal off-label marketing practices.

564.    By reason of the Defendants' acts, the State of Louisiana has been damaged, and continues to be damaged, in substantial amounts to be determined at trial.

565.    The Louisiana State Government is entitled to the maximum civil penalty of $ 10,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendants.

## COUNT 45 - MASSACHUSETTS  FALSE CLAIMS LAW MASS. GEN. LAWS CH. 12 § 5B(1) AND (2)

566.    Relator repeat and incorporate by reference the allegations of all previous paragraphs as fully as though the same were set forth at length herein.

567.    This is a claim for treble damages and penalties under the Massachusetts False Claims Law.

568.    By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the Commonwealth of Massachusetts Government for payment or approval.

569.    By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the

Commonwealth of Massachusetts Government to approve and pay such false and fraudulent claims.

570.   Each medical claim  that was written as a result of Defendants' unlawful activities and illegal marketing practices represents a false or fraudulent record or statement. In addition, each claim for reimbursement for such medical claim s submitted to a state health insurance program represents a false or fraudulent claim for payment.

571.   The false or fraudulent claims were presented by numerous separate entities across Massachusetts and Relator has no control over or dealings with such entities and has limited access to the records in their possession. The Commonwealth of Massachusetts Government, unaware of the falsity of the records, statements and claims made, used, presented, or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for Defendants' illegal off-label marketing practices.

572.   By reason of the Defendants' acts, the Commonwealth of Massachusetts has been damaged, and continues to be damaged, in substantial amounts to be determined at trial.

573.   The Commonwealth of Massachusetts is entitled to the maximum penalty of $ 10,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendants.

## COUNT 46 - MONTANA  FALSE CLAIMS ACT MONT. CODE ANN. § 17-8-403(1)(a) AND (b)

574.   Relator repeat and incorporate by reference the allegations of all previous paragraphs as fully as though the same were set forth at length herein.

575.   This is a claim for treble damages and penalties under the Montana False Claims Act.

576.   By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the Montana State Government for payment or approval.

577.   By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Montana State Government to approve and pay such false and fraudulent claims.

578.   Each medical claim  that was written as a result of Defendants' unlawful activities and/or illegal marketing practices represents a false or fraudulent record or statement. In addition, each

claim for reimbursement for such medical claim s submitted to a state health insurance program represents a false or fraudulent claim for payment.

579.     The false or fraudulent claims were presented by numerous separate entities across Montana and Relator has no control over or dealings with such entities and has limited access to the records in their possession.

580.     The Montana State Government, unaware of the falsity of the records, statements and claims made, used, presented, or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for Defendants' unlawful activities and illegal off-label marketing practices.

581.     By reason of the Defendants' acts, the State of Montana has been damaged, and continues to be damaged, in substantial amounts to be determined at trial.

582.     The State of Montana is entitled to the maximum penalty of $ 10,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendants.

## COUNT 47- NEVADA  FALSE CLAIMS ACT NEV. REV. STAT. ANN. § 357.040(1)(a) AND (b)

583.     Relator repeat and incorporate by reference the allegations of all previous paragraphs as fully as though the same were set forth at length herein.

584.     This is a claim for treble damages and penalties under the Nevada False Claims Act.

585.     By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the Nevada State Government for payment or approval.

586.     By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Nevada State Government to approve and pay such false and fraudulent claims.

587.     Each medical claim  that was written as a result of Defendants' unlawful activities and illegal marketing practices represents a false or fraudulent record or statement. In addition, each claim for reimbursement for such medical claim s submitted to a state health insurance program represents a false or fraudulent claim for payment.

588.    The false or fraudulent claims were presented by numerous separate entities across Nevada and Relator has no control over or dealings with such entities and has limited access to the records in their possession.

589.    The Nevada State Government, unaware of the falsity of the records, statements and claims made, used, presented, or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for Defendants' illegal off-label marketing practices.

590.    By reason of the Defendants' acts, the State of Nevada has been damaged, and continues to be damaged, in substantial amounts to be determined at trial.

591.    The State of Nevada is entitled to the maximum penalty of $ 10,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendants.

## COUNT 48 - NEW HAMPSHIRE  FALSE CLAIMS ACTS N.H. REV. STAT. ANN. § 167.61-b(I)(a) AND (b)

592.    Relator repeat and incorporate by reference the allegations of all previous paragraphs as fully as though the same were set forth at length herein.

593.    This is a claim for treble damages and penalties under the New Hampshire False Claims Acts.

594.    By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the New Hampshire State Government for payment or approval.

595.    By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the New Hampshire State Government to approve and pay such false and fraudulent claims.

596.    Each medical claim  that was written as a result of Defendants' unlawful activities and illegal marketing practices represents a false or fraudulent record or statement. In addition, each claim for reimbursement for such medical claims submitted to a state health insurance program represents a false or fraudulent claim for payment.

597.     The false or fraudulent claims were presented by numerous separate entities across New Hampshire and Relator has no control over or dealings with such entities and has limited access to the records in their possession.

598.     The New Hampshire State Government, unaware of the falsity of the records, statements and claims made, used, presented, or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for Defendants' illegal off-label marketing practices.

599.     By reason of the Defendants' acts, the State of New Hampshire has been damaged, and continues to be damaged, in substantial amounts to be determined at trial.

600.     The State of New Hampshire is entitled to the maximum penalty of $ 10,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendants.

## COUNT 49 - NEW MEXICO MEDICAID  FALSE CLAIMS ACT N.M. STAT. ANN. § 27-14-4(A), (B) AND (C)

601.     Relator repeat and incorporate by reference the allegations of all previous paragraphs as fully as though the same were set forth at length herein.

602.     This is a claim for treble damages and penalties under the New Mexico Medicaid False Claims Act.

603.     By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the New Mexico State Government for payment or approval.

604.     By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the New Mexico State Government to approve and pay such false and fraudulent claims.

605.     Each medical claim  that was written as a result of Defendants' illegal marketing practices represents a false or fraudulent record or statement. In addition, each claim for reimbursement for such medical claim s submitted to a state health insurance program represents a false or fraudulent claim for payment.

606.     The false or fraudulent claims were presented by numerous separate entities across New Mexico and Relator has no control over or dealings with such entities and has limited access to the records in their possession.

607.     The New Mexico State Government, unaware of the falsity of the records, statements and claims made, used, presented, or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for Defendants' unlawful activities and/or illegal off-label marketing practices.

608.     By reason of the Defendants' acts, the State of New Mexico has been damaged, and continues to be damaged, in substantial amounts to be determined at trial.

609.     The State of New Mexico is entitled to three times the amount of damages the State sustained as a result of the Defendants' illegal and false or fraudulent acts.


## COUNT 50 - OKLAHOMA MEDICAID FALSE CLAIMS ACT OKLA. STAT. TIT. 63 § 5053.1B(1) AND (2)

610.     Relator repeat and incorporate by reference the allegations of all previous paragraphs as fully as though the same were set forth at length herein.

611.     This is a claim for treble damages and penalties under the Oklahoma Medicaid False Claims Act.

612.     By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the Oklahoma State Government for payment or approval.

613.     By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Oklahoma State Government to approve and pay such false and fraudulent claims.

614.     Each medical claim that was written as a result of Defendants' unlawful activities and/or illegal marketing practices represents a false or fraudulent record or statement. In addition, each claim for reimbursement for such medical claim s submitted to a state health insurance program represents a false or fraudulent claim for payment.

615.    The false or fraudulent claims were presented by numerous separate entities across Oklahoma and Relator has no control over or dealings with such entities and has limited access to the records in their possession.

616.    The Oklahoma State Government, unaware of the falsity of the records, statements and claims made, used, presented, or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for Defendants' illegal off-label marketing practices.

617.    By reason of the Defendants' acts, the State of Oklahoma has been damaged, and continues to be damaged, in substantial amounts to be determined at trial.

618.    The State of Oklahoma is entitled to the maximum penalty of $ 10,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendants.

## COUNT 51 - RHODE ISLAND  FALSE CLAIMS ACT R.I. GEN. LAWS § 9-1.1-3(a)(1) AND (2)

619.    Relator repeat and incorporate by reference the allegations of all previous paragraphs as fully as though the same were set forth at length herein.

620.    This is a claim for treble damages and penalties under the Rhode Island False Claims Act.

621.    By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the Rhode Island State Government for payment or approval.

622.    By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Rhode Island State Government to approve and pay such false and fraudulent claims.

623.    Each medical claim  that was written as a result of Defendants' unlawful activities and/or illegal marketing practices represents a false or fraudulent record or statement. In addition, each claim for reimbursement for such medical claim s submitted to a state health insurance program represents a false or fraudulent claim for payment.

624.    The false or fraudulent claims were presented by numerous separate entities across Rhode Island and Relator have no control over or dealings with such entities and has limited access to the records in their possession.

625.    The Rhode Island State Government, unaware of the falsity of the records, statements and claims made, used, presented, or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for Defendants' illegal activities and or off-label marketing practices.

626.    By reason of the Defendants' acts, the State of Rhode Island has been damaged, and continues to be damaged, in substantial amounts to be determined at trial.

627.    Additionally, the Rhode Island State Government is entitled to the maximum penalty of $ 10,000 for each and every violation alleged herein.

## COUNT 52 - TENNESSEE MEDICAID  FALSE CLAIMS ACT TENN. CODE ANN. § 71-5-182(a)(1)(A) AND (B)

628.    Relator repeat and incorporate by reference the allegations of all previous paragraphs as fully as though the same were set forth at length herein.

629.    By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the Tennessee State Government for payment or approval.

630.    By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Tennessee State Government to approve and pay such false and fraudulent claims.

631.    Each medical claim  that was written as a result of Defendants' unlawful activities and/or illegal marketing practices represents a false or fraudulent record or statement. In addition, each claim for reimbursement for such medical claims submitted to a state health insurance program represents a false or fraudulent claim for payment.

632.    The false or fraudulent claims were presented by numerous separate entities across Tennessee and Relator has no control over or dealings with such entities and has limited access to the records in their possession.

633.    The Tennessee State Government, unaware of the falsity of the records, statements and claims made, used, presented, or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for Defendants' unlawful activities and illegal off-label marketing practices.

634.    By reason of the Defendants' acts, the State of Tennessee has been damaged, and continues to be damaged, in substantial amounts to be determined at trial.

635.    The State of Tennessee is entitled to the maximum penalty of $ 25,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendants.

## COUNT 53 - TEXAS MEDICAID FRAUD PREVENTION LAW TEX. HUM. RES. CODE ANN. § 36.002(1), (2) AND (13)

636.    Relator repeat and incorporate by reference the allegations of all previous paragraphs as fully as though the same were set forth at length herein.

637.    This is a claim for treble damages and penalties under the Texas Medicaid Fraud Prevention Law.

638.    By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the Texas State Government for payment or approval.

639.    By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Texas State Government to approve and pay such false and fraudulent claims.

640.    Each medical claim  that was written as a result of Defendants' unlawful activities and/or illegal marketing practices represents a false or fraudulent record or statement. In addition, each claim for reimbursement for such prescriptions or services submitted to a state health insurance program represents a false or fraudulent claim for payment.

641.    The false or fraudulent claims were presented by numerous separate entities across Texas and Relator have no control over or dealings with such entities and has limited access to the records in their possession.

642.    The Texas State Government, unaware of the falsity of the records, statements and claims made, used, presented, or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for Defendants' illegal practices.

643.    By reason of the Defendants' acts, the State of Texas has been damaged, and continues to be damaged, in substantial amounts to be determined at trial.

644.    The State of Texas is entitled to the maximum penalty of $ 10,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendants.

## COUNT 54 - WISCONSIN  FALSE CLAIMS FOR MEDICAL ASSISTANCE ACT WIS. STAT. § 20.931(2)(a) AND (b)

645.    Relator repeat and incorporate by reference the allegations of all previous paragraphs as fully as though the same were set forth at length herein.

646.    This is a claim for treble damages and penalties under the Wisconsin Fraud Against Taxpayers Act.

647.    By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the Wisconsin State Government for payment or approval.

648.    By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Wisconsin State Government to approve and pay such false and fraudulent claims.

649.    Each medical claim  that was written as a result of Defendants' illegal practices represents a false or fraudulent record or statement. In addition, each claim for reimbursement for such medical claim s submitted to a state health insurance program represents a false or fraudulent claim for payment.

650.    The false or fraudulent claims were presented by numerous separate entities across Wisconsin and Relator have no control over or dealings with such entities and has limited access to the records in their possession.

651.    The Wisconsin State Government, unaware of the falsity of the records, statements and claims made, used, presented, or caused to be made, used or presented by Defendants, paid and

continues to pay the claims that would not [*159] be paid but for Defendants' illegal off-label marketing practices.

652.     By reason of the Defendants' acts, the State of Wisconsin has been damaged, and continues to be damaged, in substantial amounts to be determined at trial.

653.     Additionally, the Wisconsin State Government is entitled to the maximum penalty of $10,000 for each and every violation alleged herein.

## COUNT 55 - CONNECTICUT FALSE CLAIMS ACT SEPTEMBER SPECIAL SESSION, PUBLIC ACT No. 09-5 § 2(a)1 and 2

654.     Relator repeat and incorporate by reference the allegations of all previous paragraphs as fully as though the same were set forth at length herein.

655.     This is a claim for treble damages and penalties under the Connecticut False Claims Act.

656.     By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the Connecticut State Government for payment or approval.

657.     By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Connecticut State Government to approve and pay such false and fraudulent claims.

658.     Each medical claim  that was written as a result of Defendants' illegal practices, theft and/or illegal inducements represents a false or fraudulent record or statement. Each claim for reimbursement for such prescriptions or medical claims, invoices submitted to a state health insurance program represents a false or fraudulent claim for payment.

659.     The false or fraudulent claims were presented by numerous separate entities across Connecticut and Relator have no control over or dealings with such entities and has limited access to the records in their possession.

660.     The Connecticut State Government, unaware of the falsity of the records, statements and claims made, used, presented, or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for Defendants' illegal practices and/or illegal inducements.

661. By reason of the Defendants' acts, the State of Connecticut has been damaged, and continues to be damaged, in substantial amounts to be determined at trial.

662. Additionally, the Connecticut State Government is entitled to the maximum civil penalty of $ 10,000 for each and every violation alleged herein.

## COUNT 56 - NORTH CAROLINA  FALSE CLAIMS ACT NC GEN. STAT. § 1-607(a)(1) AND (2)

663. Relator repeat and incorporate by reference the allegations of all previous paragraphs as fully as though the same were set forth at length herein.

664. This is a claim for treble damages and penalties under the North Carolina False Claims Act.

665. By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the North Carolina State Government for payment or approval.

666. By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the North Carolina State Government to approve and pay such false and fraudulent claims.

667. Each claim or invoice that was written as a result of Defendants' illegal practices and/or illegal inducements represents a false or fraudulent record or statement. Each claim for reimbursement for such medicare/medical claims submitted to a state health insurance program represents a false or fraudulent claim for payment.

668. The false or fraudulent claims were presented by numerous separate entities across North Carolina and Relator has no control over or dealings with such entities and has limited access to the records in their possession.

669. The North Carolina State Government, unaware of the falsity of the records, statements and claims made, used, presented, or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for Defendants' unlawful misconduct illegal off-label marketing practices and/or illegal inducements.

670. By reason of the Defendants' acts, the State of North Carolina has been damaged, and continues to be damaged, in substantial amounts to be determined at trial.

671.    Additionally, the North Carolina State Government is entitled to the maximum civil penalty of $ 11,000 for each and every violation alleged herein.

## COUNT  57 - MICHIGAN MEDICAID  FALSE CLAIMS ACT MICH. COMP. LAWS. § 400.603 AND 607

672.    Relator repeat and incorporate by reference the allegations of all previous paragraphs as fully as though the same were set forth at length herein.

673.    This is a claim for treble damages and penalties under the Michigan Medicaid False Claims Act. By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the Michigan State Government for payment or approval.

674.    By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Michigan State Government to approve and pay such false and fraudulent claims.

675.    Each medical claim  that was written as a result of Defendants' unlawful misconduct, illegal marketing practices represents a false or fraudulent record or statement. In addition, each claim for reimbursement for such medical claim s submitted to a state health insurance program represents a false or fraudulent claim for payment.

676.     The false or fraudulent claims were presented by numerous separate entities across Michigan and Relator have no control over or dealings with such entities and has limited access to the records in their possession. The Michigan State Government, unaware of the falsity of the records, statements and claims made, used, presented, or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for Defendants' illegal practices. By reason of the Defendants' acts, the State of Michigan has been damaged, and continues to be damaged, in substantial amounts to be determined at trial.

677.    The State of Michigan is entitled to the maximum penalty of $ 10,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendants.

## COUNT 58 - NEW JERSEY  FALSE CLAIMS ACT N.J. STAT. § 2A:32C-3(a) AND (b)

678.   Relator repeat and incorporate by reference the allegations of all previous paragraphs as fully as though the same were set forth at length herein.

679.   This is a claim for treble damages and penalties under the New Jersey False Claims Act.

680.   By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the New Jersey State Government for payment or approval.

681.   By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the New Jersey State Government to approve and pay such false and fraudulent claims.

682.   Each medical claim  that was written as a result of Defendants' illegal practices represents a false or fraudulent record or statement. In addition, each claim for reimbursement for such medical claim s submitted to a state health insurance program represents a false or fraudulent claim for payment.

683.   The false or fraudulent claims were presented by numerous separate entities across New Jersey and Relator has no control over or dealings with such entities and has limited access to the records in their possession.

684.   The New Jersey State Government, unaware of the falsity of the records, statements and claims made, used, presented, or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for Defendants' illegal practices.

685.   By reason of the Defendants' acts, the State of New Jersey has been damaged, and continues to be damaged, in substantial amounts to be determined at trial.

686.   Additionally, the New Jersey State Government is entitled to the maximum penalty of $ 10,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendants.


**PRAYER FOR RELIEF**


**WHEREFORE**, Relator prays that judgment be entered against Defendants, jointly and severally and/or there agents, employees, officers, related affiliates as follows:

a. that Defendants cease and desist from violating  31 U.S.C. § 3729 et seq, and the equivalent provisions of the State statutes set forth above;

b. that this Court enter judgment against Defendants in an amount equal to three times the amount of damages the United States has sustained because of Defendants' actions, plus a civil penalty of not less than $ 5,500 and not more than $ 11,000 for each violation of  31 U.S.C. § 3729 et seq;

c. award Relator the maximum allowed pursuant to 3730(d) of the Federal False Claims Act and state (and District) false claims act;

d. reinstate Relator in his and their position and make Relator whole for civil damages, and any all other damages from flowing wrongful misconduct of defendants, including but not limited retaliatory discharge.

e. award Relator and the United States liquidated damages, compensatory damages, special damages and punitive damages in a combined amount to be determined at trial but in no event no less than $400,000,000.00 (and likely at least $700,000,000.00 - the stated amount(s) that the company was worth by Defendant Spring on multiple occasions in early January 2012 when company was acquisition target before they engaged in fraudulent conduct - see *Lynch v. Vickers case* regarding target valuation statements by corporate managers being relevant for valuation purposes) Defendants wrongful misconduct pursuant to this unlawful misconduct in order to address the damages and deter this type of conduct.

f. award Relator and United States all costs of this action, including attorneys fees and expenses.

g. issue and grant a temporary restraining and permanent injunctive relief against Defendants and co-conspirators to immediately enjoin them from continuing to violate the federal and state statutes.

h. award Relator any and all damages related to their civil claims to make them whole under statute, common law and equity.

i. that Relator be awarded the maximum amount allowed pursuant to the federal False Claims Act 31 U.S.C. § 3730(d), and the equivalent provisions of the state statutes set forth above;

j. that Relator be awarded all costs of this action, including attorneys' fees and expenses; and

k. that Relator have such other and further relief that this Court deems just and proper.


## JURY DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Relator hereby demand trial by jury as to all issues so triable.

DATED: MARCH 4th, 2014

/s/ Joseph G. Odish
ODISH & ASSOCIATES, PLLC
J. G. ODISH (P53629)
Attorney for Relator-Plaintiff
39341 Fulton Ct, Ste. 100
Farmington Hills, MI 48331
Tel: 310-345-2802
Fax: 313-344-7555
Email: josephodish@gmail.com